**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION**

| | |
|---|---|
| ADAM P. FAUST, *et al.*, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Civil Action No. 21-cv-548-WCG |
| ) | |
| THOMAS J. VILSACK, in his official ca- ) | |
| pacity as Secretary of Agriculture, *et al.*, ) | |
| ) | |
| *Defendants*. ) | |
| ) | |
| ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER**

In the midst of a global pandemic, Congress passed Section 1005 of the American Rescue

Plan Act (ARPA) to alleviate the debt of certain socially disadvantaged farmers at a time of acute

need. Congress did so based on strong evidence that socially disadvantaged farmers had been

subject to decades of discrimination in U.S. Department of Agriculture (USDA) programs, such

that when COVID-19 hit, they sat on the brink of foreclosure at higher rates than white farmers,

and reporting that, despite those farmers' urgent need for relief, the vast majority of recent agri-

cultural subsidies and pandemic relief did not reach socially disadvantaged farmers. Plaintiffs, a

group of twelve farmers, who do not allege that they have been subject to USDA discrimination

or left out of prior funding, have filed a motion seeking the immediate cessation of the program to

prevent even one payment to a socially disadvantaged farmer, arguing that it is unconstitutional

for Congress to provide such targeted assistance. Plaintiffs' motion should be denied.

1

The Supreme Court has recognized that the Government can use race-conscious measures where, as here, it concludes that groups of individuals have been subject to discrimination in government programs based on race and that government funding is perpetuating the effects of that discrimination along racial lines. Plaintiffs emphasize that COVID-19 did not discriminate on the basis of race, but impacted all farmers. But Congress relied on evidence to conclude that COVID-19 did not impact all farmers equally—it hit minority farmers the hardest. Compounding this, Congress also concluded that prior, race-neutral pandemic relief did not reach all farmers equally. In these circumstances, it is not unlawful for Congress to attempt to remedy harms resulting from this inequitable treatment and funding disparity by providing targeted relief to farmers who it determined were most in need of it and yet, largely did not receive it.

And it is certainly not a situation that warrants an immediate injunction. Plaintiffs' disagreement with the Government's distribution of funding to minority farmers is not a legally cognizable injury sufficient to establish standing—much less an irreparable one sufficient to warrant a temporary restraining order—where the majority of Plaintiffs do not even allege that they would seek debt payments and at times even disclaim wanting such relief. And to the extent any of the Plaintiffs do indicate that they want debt payments, their emergency motion should be denied for the simple reason that there is no immediate urgency to their request. Congress did not provide a finite sum for debt relief; rather, it expressly appropriated "such sums as may be necessary" to pay off certain direct or guaranteed USDA farm loans held by eligible farmers. Thus, even if this Court were later to conclude that there were some legal defect (constitutional or otherwise) in the criteria employed by USDA to determine eligibility for debt relief, the Court could fashion an appropriate remedy at that juncture, without any risk of statutory funds having been depleted in the meantime. Indeed, even aside from the fact that there is no statutory funding cap, any harm to Plaintiffs'

2

ability to obtain debt relief is not imminent, where USDA is just beginning to identify eligible borrowers and implement only part of the program.

Moreover, any harm Plaintiffs could possibly suffer in the absence of an injunction is decisively outweighed by the harm that would be wrought to the public interest if the Court granted Plaintiffs' request. Congress reasonably determined that minority farmers are in need of timely debt relief after decades of USDA discrimination and in the midst of a pandemic that disproportionately affected them, and that relief is just starting to be distributed. The views of twelve Plaintiffs, some of whom disclaim wanting any such relief themselves, should not be permitted to override Congress's determination and halt the distribution of payments to fellow Americans in need.

## BACKGROUND

Defendants have detailed the background of this case in a previous brief filed in another lawsuit challenging Section 1005 of ARPA. For purposes of this opposition to Plaintiffs' motion for a temporary restraining order (TRO), Defendants briefly summarize that background below and respectfully refer the Court to that filing for more detail. *See* Defs.' Resp. in Opp'n to Plaintiff's Mot. for Prelim. Inj., Background (BG), *Wynn v. Vilsack*, No. 21-514 (M.D. Fla.), ECF No. 22 (filed June 4, 2021). A copy of this brief is attached as Exhibit A.

### I.    Discrimination Against Minority Farmers In USDA's Loan Programs, Its Lingering Effects, And Congress's Attempts To Remedy It

As explained more fully in the Government's brief in *Wynn*, the Farm Service Agency (FSA) provides direct and guaranteed loans to farmers and ranchers[1] who would otherwise be unable to obtain them from private lenders at reasonable rates and terms. *See* Ex. A, § BG I; 7 USC § 6932(b). Those loans assist farmers with buying or improving farm property, *id.* § 764.151,

---

[1] For ease of reference, throughout this brief, Defendants use "farmers" to include "farmers and ranchers."

3

provide credit and management assistance to help farmers run their farms, *id.* § 764.251, or help farmers resume operations after a disaster, *id.* § 764.351.  *See* Ex. A, § BG I; 7 USC §§ 1923, 1942, 1963.

Although USDA's goal is to support all farmers equitably, it is "no secret" that its loan programs administered by FSA have historically been infected by discrimination against minority farmers.[2] Ex. A at 27; *see id.* § BG II.  That unfortunate history is longstanding and well documented in numerous investigations and reports, testimony before Congress, and civil rights complaints and lawsuits by minority farmers against USDA spanning the past several decades.  *See* Ex. A, § BG II.  Congress has recognized this unfortunate history and has repeatedly attempted to remedy this discrimination and its lingering effects by race-neutral means.  *See id.* § BG III.  Through prior legislation, Congress modified who at USDA can make loan determinations and how, allocated funds to settle discrimination claims against USDA, permanently funded a program to increase USDA outreach to minority farmers, and created an entire civil rights office at USDA. *See id.*

Despite these efforts, Congress found that minority farmers continued to suffer the effects of discrimination in USDA programs, in particular its loan programs.  *See id.*  Congress also found that, due to the lingering effects of the longstanding discrimination in USDA programs against minority farmers, those farmers were in a far more precarious financial situation than non-minority farmers before COVID–19 hit.  *See id.*  Despite the particularly vulnerable position of minority

---

[2] As explained below, USDA defines "socially disadvantaged farmers and ranchers" (SDFRs) to include certain racial and ethnics minorities; herein, Defendants refer to SDFRs and minority farmers interchangeably.

farmers, lawmakers cited evidence that the overwhelming majority of recent, race-neutral agricultural subsidies and pandemic relief prior to ARPA did not reach minority farmers—again, in part due to the lingering effects of discrimination. *See id.*

## II.    The Enactment Of Section 1005 And Provision Of Debt Payments To Socially Disadvantaged Farmers And Ranchers

To address inequities in USDA's farm loan programs and unbalanced distribution of funding, Congress enacted Section 1005 of ARPA. *See* Pub. L. No. 117-2, § 1005 (March 21, 2021). Section 1005 appropriates "such sums as may be necessary" to pay up to 120 percent of certain direct or guaranteed USDA farm loans held by a "socially disadvantaged farmer or rancher" and outstanding as of January 1, 2021.[3] *Id.* § 1005(a)(1)-(2). For purposes of Section 1005, Congress gave the term "socially disadvantaged farmer or rancher" the same meaning as in Section 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990, codified at 7 USC § 2279(a). *See id.* § 1005(b)(3). That provision defines a "socially disadvantaged farmer or rancher" as "a farmer or rancher who is a member of a socially disadvantaged group," 7 USC 2279(a)(5), which is further defined as "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities," *id.* § 2279(a)(6).

USDA has long interpreted "socially disadvantaged group[s]" under 7 USC § 2279 to include, at a minimum, the following five groups: American Indians or Alaskan Natives; Asians; Blacks or African Americans; Hispanics or Latinos; and Native Hawaiians or other Pacific Islanders. *See* 66 FR 21617 (Apr. 30, 2001) (interpreting 7 USC § 2279 to include those groups for

---

[3] Congress provided 20% over and above outstanding loan balances because State taxes eroded previous settlement payments to minority farmers. *See* 167 Cong. Rec. S1264 (Mar. 5, 2021) (Stabenow); David Zucchino, *Sowing Hope, Harvesting Bitterness*, LA Times (Mar. 23, 2012), https://perma.cc/V8TZ-C6RZ; *see also* USDA, ARPA Fact Sheet 2 (May 2021), https://perma.cc/KEV8-PYZK (explaining that the additional 20% "may be used for tax liabilities and other fees associated with payment of the debt").

purposes of Outreach and Assistance for SDFRs Program); 74 FR 31571 (July 2, 2009) (same for Conservation Reserve Program); 75 FR 27615 (May 14, 2010) (same for Risk Management Purchase Waiver). USDA confirmed in a Notice of Funds Availability published in the Federal Register on May 26, 2021 (NOFA), that SDGs would continue to "include, but are not limited to," those same five groups. USDA also announced in that Notice that other groups could be considered for inclusion on a case-by-case basis by the Secretary in response to a written request. *See* NOFA.[4]

USDA will implement Section 1005 in stages, with the majority of eligible loans being paid off in the coming months. Two separate NOFAs, including the first NOFA issued on May 26, 2021, will address the different types of loans eligible for ARPA payments and the distribution processes applicable to each. That first NOFA deals with all direct loans, except those that "no longer have collateral and have been previously referred to the Department of Treasury for debt collection for offset." NOFA; *see also* Declaration of William D. Cobb ("Cobb Decl."), attached hereto as Exhibit B, ¶ 10. The second NOFA, which USDA expects to publish by September 23, 2021, will address that narrow category of direct loans referred to Treasury, as well as qualifying guaranteed loans. *See* Cobb Decl. ¶ 11. USDA estimates that the loans covered by the first NOFA comprise roughly 88% of the total ARPA-eligible payments that will be made to eligible accounts once Section 1005 is fully implemented. *Id.* ¶ 25.

USDA is in the process of identifying and notifying individuals eligible to receive debt payments under the first NOFA and distributing those funds. As the NOFA explained, USDA is aiming to send those offer notices to eligible recipients of ARPA payments by July 10, 2019. *See* NOFA; Cobb Decl. ¶ 14. A subset of those loans, requiring reversals of loan payments made after

---

[4] *Available at* https://perma.cc/A35E-UANV.

6

January 1, 2021, will take longer, or up to nine weeks to complete. *See* Cobb Decl. ¶¶ 22-24, 32,

35. To date, FSA has identified 15,602 eligible recipients covered by the first NOFA. *Id.* ¶¶ 22,

24, 37. "FSA anticipates beginning to process and mail offer letters for 8,580" accounts held by

eligible recipients on June 9, 2021. *Id.* ¶ 32. FSA expects to begin sending letters to the eligible

recipients on the remaining 6,836 identified accounts covered by the first NOFA on a rolling basis

starting on June 14, 2021. *Id.* at 35.[5]

### III.    Procedural History

On April 29, 2021, Plaintiffs filed suit to challenge the USDA's implementation of Section

1005. *See* Compl., ECF No. 1.[6] Plaintiffs allege that they hold loans with USDA and would

otherwise qualify for loan forgiveness under Section 1005 "except that [they are] white." Am.

Compl. ¶ 8; *see also id.* ¶¶ 8-17. They claim that USDA's interpretation of "socially disadvantaged

farmer or rancher" in Section 1005 to include farmers and ranchers who identify as "Black/African

American, American Indian or Alaskan native, Hispanic or Latino, or Asian American or Pacific

Islander," *id.* ¶ 44, "violate[s] the Equal Protection guarantee in the United States Constitution,"

*id.* ¶ 48.

On June 3, 2021, Plaintiffs filed a motion for a TRO, "to last until this Court rules on

Plaintiffs' motion for a preliminary injunction, prohibiting Defendants from forgiving any loans

pursuant to … Section 1005 …, *unless* Defendants begin administering the program without regard

to the race or ethnicity of the indebted farmer or rancher," ECF No. 12, as well as a motion for a

---

[5] As the Cobb Declaration explains, these 6,836 accounts will take longer to process because the eligible account-holders made payments on their eligible loans after January 1, 2021, and FSA must reverse those payments to establish an accurate outstanding indebtedness before offering a specific payment amount to such recipients. *Id.* ¶ 23.

[6] Plaintiffs filed an amended complaint on May 19, 2021, adding additional plaintiffs among other things. *See* Am. Compl., ECF No. 7.

preliminary injunction, ECF No. 13. On June 4, 2021, this Court held a hearing on Plaintiffs'

motion for a TRO. During the hearing, Plaintiffs' counsel took the position that one payment to a

minority farmer under Section 1005 would constitute irreparable harm to Plaintiffs' interests. At

the close of the hearing, the Court permitted Defendants to file a response to Plaintiffs' motion for

a preliminary injunction by June 18, 2021, and a response to Plaintiffs' motion for a TRO by June

8, 2021.

## ARGUMENT

### I.    Plaintiffs Have Not Satisfied Any Of The Requirements For The Extraordinary Relief They Seek.

A TRO is an "extraordinary and drastic remed[y] that should not be granted unless the

movant, '*by a clear showing*, carries the burden of persuasion.'" *Elim Romanian Pentecostal

Church v. Pritzker*, 2020 WL 2468194, at *2 (N.D. Ill. May 13, 2020), *aff'd*, 962 F.3d 341 (7th

Cir. 2020), *cert. denied*, 2021 WL 1163867 (U.S. Mar. 29, 2021) (quoting *Mazurek v. Armstrong*,

520 U.S. 968, 972 (1997)).[7]  As with a motion for preliminary injunction, a plaintiff seeking a

TRO must show "(1) some likelihood of succeeding on the merits, and (2) that it has no adequate

remedy at law and will suffer irreparable harm if preliminary relief is denied." *Cassell v. Snyders*,

990 F.3d 539, 544–45 (7th Cir. 2021).  "If these threshold factors are met," the court then proceeds

to balance the harm to the moving party if relief is denied against "(3) the irreparable harm the

non-moving party will suffer if preliminary relief is granted" and "(4) the public interest, meaning

the consequences of granting or denying the injunction to non-parties." *Id.* at 545. The latter two

factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435

(2009).  Plaintiffs fail to carry their burden here.

---

[7] Hereinafter, all internal alterations, citations, omissions, quotations, and subsequent history are
omitted unless otherwise indicated.

### A. Plaintiffs Have Not Shown Irreparable Harm.

"A sine qua non for [preliminary] relief is proof of irreparable harm if the injunction is denied." *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 553 (7th Cir. 2014). "For if the harm can be fully repaired in the final judgment, there is no reason to hurry the adjudicative process." *Id.* at 554. Thus, even where a plaintiff can establish a substantial likelihood of success on the merits—and Plaintiffs cannot, *see infra* Arg. I.B—preliminary relief is inappropriate without a showing of irreparable harm, *see Meek v. Archibald & Meek, Inc.*, 2021 WL 2036535, at *4 (N.D. Ill. May 21, 2021) ("Lack of irreparable harm is a sufficient basis to deny a plaintiff's request for a preliminary injunction."). Plaintiffs cannot make that showing.

Here, Plaintiffs contend that an "equal protection violation itself is an irreparable harm that warrants an injunction." Pls.' Mem. in Supp. of Mots. For TRO and Prelim. Inj. ("Pls.' Mem.") 23. That is incorrect. The logic of Plaintiffs' position would mean that in any case alleging an equal protection violation, a plaintiff would be able to make the irreparable harm showing necessary to warrant emergency relief. That is wholly inconsistent with the high bar that the courts have set for such a drastic remedy, and it is not supported—even by the sources Plaintiffs cite.

In support of their contention, Plaintiffs rely on the proposition that "when a 'deprivation of a constitutional right is involved … most courts hold that no further showing of irreparable injury is necessary.'" Pls.' Mem. 23 (quoting Wright & Miller, 11A Fed. Prac. & Proc. § 2948.1 (3d. ed.). But as Plaintiffs' source notes, most courts so hold only in certain contexts, such as when "the right to free speech or freedom of religion" is involved. Wright & Miller, 11A Fed. Prac. & Proc. § 2948.1. Thus, as Plaintiffs later acknowledge, the Seventh Circuit, like most other courts, "has held that irreparable harm is presumed" only in cases involving First and Second Amendment rights and rights of privacy. Pls.' Mem. 25; *see, e.g., Ezell v. City of Chicago*, 651

9

F.3d 684, 699 (7th Cir. 2011) (explaining that "for *some* kinds of constitutional violations, irreparable harm is presumed," and citing allegations of irremediable First and Second Amendment rights as examples) (emphasis added)); *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1018 (7th Cir. 1990) (explaining that Seventh Circuit has interpreted case finding irreparable harm due to loss of First Amendment freedoms "as limited to first amendment cases"). Thus, where Plaintiffs' claims do not implicate First or Second Amendment rights or rights to privacy, their alleged constitutional violation is not sufficient in and of itself to establish irreparable harm. *Ditton v. Rusch*, No. 14 C 3260, 2014 WL 4435928, at *5 (N.D. Ill. Sept. 9, 2014) ("[I]njury to constitutional rights does not *a priori* entitle a party to a finding of irreparable harm.") (holding as much even in a First Amendment context) (citing *Hohe v. Casey,* 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction.")).

This conclusion is evidenced by the fact that Plaintiffs cannot cite one case in the Seventh Circuit to support their overbroad proposition that every alleged deprivation of equal protection is *per se* sufficient to establish irreparable harm. Instead, they rely on out-of-context statements taken from out-of-circuit cases for the proposition that "multiple federal courts … have held that irreparable injury is presumed when the government discriminates on the basis of race." Pls.' Mem. 24 (citing cases). But even then, Plaintiffs' position is not supported by the case law. For instance, Plaintiffs cite an Eleventh Circuit case from 1984, *see id.* (citing *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984)), but the Eleventh Circuit explicitly rejected Plaintiffs' position six years later in a lawsuit challenging a set-aside for minority owned businesses, *see Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285–86 (11th Cir. 1990) ("The district court found that 'a continuation of the MBE

10

programs [would] result in an on-going violation of Plaintiffs' constitutional rights [which] ... by itself, is sufficient to show irreparable injury to the Plaintiffs.' … This is incorrect."). It explained that, as with the Seventh Circuit, "[t]he only area of constitutional jurisprudence where we have said that an on-going violation constitutes irreparable injury is the area of first amendment and right of privacy jurisprudence." *Id.* The plaintiffs in *Wynn* (as noted, a case raising a substantially similar equal protection challenge to Section 1005) thus conceded that "[t]he Eleventh Circuit held several decades ago that an equal protection injury does not in and of itself constitute irreparable harm." Pls.' Mem. 22 n.17, *Wynn v. Vilsack*, No. 21-514, ECF No. 11 (citing *Ne. Fla. Chapter*, 896 F.2d at 1285–86).

Other cases Plaintiffs rely on are equally unhelpful to their position. Four of the cases Plaintiffs cite were not in a preliminary posture. The courts thus did not "presume[]" irreparable injury for purposes of a preliminary injunction based on allegations of racial discrimination, as Plaintiffs suggest, Pls.' Mem. 24; rather, they found the requisite injury for purposes of permanent injunctions after extensive proceedings and final determinations on the merits. *See San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 59 F. Supp. 2d 1021, 1025 (N.D. Cal. 1999); *Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan*, 543 F. Supp. 198 (S.D. Tex. 1982); *Small v. Hudson*, 322 F. Supp. 519, 528–29 (M.D. Fla. 1970); *DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 292 (D.D.C. 2012). Indeed, in *San Francisco NAACP*, where the plaintiffs challenged an ethnically-based student assignment plan on equal protection grounds, the Court *denied* the plaintiffs' motion at the preliminary injunction stage on the basis that "plaintiffs had *not* shown irreparable harm sufficient to justify immediate injunctive relief," *id.* at 1025 (emphasis added). And in *DynaLantic*, where, like here, the plaintiffs challenged on equal protection grounds a provision that allocated benefits to "socially disadvantaged" individuals presumptively including

11

certain racial groups, the court not only denied the plaintiffs' motion for a preliminary injunction,
*see* 885 F. Supp. 2d at 247, it ultimately denied the plaintiffs' facial challenge to the program
altogether, *see id.* at 292. Plaintiffs' reliance on out-of-context snippets from out-of-circuit cases
underscores the lack of authority for their contention that an alleged equal protection violation
itself is sufficient to establish irreparable harm.[8]

Lastly on this score, Plaintiffs argue that the Court should presume irreparable harm based
on an alleged equal protection violation because, like cases where the Seventh Circuit has applied
such a presumption (*e.g.,* in the First Amendment context), Plaintiffs' alleged harm implicates
"'intangible and unquantifiable interests' that cannot be compensated by monetary damages."
Pls.' Mem. 25 (quoting *Ezell*, 651 F.3d at 699). To the extent Plaintiffs allege harm to those
"intangible" interests, however, their allegations are insufficient to establish standing, much less
irreparable harm. Plaintiffs try to have it both ways; at times, they claim to want an "equal shot"
at debt relief, Pls.' Mem. 26, but at other times, they disclaim wanting debt relief at all, *see id.*
(noting that they are "not ask[ing] this Court to order a particular remedy (such as requiring De-
fendants to forgive all of their loans as well)"). Indeed, Plaintiff Christopher Baird declares that
"loan forgiveness would be at the expense of [his] neighbors" and "the American taxpayer" and
that he does not want his farm to succeed "at the expense of anyone else." Baird Decl., ECF No.
14-2. He thus avers that he joined this lawsuit, not to receive debt relief under Section 1005, but

---

[8] For the same reason, there is no authority for Plaintiffs' position, expressed at the TRO hearing,
that they suffer irreparable harm to their interests if even one minority farmer receives debt relief.
Such a theory is akin to Plaintiffs' argument that their equal protection allegation is sufficient in
and of itself to constitute irreparable harm. As set forth above, that is not the law. And the mere
fact that the Government has provisionally conferred some benefit on one person but not on an-
other does not demonstrate that emergency relief is justified. Rather, to demonstrate an "irrepara-
ble" injury that would justify an immediate injunction, Plaintiffs must show that any relief that
would eventually be available through the ordinary channels of civil litigation would not be ade-
quate to redress the alleged inequality. As noted, they do not do so here.

because he "believe[s] that treating another person differently because of their race or the color of their skin is wrong." *Id.* ¶ 10. Plaintiff Cheryl Ash similarly declares, "I just want the government to treat everyone equally, just like we do, regardless of my race." Ash Decl. ¶ 7, ECF No. 14-6. And aside from Plaintiff Teena Banducci, none of the Plaintiffs even indicate in their declarations that they want or would seek debt payments under Section 1005. But to the extent Plaintiffs do not seek debt payments under Section 1005, and bring this suit merely because they disagree with the Government relieving others' debts, they lack a concrete and particularized injury. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485–86 (1982) ("[O]bservation of conduct with which one disagrees ... is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms.").[9] Thus, far from enabling this Court to presume irreparable harm, any injury based on Plaintiffs' "intangible and unquantifiable interests" in the equal distribution of debt relief, Pls.' Mem. 24, is an abstract generalized grievance insufficient to establish standing, *see Valley Forge*, 454 U.S. at 482–83.[10]

Finally, to the extent Plaintiffs do purport to want a "shot" at debt relief for socially disadvantaged farmers, Pls.' Mem. 25; *see also* Banducci Decl. ¶¶ 4, 8 (indicating that she had asked how to apply for relief under Section 1005 and declaring that she and her husband were "hoping …

---

[9] In *Valley Forge*, an organization dedicated to the separation of church and state sought to prevent the Government from transferring surplus property to a religious organization without payment on the basis of the Establishment Clause. In holding that the plaintiffs did not have standing, the Court also noted that the organization's claim that the Constitution had been violated was an "abstract injury" "amount[ing] to little more than [an] attempt[] to employ a federal court as a forum in which to air ... generalized grievances about the conduct of government." 454 U.S. at 482–83.

[10] To the extent Plaintiffs claim to suffer harm because they believe distribution of debt payments to minority farmers is "unfair," Banducci Dec. ¶ 8, such "'abstract psychic harm' … is insufficient to establish standing" as well. *Kushner v. Illinois State Toll Highway Auth.*, 575 F. Supp. 2d 919, 922–23 (N.D. Ill. 2008) (quoting *MainStreet Organization of Realtors v. Calumet City*, 505 F.3d 742, 745 (7th Cir.2007)).

13

[to] get some help"), they likewise cannot establish irreparable harm on the basis of any harm to that interest.[11]  Plaintiffs are fundamentally mistaken in their assertion that they face irreparable harm because "[o]nce the money budgeted for [Section 1005] is spent," Pls.' Mem. 25, Defendants "will have accomplished their goal of race-based COVID relief" and "will have no reason" to provide "similar relief on an equitable basis to all, including white farmers," *id*. at 27.  First, the "money budgeted" for Section 1005, Pls.' Mem. 25, is "such sums as may be necessary" to carry out the program. § 1005(a)(1).  This is thus not a situation, like the two remaining cases Plaintiffs cite, where "[t]here is a real risk that the funds will run out," *Vitolo v. Guzman*, 2021 WL 2172181, at *3 (6th Cir. May 27, 2021) (granting TRO where socially disadvantaged program involved a finite appropriation for grants for restaurant owners to meet payroll and other obligations), or where there is "little hope of obtaining adequate compensatory or other corrective relief at a later date if the injunction does not issue," *O'Donnell Const. Co. v. D.C.*, 963 F.2d 420, 428 (D.C. Cir. 1992).  The statute therefore lends no support to Plaintiffs' assertion that an immediate injunction is needed to preserve a finite pool of funds, and Plaintiffs have not shown that providing debt relief to minority farmers will affect the prospect that USDA could provide debt relief to them if they were determined to be eligible.

Second, and relatedly, any harm to Plaintiffs' interests is not "imminent," as it must be, *Meek* 2021 WL 2036535, at *4 ("The irreparable harm alleged must be actual and imminent, not merely speculative."), because USDA is just beginning to implement the first part of the program. As set forth in the Cobb Declaration, USDA is currently identifying eligible recipients, *see* Cobb Decl. ¶ 13, and implementing Section 1005 with respect to certain qualifying direct loans, *see id.*

---

[11] USDA has announced that it will determine on a case-by-case basis whether additional groups qualify as socially disadvantaged.  *See* NOFA.

14

¶ 11. USDA anticipates sending offer notices to most eligible recipients by July 10, 2021, *see id.* ¶ 14, and based on an initial test of its procedures, anticipates that it will take seven days from the time of mailing to receive an acceptance of the offer, *see id.* ¶ 31. For approximately 44% of eligible recipients who require reversals of loan payments they made after January 1, 2021, however, USDA anticipates that the process will take longer, up to nine weeks. *See id.* ¶¶ 14, 23, 32, 37.[12] And USDA has not even issued a NOFA with respect to eligible guaranteed loans and certain direct loans that have been referred to Treasury for collection. *See id.* ¶ 26. For those loans, which, by USDA estimates, comprise roughly 12% of total ARPA-eligible payments, USDA anticipates issuing a NOFA by September 23, 2021. *See id.* ¶¶ 11, 27. Thus, even if Plaintiffs' theory were correct, any danger that Defendants will no longer have an incentive to provide broader debt relief once Section 1005 funds are allocated to minority farmers is plainly not imminent where those funds are statutorily unlimited and their allocation will take months. And it is certainly not so imminent as to warrant a TRO at the nascent stage of this case and program implementation. Plaintiffs have not carried their burden to establish irreparable harm. *See Meek*, WL 2036535, at *4 ("The relevant inquiry is whether, at the time the injunctive relief is to be issued, the party seeking the injunction is in danger of suffering irreparable harm.").

### B. Plaintiffs Have Not Shown that They Are Likely to Succeed on the Merits.

In addition to lacking an irreparable injury, Plaintiffs also have not shown that they are likely to succeed on the merits of their facial attack on Section 1005. Defendants intend to address Plaintiffs' particular merits arguments more fully in their opposition to Plaintiffs' motion for a preliminary injunction to be filed on June 18, 2021. For purposes of responding to Plaintiffs' TRO,

---

[12] There are 15,602 eligible recipients under the NOFA published in May, *see id.* ¶ 37, 6,836 of which will require payment reversals, *see id.* ¶ 23.

Defendants respectfully refer the Court to Defendants' opposition in *Wynn*, which shows that Plaintiffs are not likely to succeed on the merits of their equal protection claim. *See* Ex. A. As briefly summarized below, that opposition shows that the targeted debt payments in Section 1005 to minority farmers is a narrowly tailored remedy to serve the Government's compelling interests.

The Supreme Court has recognized, *inter alia*, two compelling interests that may justify the use of racial classifications. "The Government unquestionably has a compelling interest in remedying [its own] past and present discrimination." *United States v. Paradise*, 480 U.S. 149, 167 (1987). And "[i]t is beyond dispute that any public entity ... has a compelling interest in assuring that public dollars drawn from the tax contributions of all citizens do not serve to finance the evil of private prejudice." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (O'Connor, J., plurality op.). Congress relied on both interests when it authorized the debt payments to SDFRs in Section 1005. *See* Ex. A, § BG III.B.

And Congress had a strong basis in evidence for concluding that both interests warranted the remedial action in Section 1005. *See id.* §§ BG III.A, Argument (Arg.) I.B.2. It pointed to significant statistical and anecdotal evidence, including studies, investigations, reports, prior lawsuits, and other sources, showing the unfortunate and longstanding history of discrimination against minority farmers, including in the very USDA loan programs at issue in this case. *See id.* §§ BG III.A, Arg I.B.2.[13] Those sources showed that minority farmers not only had less access to USDA farm loans as compared to their white counterparts, but also received smaller loan amounts, had those amounts arbitrarily reduced, were subject to inordinate approval wait times that adversely affected their ability to repay the loans, were denied opportunities to avoid foreclosure,

---

[13] Indeed, Plaintiffs themselves acknowledge "USDA's past discriminatory history," "its efforts to remedy that conduct," Pls.' Mem. 8, and that Congress previously passed legislation "to rectify USDA's prior intentional discrimination," *id.* at 11.

16

and were often assigned "supervised" loans that required white loan officers to approve and cosign every transaction. *See id.* §§ BG III.A, Arg I.B.2. Those sources also showed that minority farmers lacked adequate recourse to remedy those problems via the USDA's ineffective civil rights complaints process. All of this, the sources showed (and members of Congress concluded), contributed to a significant loss of minority-owned farmland and placed minority farmers in a worse financial position today than their white counterparts. *See id.* §§ BG III.A, Arg I.B.2. Congress also relied on evidence to conclude that its recent agriculture subsidies and pandemic relief efforts—which were administered in a race-neutral fashion—were exacerbating the effects of discrimination against minority farmers in USDA programs, where the vast majority of that funding did not reach minority farmers, despite their disproportionate need for such relief. *See id.* §§ BG III.A, Arg I.B.2; *see also supra* § Background I.

With this evidence in mind, Congress targeted the debt payments in Section 1005 to the minority groups that it determined had suffered discrimination in USDA programs and that had been largely left out of recent agricultural funding and pandemic relief. *See* Ex. A, § BG III.B. That remedy was narrowly tailored to serve the Government's compelling interests. *See id.* § Arg. I.B.3. First, the necessity for debt payments to minority farmers is firmly rooted in the evidence before Congress, showing longstanding discrimination against minority farmers in USDA programs, the effects of which were made even more acute by a pandemic that disproportionately affected them. *See id.* The necessity of that debt relief is underscored by the numerous race-neutral alternatives that Congress employed before enacting Section 1005, which it found had not provided an adequate remedy. *See id.* Second, the debt payments to minority farmers is both flexible and time-limited. *See id.* Third, the provision of debt payments to minority farmers— approximately 0.2% of the $1.9 trillion package in ARPA based on current estimates—does not

17

burden innocent third parties, namely white farmers, who have not suffered discrimination in USDA programs and who have disproportionately benefitted from prior agricultural and pandemic subsidies. *See id.* And fourth, the debt payments to minority farmers is not under- or over-inclusive because it is targeted to the groups that Congress determined had suffered from discrimination in USDA loan programs and had largely been left out of recent funding and relief efforts. *See id.*

In sum, as Defendants have shown, *see id.* § Arg. I.B, and will show in greater detail in opposition to Plaintiffs' motion for a preliminary injunction, the targeted debt payments in Section 1005 to minority farmers is a narrowly tailored remedy to serve the Government's compelling interests in remedying prior discrimination against minority farmers in USDA programs, including USDA's loan programs, and ensuring that the Government is not perpetuating the effects of that discrimination by continuing to distribute funding in a manner that largely fails to reach minority farmers.

### C. The Injunction Plaintiff Seeks Is Contrary To the Public Interest.

Finally, the balance of the harms overwhelmingly favors Defendants, as the injunction Plaintiff seeks is manifestly contrary to the public interest. *See Nken*, 556 U.S. at 435 (pointing out that "[t]hese factors merge when the Government is the opposing party"); Pls.' Mem. 1 (seeking to enjoin the implementation of Section 1005 "immediately"). Congress passed Section 1005 based on its determination that timely debt relief for minority farmers was necessary to remedy the lingering effects of the well-documented history of USDA discrimination against them and to ensure that, unlike prior funding, pandemic relief actually reached them. *See* Ex. A, § BG III.A-B. And it did so based on evidence that minorities, and minority farmers in particular, were especially in need due to the disproportionate impact of COVID-19 on those communities and their lack of access to prior rounds of agricultural funding and pandemic relief. *See id.*

18

As noted, Congress has a compelling interest in remedying prior discrimination and in ensuring that its funds are not allocated in a manner that perpetuates that discrimination. *See id.* § Arg. I.B.1; *see also supra* Arg. I.B. The Government and the public have a strong interest in the implementation of the laws enacted by the duly elected representatives in Congress. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). And the thousands of minority farmers, who, Congress noted, sat disproportionately on the brink of foreclosure when COVID-19 hit, and who were allocated this emergency debt relief, plainly have a strong interest in receiving those funds. As the Cobb Declaration explains, 299 accounts with eligible recipients to whom USDA anticipates sending offer notices are currently in bankruptcy proceedings, *see* Cobb Decl. ¶ 37, and minority farmers are delinquent on FSA loans at higher rates, and in some cases much higher rates, than white farmers, *see id.* ¶ 38. If payments to those farmers are halted, as Plaintiffs request, that could adversely affect those farmers' ability to obtain student loans, loans from the Small Business Administration, or loans from other federal agencies. *See id.* It will delay their closings on new FSA loans. *See id.* ¶ 40. And it could result in foreclosure on their farms by non-USDA lenders, which already account for a disproportionate number of foreclosures. *See id.* ¶ 39. All of those interests would be harmed if Plaintiffs were to obtain the immediate injunctive relief they seek.

Plaintiffs, on the other hand, are seeking to thwart the will of Congress and prevent timely payments to fellow Americans in need based largely on their own beliefs and unjustified fears about finite appropriations. But Plaintiffs' views do not outweigh those of Congress and the general public that elected them. And Plaintiffs have not shown that any economic interests they assert will be irreparably harmed by one-time payments to minority farmers, in particular where

the appropriation at issue is unlimited, and the implementation of Section 1005 is just beginning. Even if they had, the Government and the public's interests in remedying prior discrimination, ensuring the equitable and timely distribution of much-needed pandemic relief—a direct response to a national economic and public-health emergency of historic proportions—and seeing the implementation of duly enacted federal law, outweigh any possible harm to these twelve Plaintiffs' ideological and economic interests due to the implementation of Section 1005. Granting an injunction here would be directly at odds with the purpose such an extraordinary remedy is designed to serve: rather than preventing harm and preserving the status quo, Plaintiffs' requested relief would result in substantial prejudice to thousands of their fellow farmers nationwide who have a substantial interest in receiving the debt relief that they were allocated. *See* Cobb Decl. ¶¶ 36-40 (explaining that minority farmers have requested a disproportionate number of disaster set-aside requests due to the impacts of COVID-19 and the adverse impacts on those farmers if debt payments were to be delayed).

Indeed, the public interest weighs against an immediate halt of the implementation of Section 1005 even if one assumes that Plaintiffs' legal claims have merit. "When the right invoked is that to equal treatment, the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 (2017). "The choice between these outcomes is governed by the legislature's intent, as revealed by the statute at hand." *Id.* at 1699; *see Ayotte v. Planned Parenthood of Northern New Eng.,* 546 U.S. 320, 330 (2006) (explaining that "the touchstone for any decision about remedy is legislative intent"). An immediate halt to implementation of the program would be appropriate only if Plaintiffs could show, in addition to the other requisite showings, that Congress would prefer, as a remedy for any

20

constitutional violation, to provide *no* immediate relief for *any* minority farmers while the program is redesigned. As Plaintiffs themselves all but acknowledge, *see* Pls.' Mem. 29, there is no basis for concluding that delaying the provision of emergency relief to those farmers would be consistent with Congress's intent in enacting Section 1005. Plaintiffs therefore fail to show that their desired injunction would constitute an appropriate remedy under binding Supreme Court precedent.

## II.    Any Temporary Restraining Order Issued Should Be Limited To Plaintiffs.

If the Court were to enjoin any aspect of Section 1005 (and it should not), any such injunction should be limited. A remedy "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1094 (7th Cir. 1988) ("[T]he scope of injunctive relief must not exceed the extent of the plaintiff's protectible rights."). And an injunction should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[]." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

To the extent that Plaintiffs ask this Court to ensure that they will "have a fair shot at any amended version" of the program, *id.*, any relief should be limited to addressing the alleged injury to these Plaintiffs—and not to the "thousands of other farmers" across the country, *id.* at 24, who are not parties to this action and whose interests Plaintiffs lack standing to represent, *see McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997) (overruling district court that "wrote that it was appropriate to enjoin the entire program, despite the lack of class certification, in order to prevent the City from violating the Constitution" because "plaintiffs lack standing to seek—and the district court therefore lacks authority to grant—relief that benefits third parties"). For instance, even though Congress has already appropriated "such sums as may be necessary" to carry

out Section 1005, ARPA § 1005(a)(1), if the Court nevertheless had any doubts about the availability of funds for Plaintiffs at a later date, it could issue a limited injunction requiring the Government to set aside funds sufficient to pay off any of Plaintiff's qualified loans pending the outcome of this litigation.  That limited injunction would ensure that Plaintiffs have any "shot" at debt relief that they could possibly want, and it would be consistent with the well-established principle that courts cannot grant relief to third parties not before them.

A limited injunction of that nature would also go farther toward preserving the status quo, which is of paramount concern when fashioning relief for purposes of a TRO.  *Crue v. Aiken*, 137 F. Supp. 2d 1076, 1082 (C.D. Ill. 2001) ("A temporary restraining order … is an emergency remedy issued to maintain the status quo until a hearing can be held on an application for a preliminary injunction.").  As noted, granting the immediate injunction Plaintiffs seek on a nationwide basis would upset the status quo for the thousands of minority farmers in need of the emergency relief authorized by Section 1005.

Finally, an injunction extending beyond these Plaintiffs would flout Supreme Court warnings against nationwide injunctions.  *See, e.g., Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) (Nationwide relief "take[s] a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."); *see also City of Chicago v. Barr*, 961 F.3d 882, 936 (7th Cir. 2020) (Manion, J., concurring) (explaining that tailored relief "guards against a decision premised on faulty assumptions: that the parties presented the district court with the very best arguments on the merits; that no other jurisdictions' standards for injunctive relief would yield different results than in this case; … and that no trial judge sitting in the 93 other districts could possibly reach a different decision on these issues.").

22

Those warnings are particularly apt here where Section 1005 is being challenged in other courts and Plaintiffs are the only plaintiffs who have sought a TRO that would immediately halt consideration of these issues. [14]

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a TRO.


Dated: June 8, 2021    Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

LESLEY FARBY
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Emily Sue Newton*
EMILY SUE NEWTON (VA Bar No. 80745)
Senior Trial Counsel
KYLA M. SNOW (Ohio Bar No. 96662)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-8356 / Fax: (202) 616-8460
emily.s.newton@usdoj.gov

*Counsel for Defendants*

---

[14] If the Court were, nevertheless, inclined to issue some form of nationwide relief, again that relief should be tailored to preserve the status quo as much as possible. For instance, if the Court were to determine that any immediate disbursement of funds to minority farmers constituted irreparable harm, then it could tailor an injunction to preclude disbursement of funds during its consideration of the preliminary injunction motion, while allowing USDA to continue sending notices and processing return letters in the interim. That would allow USDA to take necessary steps to prepare funds for issuance as soon as the injunction is lifted, thereby minimizing the harm to minority farmers across the Nation who have a significant interest in receiving much-needed debt relief during the pandemic. Again, however, because the appropriation under Section 1005 is not finite, Plaintiffs have identified no sound basis for concluding that allowing USDA to continue disbursing funds to minority farmers will cause them any harm at all, much less irreparable harm.