# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

_____

| | |
|---|---|
| **ROBERT HOLMAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 1:21-cv-01085-STA-jay** |
| ) | |
| **THOMAS J. VILSACK, in his official** ) | |
| **capacity as Secretary of Agriculture;** ) | |
| **and ZACH DUCHENEAUX, in his official** ) | |
| **capacity as Administrator of the Farm** ) | |
| **Service Agency,** ) | |
| ) | |
| **Defendants.** ) | |

_____

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

_____

**TABLE OF CONTENTS**

INTRODUCTION......................................................................................................... 1

BACKGROUND.......................................................................................................... 2

I.      USDA'S FARM SERVICE AGENCY AND FARM LOAN PROGRAMS.................... 2

II.     THE HISTORY OF DISCRIMINATION AGAINST SOCIALLY DISADVANTAGED
        FARMERS IN USDA PROGRAMS................................................................... 3

III.    CONGRESSIONAL RECOGNITION OF DISCRIMINATION AGAINST SOCIALLY
        DISADVANTAGED FARMERS IN USDA PROGRAMS AND PAST FAILURES TO
        REMEDY ITS LINGERING EFFECTS................................................................ 5

        A.    Congress concludes that Its Previous Efforts Failed to Address—and Indeed
              Perpetuated—the Disparities Caused By the Longstanding Discrimination Against
              Socially Disadvantaged Farmers. ............................................................. 6

        B.    Congress Enacts Section 1005 To Remedy Discrimination in USDA Programs and
              Avoid Perpetuating Its Effects.................................................................. 9

IV.     PROCEDURAL HISTORY............................................................................... 11

ARGUMENT............................................................................................................... 12

I.      Plaintiff Has Not Satisfied The Requirements For The Extraordinary Relief He Seeks...12

        A.    Plaintiff Is Not Likely to Succeed on the Merits of His Claims. .............................. 13

              1.    Claim 1: Denial of Equal Protection Based on USDA's
                    Interpretation of SDFR......................................................................... 13

                    i.     The Government's Provision of Debt Payments to SDFRs
                           Serves Compelling Government Interests. .................................. 14

                    ii.    The Government Had Strong Evidence that Remedial
                           Action Was Necessary to Further Its Compelling Interests. .........15

                    iii.   The Provision of Debt Relief to Minority Farmers Is
                           Narrowly Tailored to Serve the Government's Compelling
                           Interests. .................................................................................... 25

              2.    Claims Two and Three: Denial of Equal Protection and "Illegally
                    Allowing Future Eligibility" to SDFRs Who Receive Debt Relief .........31

        B.    Plaintiff Fails to Show a Substantial Likelihood of Irreparable Harm......................34

C.    The Balance of Equities and Public Interest Favor Defendants. ...............................38

II.    If The Court Were To Conclude  And Injunction  Is Warranted—And It Is Not—Any such
Injunction Should Be Limited To Plaintiff....................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995) .......................................................................................14, 25

*Aiken v. City of Memphis,*
  37 F.3d 1155 (6th Cir. 1994) ..............................................................14, 16, 24, 26

*Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.,*
  796 F.3d 636 (6th Cir. 2015) ....................................................................13

*Associated Gen. Contractors of Ohio, Inc. v. Drabik,*
  214 F.3d 730 (6th Cir. 2000) ....................................................................15

*Ayotte v. Planned Parenthood of N. New Eng.,*
  546 U.S. 320 (2006) ................................................................................40

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) ................................................................................37

*Cantu v. United States,*
  565 F. App'x 7 (D.C. Cir. 2014) .................................................................19

*City of Richmond v. J.A. Croson Co.,*
  488 U.S. 469 (1989) ...........................................................................*passim*

*Fisher v. Univ. of Tex. at Austin,*
  136 S. Ct. 2198 (2016) ........................................................................16, 27

*Franks v. Bowman Transp. Co.,*
  424 U.S. 747 (1976) ................................................................................25

*Fullilove v. Klutznick,*
  448 U.S. 448 (1980) ................................................................................28

*Garcia v. Johanns,*
  444 F.3d 625 (D.C. Cir. 2006) ...................................................................3

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) ............................................................................40

*Grutter v. Bollinger,*
  539 U.S. 306 (2003) ................................................................................14

*In re Black Farmer, Discrimination Litig., (Pigford II),*
   856 F. Supp. 2d 1 (D.D.C. 2011) ...................................................*passim*

*Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC,*
   478 U.S. 421 (1986)..........................................................................28

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994)..........................................................................40

*Maryland v. King,*
   567 U.S. 1301 (2012)........................................................................38

*Nat'l Urb. League v. DeJoy,*
   2020 WL 6363959 (D. Md. Oct. 29, 2020)........................................35

*Nken v. Holder,*
   556 U.S. 418 (2009)..........................................................................38

*Obama for Am. v. Husted,*
   697 F.3d 423 (6th Cir. 2012) ........................................14, 21, 35, 36

*Patton v. Shelby Cty. Sheriff's Dep't,*
   2021 WL 640833 (W.D. Tenn. Feb. 18, 2021) .................................34

*Pension Benefit Guar. Corp. v. LTV Corp.,*
   496 U.S. 633 (1990)..........................................................................34

*Pigford v. Glickman, (Pigford I),*
   185 F.R.D. 82 (D.D.C. 1999) .....................................................19, 21

*Sessions v. Morales-Santana,*
   137 S. Ct. 1678 (2017)................................................................39, 40

*Shoshone-Bannock Tribes of Fort Hall Rsrv. v. Shalala,*
   988 F. Supp. 1306 (D. Or. 1997) .....................................................37

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018)......................................................................40

*United Black Firefighters Ass'n v. City of Akron,*
   976 F.2d 999 (6th Cir. 1992) .....................................................15, 16

*United States v. Paradise,*
   480 U.S. 149 (1987).................................................................*passim*

*Vitolo v. Guzman*,
　2021 WL 2172181 (6th Cir. May 27, 2021) ................................................15, 36

*Wygant v. Jackson Bd. of Educ.*,
　476 U.S. 267 (1986)..............................................................................................14

**Statutes**

7 U.S.C. §§ 1921 *et seq.* ..........................................................................................2

7 U.S.C. § 1991 ........................................................................................................33

7 U.S.C. § 2008h ......................................................................................................33

7 U.S.C. § 2279 ........................................................................................................11

7 U.S.C. § 6932 ..........................................................................................................3

American Rescue Plan Act, Pub. L. No. 117-2 (2021).............................................10

American Rescue Plan Act § 1005 ....................................................................*passim*

Claims Resolution Act of 2010, Pub. L. No. 111-291 (2010)...................................19

Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 14012 (2008)................19

**Regulations**

7 C.F.R. § 2.42 ............................................................................................................2

7 C.F.R. § 762.129 ......................................................................................................3

7 C.F.R. § 764.151 ......................................................................................................3

7 C.F.R. § 764.251 ......................................................................................................3

7 C.F.R. § 764.351 ......................................................................................................3

66 Fed. Reg. 21617-01 (Apr. 30, 2001) ...................................................................11

74 Fed. Reg. 31567 (July 2, 2009) ...........................................................................11

75 Fed. Reg. 27165 (May 14, 2010) .........................................................................11

86 Fed. Reg. 28329 (May 26, 2021) ............................................................. 11, 12, 28

**Legislative Materials**

167 Cong. Rec. H735 (daily ed. Feb. 26, 2021).................................................*passim*

167 Cong. Rec. S.1217 (daily ed. Mar. 5, 2021)............................................*passim*

2019 Civil Rights Hr'g .............................................................................22, 27

American Rescue Plan Act of 2021, 117 H.R. 1319, Title I, § 1005..........................................34

Comm. Hr'g, State of Black Farmers, 2021WL1154123  (Mar. 25, 2021)................................21

H.R. No. 117-7 (2021) ................................................................. 10, 23, 24

House Ag. Comm. Hr'g on U.S. Ag. Policy and the 2012 Farm Bill (Apr. 21, 2010)................. 6

House Ag. Comm. Hr'g on USDA Oversight (July 22, 2015)..................................................... 6

Hr'g on Mgmt. of Civil Rights at the USDA before the House Subcomm. on Gov't Mgmt.,
    Org., and Procurement, Comm. on Oversight and Gov't Reform, 110th Cong. 8 (2008) ........ 6

Hr'g on the USDA's Civil Rights Prog. for Farm Prog. Participants before House Subcomm.,
    Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Agric., 107th Cong. (2002)
    (2002 Civil Rights Hr'g) .........................................................................4, 5

Hr'g on the Decline of Minority Farming in the United States, Comm. on Gov't Ops., U.S.
    House of Reps. (1990) ..............................................................................10

Hr'g to Review the USDA's Farm Loan Progs. before the Senate Comm. on Ag., Nutrition, and
    Forestry, 109th Cong. 800 .......................................................................... 6

Hr'g on USDA's Civil Rights Progs. and Responsibilities  before The House Subcomm. on
    Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Ag., 106th Cong. 37 (1999).......... 5

Opening Stmt. of Thomas J. Vilsack before House Comm. on Ag. (Vilsack Stmt.),
    https://perma.cc/3LWV-4SMF ...................................................................16, 26

Review of the Off. of the Assistant Sec'y for Civil Rights, Hr'g before the House Subcomm.
    On Nutrition, Oversight, and Dep't Ops., Comm. on Agric., 116th Cong. (2019) .................. 8

S. 278, 117 Cong. (2021) ..............................................................................6, 10

**Other Authorities**

Civil Rights at the USDA - A Report by the Civil Rights Action Team (CRAT) (1997)
    (CRAT Rep.)......................................................................................4, 29

Congressional Research Service (CRS), Farm Serv. Agency Comms.: In Brief
(Jan. 29, 2021), (FSA Comms.) ................................................................ 3

COVID-19 Racial and Ethnic Health Disparities, CDC (Dec. 10, 2020),
https://perma.cc/DJ3J-22DU .................................................................23

David Zucchino, *Sowing Hope, Harvesting Bitterness*, LA Times (Mar. 23, 2012),
https://perma.cc/V8TZ-C6RZ........................................................11, 31

D.J. Miller & Associates, report prepared for the USDA FSA (1996) ........................................10

D.J. Miller, Disparity Study: Producer Participation and EEO Compl. Process Study ...............10

Equal Opportunity in Farm Progs., An Appraisal of Servs. Rendered by Agencies of the
USDA, USCCR (1965) ....................................................................17, 29

Fed'n of S. Coops/Land Assist. Fund, Ann. Rep. 4 (2020), https://perma.cc/94PY-HSM6 ......... 9

GAO-19-464, Indian Issues: Ag'l Credit Needs and Barriers to Lending on Tribal
Lands (2019) ........................................................................7, 8, 22

GAO-19-539, Agric. Lending: Info. on Credit & Outreach to [SDFRs]
Is Limited (2019) ........................................................................7, 22

GAO-21-399T, Fin. Servs.: Fair Lending, Access, & Retirement Sec. (2021) ......................5, 22

Gen. Acc. Off., 1 *Principles of Fed. Appropriations L.* (2d ed. 1991) ........................................37

J. Hayes, *USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers*,
Envir'l Working Group (EWG) (Feb. 18, 2021), https://perma.cc/PVZ7-QMFD...............9, 34

Jackson Lewis LLP, "Civil Rights Assessment" Final Report (Mar. 31, 2011)
(JL Report,) https://perma.cc/8X6Q-GZ5V ................................................*passim*

L. Minkoff-Zern & S. Sloat, *A New Era of Civil Rights? Latino Immigrant Farmers and
Exclusion at the [USDA]*, AG. & HUMAN VALUES (2017) ..........................................21, 22, 29

M. Gordon, "Revolution is Based on Land: Wealth Denied via Black Farmland Ownership
Loss" (Dec. 17, 2018) (M.A. thesis, Tufts University), https://perma.cc/YJ9U-KC7E) .......... 7

N. Rosenberg, *USDA Gave Almost 100 Percent of Trump's Trade War Bailout to White
Farmers*, Farm Bill Law Enterprise, https://perma.cc/T7SY-TZQM ...................................... 9

Nat'l Young Farmers Coal., Cal. Young Farmers Rep. (Apr. 2019),
    https://perma.cc/PEY5-Z253 ................................................................ 8

NOFA, https://perma.cc/A35E-UANV ......................................... 11, 12, 37

U.S. Commission on Civil Rights (USCCR), *The Decline of Black Farming in America*
    (1982) (1982 Rep.)...........................................................................*passim*

*USDA Announces [CFAP]*, USDA (Apr. 17, 2021), https://perma.cc/B7N9-PTRE ................... 9

USDA, FACT SHEET: United States Department of Agriculture Provisions in H.R. 1319, the
    American Rescue Plan, https://perma.cc/R69N-AL5K .......................................28

USDA OIG, *Rep. for the Secretary on Civil Rights Issues – Phase I*, (1997),
    https://perma.cc/NK6B-W2CL .................................................................18

USDA: Problems in Processing Discrim. Compls., GAO (2002) .............................................10

USDA Recommendations and Options to Address Mgmt. Deficiencies in the Off. of the
    Assistant Secretary for Civil Rights, GAO (2008) , https://perma.cc/YW73-83WE ..............28

USDA *Who Owns the Land? Agricultural Land Ownership by Race/Ethnicity, Rural America*
    (2002), https://perma.cc/FG7J-YJEQ..................................................................... 7

## INTRODUCTION

Congress enacted § 1005 of the American Rescue Plan Act (ARPA), which provides debt relief to socially disadvantaged farmers holding certain U.S. Department of Agriculture (USDA) loans, to remedy the lingering effects of the unfortunate but well-documented history of racial discrimination in USDA loan programs. In doing so, Congress considered strong evidence that discriminatory loan practices at USDA have placed minority farmers at a significant disadvantage today: these farmers generally own smaller farms, have disproportionately higher delinquency rates, and are at a significantly higher risk of foreclosure than non-minority farmers. Congress found that minority farmers' diminished position was only made worse by a global pandemic that disproportionately burdened them and the general failure of recent agricultural and pandemic relief to reach them. In authorizing the debt relief in § 1005, Congress thus adopted a measure narrowly tailored to remedying the lingering effects of discrimination in USDA loan programs at a time of acute need, and to correct the ways prior funding had perpetuated those effects by remaining largely beyond minority farmers' reach.

Plaintiff, a self-identified white farmer who does not allege that he has been effected by historic discrimination in USDA loan programs or that he was left out of prior relief efforts (in fact, he has received thousands of dollars in agricultural funds), seeks to preliminarily enjoin § 1005's implementation on the ground that it violates his equal protection rights. But he fails to meet the requirements for the extraordinary relief he seeks. At the start, Plaintiff has not shown that he is substantially likely to succeed on the merits of his claims. Plaintiff's first equal protection claim challenging § 1005's implementation fails because he has not rebutted Congress's strong evidence supporting its conclusion that paying off minority farmers' qualifying USDA loans was necessary to further its interests in remedying the lingering effects of racial discrimination in USDA loan programs and ensuring that its pandemic relief efforts did not perpetuate those

lingering effects. And Plaintiff's remaining two claims, based on allegations that USDA is providing "debt forgiveness" to SDFRs and then allowing them to obtain future USDA loans, likewise fail as they have no basis in law or fact. The relief provided by § 1005 is not "debt forgiveness" as that term is statutorily defined and thus does not implicate future loan eligibility.

The equitable factors also weigh decisively in Defendants' favor. First, Plaintiff has not established irreparable harm, as the funds appropriated under § 1005 are not limited and will not expire—which means that Plaintiff can obtain any monetary relief he seeks at the end of this case (if he shows that he is entitled to it). And any harm is also not imminent, as the agency is currently enjoined from distributing funds. *See Wynn v. Vilsack*, No. 3:21-cv-514 (M.D. Fla.), ECF No. 41 (June 23, 2021) ("*Wynn* Op."). Second, Plaintiff has not shown that any injury to him absent an injunction would outweigh the grave harm to the socially disadvantaged farmers who are at a disproportionately higher risk of foreclosure and whose dire economic position in the midst of a global pandemic only worsens the longer payments are delayed. The Court should deny Plaintiff's request for such extraordinary relief.

## BACKGROUND

## I.    USDA'S FARM SERVICE AGENCY AND FARM LOAN PROGRAMS

USDA's Farm Service Agency (FSA) administers a variety of farm credit and benefit programs. *See* 7 USC §§ 1921, *et seq.*; 7 C.F.R. § 2.42(a)(28). Like its predecessor the Farmers Home Administration (FmHA), FSA makes credit available to farmers who cannot obtain it from commercial institutions, 7 USC § 6932(b), including by making loans directly to farmers, *see id.*, and guaranteeing loans of commercial lenders up to 95%, 7 CFR § 762.129.[1] These loans may assist farmers with buying or improving farm property, *id.* § 764.151, operating their farms, *id.* §

---

[1] For ease of reference, Defendants use "farmers" to include "farmers and ranchers."

764.251, or resuming operations after a disaster, *id.* § 764.351, among other things. While local committees have been key in administering USDA loan programs, their structure and role in those programs have changed. *See* Congressional Research Service (CRS), FSA Comms.: In Brief (Jan. 29, 2021) (FSA Comms.);[2] in 2002 and 2008, Congress adopted measures to ensure minority representation on local committees, *id* at 2-3, and the committees' role in USDA loan eligibility and approval processes has been limited, *see Garcia v. Johanns*, 444 F.3d 625, 628–29 (D.C. Cir. 2006); FSA Comms. 3.

## II.  THE HISTORY OF DISCRIMINATION AGAINST SOCIALLY DISADVANTAGED FARMERS IN USDA PROGRAMS

Although USDA aims to serve all farmers equitably, decades of evidence shows that not all USDA stakeholders have benefitted equally from its services—particularly its farm loan services. *See infra* Argument (Arg.) II.B. In fact, the evidence indicates just the opposite: that throughout USDA's history minority farmers have been "hurt" more than helped due to discrimination in USDA's farm loan programs. Civil Rights at the [USDA]—A Report by the Civil Rights Action Team (CRAT) 6 (1997) (CRAT Rep.)[3]; *see also* Arg. II.B.

Minority farmers have long experienced inequities in FSA's administration of farm loans, including with respect to loan approval rates, amounts, and terms. *See* U.S. Commission on Civil Rights (USCCR), *The Decline of Black Farming in America* 84-85(1982) (1982 Rep.)[4] (discussing complaints of loan amounts being reduced or repayment schedules "accelerated without explanation"); *see also* CRAT Rep. 16 (discussing complaints of loans being "arbitrarily reduced" or not arriving as promised); Hr'g on the USDA's Civil Rights Prog. for Farm Prog. Participants before House Subcomm., Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Ag., 107th

---

[2] *Available at* https://perma.cc/HA3L-PDPG.
[3] *Available at* https://perma.cc/5DNF-PFJY.
[4] *Available at* https://perma.cc/CFE9-ANJ3.

Cong. 23, 16-21, 33-35 (2002) (2002 Civil Rights Hr'g) (discussing disparities in loan processing times and approval rates for Hispanic farmers and discrimination complaints by "black, American Indian, [and] Hispanic" farmers). These experiences are recounted in numerous reports and the many administrative civil rights complaints filed by minority farmers. *See* Arg. II.B. But those complaints have failed to remedy individual experiences of discrimination in FSA's loan programs: too often they languished in a growing backlog or went unanswered altogether. *See id.*

These problems spawned a series of lawsuits against USDA by groups of minority farmers.[5] From 1997 and over the next decade, African-American, Native American, Hispanic, and female farmers alleged that USDA systematically discriminated against them in the administration of farm loans and other benefits and failed to investigate discrimination complaints. *See Pigford II*, 856 F. Supp. 2d 1, 8 (D.D.C. 2011); Arg. II.B. Although USDA has settled the lawsuits and paid more than $2.4 billion to claimants, State taxes eroded recoveries, debt relief was incomplete, and reports before Congress have shown that the settlements did not cure the problems faced by minority farmers. *See* 167 Cong. Rec. S1264 (Mar. 5, 2021) (Stabenow).

Even after the settlement of those lawsuits, investigations revealed that Socially Disadvantaged Groups ("SDGs") continued to experience discrimination with respect to the requirements, availability, and timing of FSA loans. *See* Arg. II.B (discussing Jackson Lewis LLP, "Civil Rights Assessment" (Mar. 31, 2011) (JL Report)).[6] Just this year, the Government Accountability Office (GAO) noted that "[c]oncerns about discrimination in credit markets … have long existed" and that minority farmers continue to "ha[ve] less access to credit." GAO-21-

---

[5] *Pigford v. Glickman* ("*Pigford I*"), No. 97-1978 (D.D.C.); *Keepseagle v. Veneman*, No. 99-03119 (D.D.C.); *Garcia*, No. 00-2445 (D.D.C.); *Love v. Glickman*, No. 00-2502 (D.D.C.); *In re Black Farmers Discrimination Litigation* ("*Pigford II*"), No. 08-mc-0511 (D.D.C.).
[6] *Available at* https://perma.cc/8X6Q-GZ5V.

399T, Fin. Servs.: Fair Lending, Access, and Retirement Sec. 1 (2021).[7] As these and other reports document, discrimination in USDA's loan programs has contributed to a dramatic loss of minority-owned farmland. *See* Arg. II.B; *see, e.g.*, 1982 Rep. 176 (reporting that from 1920 to 1978, the number of all minority-owned farms fell from 926,000 to less than 60,000).

## III. CONGRESSIONAL RECOGNITION OF DISCRIMINATION AGAINST SOCIALLY DISADVANTAGED FARMERS IN USDA PROGRAMS AND PAST FAILURES TO REMEDY ITS LINGERING EFFECTS

The history of discrimination against minority farmers in USDA programs has not gone unnoticed by Congress. For decades, Congress has heard testimony and acknowledged such discrimination during numerous hearings to understand and remedy its ongoing effects.[8] And in passing § 1005, Congress did so again.

The predecessor to § 1005 included findings highlighting the pattern of discrimination in USDA programs and its consequences for minority farmers, *see* S.278, "Emergency Relief for Farmers of Color Act of 2021," (intr'd Feb. 8, 2021). It noted that over the last century, Black

---

[7] *Available at* https://perma.cc/3CWQ-B959.

[8] *See, e.g.,* Hr'g on USDA's Civil Rights Progs. and Responsibilities before The House Subcomm. on Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Ag., 106th Cong. 37 (1999) (Goodlatte) (recognizing that "[c]ivil rights at the [USDA] has long been a problem"); 2002 Civil Rights Hr'g 16, 18, 26 (hearing testimony about the disparities in loan processing times and approval rates for Hispanic farmers; underrepresentation of minorities in USDA; and continuing delays in the resolution of civil rights complaints); Hr'g to Review the USDA's Farm Loan Progs. before the Senate Comm. on Ag., Nutrition, and Forestry, 109th Cong. 800 (2006) (Karen Krub, Farmers' Legal Action Group, Inc.) ("[T]here is still no meaningful process for investigation and resolution of allegations of discrimination [against] FSA decision-makers."); Hr'g to Review Availability of Credit in Rural America before the House Subcomm. on Conserv., Credit, Energy, and Research, Comm. on Ag., 110th Cong. 8 (2007); Hr'g on Mgmt. of Civil Rights at the USDA before the House Subcomm. on Gov't Mgmt., Org., and Procurement, Comm. on Oversight and Gov't Reform, 110th Cong. 137 (2008) (hearing testimony about, and recognizing, the continued problem of USDA discrimination against minority farmers, including the inability of Native American and Hispanic farmers to receive loans; underrepresentation of minorities on county committees; and delayed processing of civil rights complaints, including allegations that complaints were shredded and not processed, all despite creation in 2002 of the Assistant Secretary of Civil Rights); House Ag. Comm. Hr'g on U.S. Ag. Policy and the 2012 Farm Bill (Apr. 21, 2010); House Ag. Comm. Hr'g on USDA Oversight 45, 50 (July 22, 2015).

farmers dwindled from 14 to two percent of all farmers and lost about 80% of their land, *id.* § 2, ¶ 5(A)-(C). Congress attributed such losses to minority farmers to various "civil rights violations by the Federal Government," including discrimination at USDA, *id.* ¶¶ 1(B), 2-15.

Floor statements leading to the passage of § 1005 echoed those findings. As Chairman of the House Agriculture Committee David Scott put it, "discrimination against … farmers of color by USDA is longstanding and well-documented and continues to present barriers for these producers to participate in the agricultural economy." 167 Cong. Rec. H765 (Feb. 26, 2021). He recounted "this history and the continuing challenges for these farmers" by summarizing over a dozen reports between 1965 and 2019 showing how discrimination manifested at all levels of USDA—resulting in little to no minority representation on county committees, disproportionately fewer loans for minority farmers, and denial of adequate processes for resolving civil rights complaints. *Id.* H765-66. Senator Cory Booker cited some of the same evidence in attributing the massive loss of Black-owned farmland and economic disadvantages of other minority farmers to the "brutal legacy of discrimination by [USDA]." *Id.* S1265; *see also id.* S1262 (Stabenow) (citing studies estimating "more than $120 billion in lost opportunities").[9]

**A.    Congress Concludes that Its Previous Efforts Failed To Address—and Indeed Perpetuated—the Disparities Caused By the Longstanding Discrimination Against Socially Disadvantaged Farmers at USDA.**

At the same time, Congress acknowledged that its previous efforts to remedy discrimination against minority farmers in USDA programs and its lingering effects "ha[d] fallen short." *Id.* S1262 (Stabenow). As Chairman Stabenow explained, Congress began targeting USDA assistance to SDFRs during the agriculture credit crisis in the 1980s, created a program to

---

[9] M. Gordon, "Revolution is Based on Land: Wealth Denied via Black Farmland Ownership Loss" (Dec. 17, 2018) (Tufts University), https://perma.cc/YJ9U-KC7E; USDA, *Who Owns the Land? Agricultural Land Ownership by Race/Ethnicity, Rural Amer.* at 55-57 (2002), https://perma.cc/FG7J-YJEQ.

provide outreach and technical assistance to SDFRs in 1990 (the "2501 Program"), and permanently funded the 2501 Program in 2018. *See id.* S1263-64. In response to the lawsuits brought by groups of farmers against USDA, *supra* Background ("BG") II, in 1998, Congress suspended statutes of limitations for Equal Credit Opportunity Act claims; in 2010, it provided $1.25 billion to ensure that *Pigford II* claimants received settlement payments. *See id.* S1264. In 2002, Congress created an Office of the Assistant Secretary for Civil Rights at USDA to ensure better compliance with civil rights laws; and in 2014, it created a permanent Office of Tribal Relations at USDA. *See id.*

Despite these efforts, Congress has recently found that minority farmers continue to suffer the effects of discrimination in USDA programs. Two GAO reports mandated by Congress in 2018 illuminated the extent of the problem. *See* GAO-19-539, Ag'l Lending: Info. on Credit & Outreach to [SDFRs] Is Limited 2 (2019)[10]; GAO-19-464, Indian Issues: Ag'l Credit Needs and Barriers to Lending on Tribal Lands (2019).[11] Those reports revealed that SDFRs still had "more difficulty getting loans and credit from USDA … [that] can help beginning farmers break into the business and help existing farmers continue running their operations," S1264 (Stabenow) (citing Nat'l Young Farmers Coal., Cal. Young Farmers Rep. 32 (Apr. 2019)).[12]

Congress also found that, due to the lingering effects of the longstanding discrimination against minority farmers, "Black farmers and other farmers of color were in a far more precarious financial situation before the COVID-19 pandemic hit"—and a year into the pandemic, some "ha[d] simply not been able to weather the storm." *Id.* S1265-66 (Booker). For instance, Congress observed that a disproportionate number of Black, Hispanic, Asian-American, and Indigenous

---

[10] *Available at* https://perma.cc/5RD6-24VH.

[11] *Available at* https://www.gao.gov/assets/gao-19-464.pdf.

[12] *Available at* https://perma.cc/PEY5-Z253.

farmers were in default on their direct loans, putting farmers of color at risk of "facing yet another wave of foreclosures and potential land loss." *Id.* (citing statistics showing that 13% of borrowers with FSA direct loans were currently delinquent and that this number increased to 35% for Black farmers and 24% for Hispanic, Asian-American, and Indigenous farmers); *see also id.* at S1264 (Stabenow) (explaining that SDFRs are more likely to have loans in default because they "are less likely to have the same access to adequate loan servicing … as their White counterparts" due to discrimination in USDA loan programs); Review of the Off. of the Assistant Sec'y for Civil Rights, Hr'g before the House Subcomm. On Nutrition, Oversight, and Dep't Ops., Comm. on Ag., 116th Cong. 25, 9 (2019) (2019 Civil Rights Hr'g) (Adams) (citing reports that Black farmers were subject to 13% of USDA foreclosures despite being less than 3 percent of direct loan recipients).

Moreover, lawmakers cited reporting that the overwhelming majority of recent agricultural subsidies and pandemic relief prior to ARPA went to non-minority farmers, despite minority farmers occupying a more vulnerable financial position. Specifically, the reporting indicated that nearly the entirety of USDA's $25 billion Market Facilitation Program (MFP) payments, *see* S1264-65; *see also id.* H766,[13] and almost all of the $9.2 billion provided through USDA's first Coronavirus Food Assistance Program (CFAP), went to non-minority farmers, *see id.* S1264-65; H766.[14] This disproportionate allocation of funding, Congress again found, was partly due to the

---

[13] Citing N. Rosenberg, *USDA Gave Almost 100 Percent of Trump's Trade War Bailout to White Farmers*, Farm Bill Law Enterprise, https://perma.cc/T7SY-TZQM. In 2018 and 2019, FSA was authorized to distribute up to $25.1 billion through the MFP to assist producers directly affected by retaliatory tariffs by China. The MFP is reportedly the single largest subsidy to farmers and, according to the Farm Bill Law Enterprise, it "has almost exclusively benefitted white men and their families." *Id.*

[14] Citing J. Hayes, *USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers*, Envir'l Working Group (EWG) (Feb. 18, 2021), https://perma.cc/PVZ7-QMFD. CFAP was created in 2020 pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") to assist producers who faced market disruptions due to COVID-19. It consisted of $16 billion in direct support to producers and $3 billion to buy agricultural products and re-distribute

lingering effects of discrimination in USDA programs. Chairman Stabenow explained that "[t]he diminished relationships between [SDFRs] and USDA as a result of both latent barriers and historic discrimination limit[ed]" SDFRs' access to, and participation in, USDA programs, such that "73 percent of Black farmers … were not even aware of the agricultural aid provisions of the[se] coronavirus rescue programs." *Id.* S1264.[15] Additionally, a letter introduced into the record from 13 full-time professors who specialize in agricultural issues explained that federal farm programs "have perpetuated and exacerbated the problem" of discrimination, by preferring certain crops that tend to be produced by white farmers and "reward[ing] the largest farms," which are predominantly owned by white farmers, "the most." *Id.* All of this, the academics stated, had "distort[ed] credit, land, input costs, and markets" to the disadvantage of minority farmers. *Id.*[16]

### B.    Congress Enacts Section 1005 To Remedy The Effects of Discrimination in USDA Programs and Avoid Perpetuating Its Effects.

On March 10, 2021, Congress passed ARPA to provide widespread pandemic relief to the American people. *See* Pub. L. No. 117-2 (2021). The House Report accompanying the bill shows that Congress was focused on the "most vulnerable communities … forced to bear the brunt of" the pandemic and resultant economic crisis "as underlying health and economic inequities grew worse." H.R. Rep. No. 117-7, 2 (2021). Among those communities were minority farmers who had "received a disproportionately small share of the farm loans and payments administered by

---

them to Americans in need.    *See USDA Announces [CFAP]*, USDA (Apr. 17, 2021), https://perma.cc/B7N9-PTRE.
[15] Citing Fed'n of S. Coops/Land Assist. Fund, Ann. Rep. 4 (2020), https://perma.cc/94PY-HSM6.
[16] In addition to most of the reports cited herein, the letter also attached and summarized the following sources documenting USDA discrimination: Hr'g on the Decline of Minority Farming in the United States, Comm. on Gov't Ops., U.S. House of Reps. (1990); D.J. Miller Disparity Study: Producer Participation and EEO Compl. Process Study, D.J. Miller & Associates report prepared for the USDA FSA (1996); USDA: Problems in Processing Discrim. Compls., GAO (2002); USDA: Recomms. and Options to Address Mgmt. Deficiencies in the Off. of the Assistant Secretary for Civil Rights, GAO (2008), https://perma.cc/YW73-83WE.    *See* S1266-67.

USDA as a result of … longstanding and widespread discrimination."  *Id.* at 23.

As part of ARPA, Congress passed § 1005, which was designed to "provide targeted and tailored support for … farmers," CR H765 (Scott), who "have for many decades suffered discrimination by [USDA]," *id.* S1265 (Booker), and had not benefited from prior pandemic relief efforts, *id.* H1273 (Rep. Neal) (explaining as much with respect to Black farmers); *id.* S1264-65 ("Congress includes these measures to address the longstanding and widespread systemic discrimination within the USDA, particularly within the loan programs, against [SDFRs].") (Stabenow); S.278, Sec. 4, ¶ (a)(1)-(2) (stating § 1005 addressed "historical discrimination against" SDFRs and "issues relating to … COVID-19 … in the farm loan programs").

Section 1005 authorizes funds to pay up to 120 percent of certain direct or guaranteed USDA farm loans held by a "socially disadvantaged farmer or rancher" and outstanding as of January 1, 2021.[17]  ARPA § 1005.  For purposes of § 1005, Congress gave the term "socially disadvantaged farmer or rancher" the same meaning as in Section 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990, codified at 7 U.S.C. § 2279(a).  *See id.* ARPA § 1005(b)(3). That provision defines a "socially disadvantaged farmer or rancher" as "a farmer or rancher who is a member of a socially disadvantaged group," 7 U.S.C. § 2279(a)(5), which is further defined as "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities," *id.* § 2279(a)(6).

USDA has long interpreted "socially disadvantaged group[s]" to include the following five groups: American Indians or Alaskan Natives; Asians; Blacks or African Americans; Hispanics or Latinos; and Native Hawaiians or other Pacific Islanders.  *See* 66 FR 21617-01 (Apr. 30, 2001)

---

[17] Congress provided 20% over and above outstanding loan balances because State taxes eroded previous settlement payments to minority farmers.  *See* S1264 (Stabenow); David Zucchino, *Sowing Hope, Harvesting Bitterness*, LA Times (Mar. 23, 2012), https://perma.cc/V8TZ-C6RZ.

(interpreting 7 U.S.C. § 2279 to include those groups for purposes of Outreach and Assistance for SDFRs Program); 74 Fed. Reg. 31567 (July 2, 2009) (for Risk Management Purchase Waiver); 75 Fed. Reg. 27165 (May 14, 2010) (for Conservation Reserve Program). USDA confirmed in a Notice of Funds Availability (NOFA) that SDGs would continue to "include, but are not limited to," those same five groups, while other groups could be considered for inclusion on a case-by-case basis by the Secretary in response to a written request. 86 Fed. Reg. 28329 (May 26, 2021).

For purposes of implementing the ARPA loan payments at issue, Congress directed that the Treasury make available to the Secretary of Agriculture "such sums as may be necessary, to remain available until expended, for the cost of loan modifications and payments under" § 1005. ARPA § 1005(a)(1). Eligible recipients need not apply to receive § 1005 loan payments, but they must formally accept USDA's offer, conveyed in letters to identified eligible borrowers, to receive such relief. *See* Declaration of William D. Cobb ¶¶ 13, 13-19 ("Cobb Decl.") (attached as Exhibit A). USDA is in the process of identifying and notifying individuals eligible to receive debt payments under this NOFA, although it is not disbursing payments. *Id*. ¶¶ 13-14, 21.

## IV.    PROCEDURAL HISTORY

On June 2, 2021, Plaintiff filed suit, challenging USDA's implementation of § 1005. Comp., ECF No. 1. Plaintiff holds direct FSA loans and alleges that he would otherwise qualify for § 1005 payment for that loan except for the fact that "he is white." *Id*. ¶ 69. He asserts that USDA's interpretation of "socially disadvantaged farmer or rancher" in § 1005 to include farmers and ranchers who identify as falling within specific racial groups violates the constitutional guarantee of equal protection. *Id*. ¶¶ 64-74. Plaintiff also brings two other claims alleging that § 1005 loan payments constitute "debt forgiveness" as defined by a pre-ARPA statute, and that those payments trigger a statutory bar against future USDA loan eligibility for farmers whose USDA debts are forgiven. *Id*. ¶ 75-85. Plaintiff asserts that USDA is violating that statute, and equal

11

protection principles, because it is selectively waiving that eligibility bar, allowing SDFRs who receive § 1005 payments—but not other farmers whose debts are forgiven—to remain eligible for future USDA loans. *Id.* He seeks injunctive and declaratory relief on all three claims. *Id.* On June 6, Plaintiff moved for a preliminary injunction asking the Court to immediately "halt[] Section 1005." Pl.'s Mot. for Prelim. Inj. (Pl.'s Mot.) 13, ECF No. 7-1.

At the same time, similar equal protection challenges to § 1005's implementation are being litigated in seven other courts. In six courts, plaintiffs have moved for preliminary injunctions. On June 10, one court granted a temporary restraining order (TRO), *Faust v. Vilsack*, 21-cv-548 (E.D. Wis.), ECF No. 21. On June 23, another court issued a nationwide injunction that prohibits USDA from distributing loan payments but allows it to continue sending offer letters to eligible recipients and taking other actions "to prepare to effectuate the relief under § 1005 in the event that it is ultimately found to be constitutionally permissible." *Wynn* Op. 49 n.19.

## ARGUMENT

## I.    Plaintiff Has Not Satisfied The Requirements For The Extraordinary Relief He Seeks.

To determine whether to grant a preliminary injunction, courts consider "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015).[18] A preliminary injunction is an "extraordinary and drastic" remedy, and "[t]he party seeking [it] bears the burden of justifying such relief." *Id.* Plaintiff fails to carry his burden here.

---

[18] Herein, all internal alterations, citations, and subsequent history are omitted unless indicated.

### A. Plaintiff Is Not Likely to Succeed on the Merits of His Claims.

Plaintiff cannot show a likelihood of success on the merits of his claims, and the Court should deny his motion on that basis alone. *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). Although Plaintiff's preliminary-injunction motion presents merits arguments only on the first of the three claims raised in his Complaint, he relies on his allegations pertaining to all three in support of the remaining, equitable preliminary-injunction factors. As Plaintiff is unlikely to succeed on the merits of any of his claims, Defendants address the merits of each below.

### 1. Claim 1: Denial of Equal Protection Based on USDA's Interpretation of SDFR

In Plaintiff's first claim, he contends that the Government's use of race and ethnicity in determining who is eligible for § 1005 loan payments violates equal protection. He is wrong. "The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995). Thus, "[a]lthough all governmental uses of race are subject to strict scrutiny, not all are invalidated by it." *Grutter v. Bollinger*, 539 U.S. 306, 326-27 (2003). "When race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied." *Id.* at 327. Ultimately, a plaintiff bears the burden of demonstrating the unconstitutionality of the Government's race-based remedial measures adopted to further a compelling interest. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277-78 (1986); *Aiken v. City of Memphis*, 37 F.3d 1155, 1162 (6th Cir. 1994) (once the Government produces evidence supporting constitutionality of race-conscious relief, challenging party "retains the ultimate burden of proving its unconstitutionality").

Plaintiff fails to satisfy that burden. Rather than engaging with the particular circumstances in this case, he resorts to conclusory assertions that the outcome in *Vitolo v. Guzman*—which dealt

with a distinct government program based on distinct record evidence—somehow controls here. *See* 2021 WL 2172181 (6th Cir. May 27, 2021). Plaintiff's refusal to address the substantial record evidence before Congress here, which revealed longstanding discrimination in USDA loan programs and its lingering effects, is fatal to his claim. In ignoring that record, Plaintiff fails to undermine Congress's strong basis in evidence that § 1005 debt relief to SDFRs is narrowly tailored to remedying (and not perpetuating) the lingering effects of discrimination at USDA.

### i.    The Government's Provision of Debt Payments to SDFRs Serves Compelling Government Interests.

The Government's compelling interest is two-fold: to remedy the lingering effects of prior discrimination against minority farmers in USDA loan (and other) programs and prevent public funds from being allocated in a way that perpetuates the effects of discrimination. Its reliance on these interests did not break new ground. "The Government unquestionably has a compelling interest in remedying past and present discrimination." *United States v. Paradise*, 480 U.S. 149, 167 (1987); *United Black Firefighters Ass'n v. City of Akron*, 976 F.2d 999, 1009 (6th Cir. 1992). And "[i]t is beyond dispute that any public entity ... has a compelling interest in assuring that public dollars drawn from the tax contributions of all citizens do not serve to finance the evil of private prejudice." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (O'Connor, J., plurality op.); *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000).

The congressional record elaborates these concerns at length. *See supra* BG III. And USDA has reiterated them. In hearings leading to § 1005's enactment, Agriculture Secretary Vilsack testified that providing debt relief to minority farmers would "address longstanding racial equity issues within [USDA]" and "respond to the cumulative impacts of systemic discrimination and barriers to access that have created a cycle of debt." Opening Stmt. of Thomas J. Vilsack

14

before House Comm. on Ag. (Vilsack Stmt.).[19]  He emphasized that historic discrimination has "plague[d] the programs at the USDA, especially [] the Farm Loan Program."  *Id.*  At the same time, Congress and USDA expressed an interest in ensuring that current pandemic-relief funds are not allocated in a manner that perpetuates discrimination against minority farmers, as had been the case with distribution of recent funds to farmers.  *See* BG III.  Members of Congress explained that minority farmers had been largely left out of prior race-neutral agricultural funding such as the MFP and the pandemic relief in CFAP, *see id.*, and Secretary Vilsack stressed that debt relief authorized by § 1005 would help SDFRs "dealing with a disproportionate share of COVID infection rates, hospitalizations, death and economic hurt," Vilsack Stmt.

### ii.    The Government Had Strong Evidence that Remedial Action Was Necessary To Further Its Compelling Interests.

The Government's compelling interests in adopting § 1005 were supported by a strong basis in evidence that remedial action was necessary to address long-standing discrimination in USDA programs and its lingering effects.  *See Croson Co.*, 488 U.S. at 500.  "No *formal* finding of past discrimination by the governmental unit involved is necessary to determine that a compelling interest exists, … but there must be strong or convincing evidence of past discrimination by that governmental unit."  *Aiken*, 37 F.3d at 1162-63.  The Government may rely on a combination of statistical and anecdotal evidence to support its use of a race-conscious program.  *See Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2212 (2016).  In fact, statistical evidence may in some cases be sufficient on its own "to show a strong basis in evidence for concluding that remedial action is constitutionally justified."  *United Black Firefighters*, 976 F.2d at 1010.  But even when gross statistical disparities are not "*conclusive* as to a finding of discrimination," a plaintiff carries the burden of "present[ing] evidence to rebut the inference" of

---

[19] *Available at* https://perma.cc/3LWV-4SMF.

discrimination arising from such statistics, "thus defeating the validity of the affirmative action plan." *Id.* at 1011.

Here, the decades of investigations, testimony, and reports on which Congress relied when it enacted § 1005 provide a strong basis in evidence to support its conclusion that it was necessary to provide targeted debt relief to minority farmers. Plaintiff fails to rebut that evidence.

a. *The Strong Evidence of Longstanding Discrimination Against SDFRs in USDA Programs.* In enacting § 1005, Congress relied on a vast body of statistical and anecdotal evidence recounting discrimination against SDFRs by USDA in the administration of its programs.

Initial reports by USCCR in 1965 and 1982 shed light on the specific inequities in USDA's farm loan programs, which "actively contributed to the [alarming] decline in the Black ownership of farmland." 1982 Rep. 176. USCCR reported that between 1970 and 1980, Black-operated farms had declined "57 percent—a rate of loss 2 1/2 times that for white-operated farms"—and that "almost 94 percent of the farms operated by blacks ha[d] been lost since 1920." *Id.* FSA (through its predecessor FmHA) was largely to blame. 1982 Rep. 176-79.

For instance, FmHA consistently provided inferior loans—with respect to amounts and terms—to Black farmers, which was consistent with its overall pattern of "follow[ing] local patterns of racial segregation and discrimination in providing assistance" to farmers. Equal Opp'y in Farm Progs., An Appraisal of Servs. Rendered by Agencies of the USDA, USCCR (1965) (1965 Rep.) at 100.[20] Data "revealed that in terms of the size of loans, purposes for which loans were to be used, and technical assistance, FmHA did not provide services to black farmers comparable to those provided to similarly situated whites." 1982 Rep. at 9. Moreover, USDA's civil rights complaints process—an otherwise "important [tool] to ensure that FmHA provide[d] equal

---

[20] *Available at* https://perma.cc/34HP-5V9P.

16

opportunities for minority farmers," *id.* at 134—was too "ineffective" and "untimely" to provide adequate recourse, *id.* at 169. Investigation into the large number of civil rights complaints showed they were often stalled or not acted on at all. *Id.* at 166-70. The cost of this discrimination was often "the season's crop, and ultimately the[] farm[]." *Id.* at 173.

That is exactly what such discrimination cost many minority farmers, according to another civil rights report issued over a decade later. When a team of USDA leaders appointed by the Secretary of Agriculture—the Civil Rights Action Team ("CRAT")—reviewed USDA's civil rights problems in 1997, it heard Black, Hispanic, Asian-American, and American Indian farmers tell of unexplained delays in processing their loan applications, arbitrary reductions in farm loans by county officials, and failures to receive promised loans at all, often leaving them "without enough money to repay suppliers and any mortgage or equipment debts." *Id.* at 3, 6-7, 15-16. Many minority farmers lost "significant amounts of land and potential farm income" as a result of these practices. *Id.* at 30; *id.* at 14 (reporting that "the number of all minority farms ha[d] fallen" significantly''—"from 950,000 in 1920 to around 60,000 in 1992"); *see also* 1982 Rep. 176 (reporting similar findings). Like the USCCR, the CRAT found that USDA's civil rights complaints process was an ineffective "system without accountability," where complaints often languished for years in a growing backlog or were left unanswered altogether. *Id.* at 24-25.[21]

Lack of administrative recourse for discrimination led to a series of lawsuits over the next decade by African-American, Native American, Hispanic, and female farmers, alleging that USDA had systematically discriminated against them on the basis of race, ethnicity, and gender in the administration of farm loans and other benefits and routinely failed to investigate administrative

---

[21] *See also* USDA OIG, *Rep. for Secretary on Civil Rights Issues – Phase I*, (1997), https://perma.cc/NK6B-W2CL.

complaints about such discrimination. *See Pigford II*, 856 F. Supp. 2d at 8 (describing allegations by African-American farmers that USDA had "deprived countless farmers of desperately needed credit and payments under various aid programs," causing "severe financial losses and even, in many cases, lost title to their farms"); *Cantu v. United States*, 565 F. App'x 7, 8-9 (D.C. Cir. 2014) (summarizing similar allegations in the other suits).

Though the cases largely settled, the court in *Pigford I* stressed that the claims, "though broad in scope, were no exaggeration"—it was clear by then that USDA had failed to "provide equal opportunity for all as the law requires." *Pigford II*, 856 F. Supp. 2d at 8. Farmers recounted not only being denied loans but also receiving them after "planting season was over, [when] the loans w[ere] virtually useless," or receiving supervised loans requiring a county supervisor's co-signature before funds could be withdrawn. *Pigford v. Glickman, (Pigford I)*, 185 F.R.D. 82, 87 (D.D.C. 1999). To receive payments under the settlements, claimants had to substantiate these claims of discrimination with some level of evidence. *Pigford II*, 856 F. Supp. 2d at 9-10 (explaining the settlement's two-track system that awarded differing amounts depending on a "substantial evidence" or "preponderance of the evidence" showing); *see also Cantu*, 565 F. App'x at 8-9 (explaining processes in other cases). In the *Pigford* litigation alone, so many African-American farmers sought relief that Congress enacted special legislation extending the statute of limitations for administrative civil rights complaints, *see* Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 14012 (2008), and then appropriated $1.25 billion to fund awards to successful claimants, *see* Claims Resolution Act of 2010, Pub. L. No. 111-291 (2010). To date, the Government has paid more than $2.4 billion under settlement agreements with claimants in all of these lawsuits who sufficiently substantiated their allegations of discrimination. *See Pigford I*,

97-cv-1978, ECF No. 1812, at 7; *Pigford II*, 08-mc-511, ECF No. 378-1, at 4; *Keepseagle*, 99-cv-3119, ECF No. 646, at 2; *Love*, 00-cv-2502, ECF No. 248-1, at 4.

Even after these settlements, problems with discrimination in USDA programs lingered. In 2011, Secretary Vilsack commissioned the firm Jackson Lewis LLP ("JL") to assess the "effectiveness" of USDA agencies "in reaching America's diverse population in a non-discriminatory manner." JL Rep. i. After a thorough 18-month investigation and analysis, JL issued a 674-page report setting forth its findings and 234 recommendations. *See id.* at iv, viii. The report compiled substantial anecdotal evidence, depicting "a system where the deck was always stacked, not only against access to USDA programs, but also against [minority customers'] ultimate success." *Id.* at viii. It contained substantial statistical evidence that, in the every-day operations of each USDA agency reviewed, SDGs were under-represented to their detriment, *see id.* xxiii, including with respect to the FSA specifically, *id.* at 131; *see also id.* at 69-72. And it found that the evidence "substantiated claims of denial of equal program access and continuing institutional discrimination," *id.* at viii, which resulted in "a broad and longstanding negative impact on … SDGs—including the loss of scarce or irreplaceable farm lands," *id.* at 64.[22]

Like preceding reports, the JL Report recounted the persistent complaints that African-Americans, Hispanics, and Asians were discriminated against with respect to the availability, timing, and requirements for obtaining FSA loans. *See id.* at 83-87. African-American farmers, for instance, complained of their loans being "doled out in small amounts by FSA or subject to dual signature" requirements, or having other supervision requirements that were not imposed on

---

[22] The JL Report included women in its groups of SDGs, along with Hispanics/Latinos; Blacks/African Americans; Asians; American Indians/Alaskan Natives; and Native Hawaiians/Pacific Islanders. *See id.* 66 n.33. Defendants rely herein on JL Report's many findings specific to the aforementioned racial and ethnic groups.

white farmers. *Id.* at 85-86 ("When loans are approved for African Americans, FSA tends to 'control the purse strings' (uses supervised accounts), and the same is not true for Whites who receive loans[.]").[23] Hispanic and Asian farmers similarly reported unfair treatment and being "stereotyped as … farm workers, rather than farm owners." *Id.* at 86-87. And American Indians and Alaskan Natives received a disproportionately smaller share of farm loan dollars as compared to their percentage of principal operator population nationwide. *Id.* at 435. Additionally, the report found that USDA's discrimination complaints processing resulted in "what appear[ed] to be an almost foregone conclusion: in 97%+ of the claims, there [wa]s no finding of discrimination." *Id.* at xxv. It stressed that "most FSA employees" believed "that inequitable treatment of customers and potential customers is, at worst, a series of isolated and independent incidents." *Id.* at 66. That was incorrect, according to JL—in reality, "the inequities faced by SDGs have, over time, been systemic and ingrained in every-day FSA operations." *Id.*

     *b. The Strong Evidence of Lingering Discrimination in USDA Farm Loan Programs.* The inequalities described in the JL Report are reflected in recent reports that "continue to document the challenges and barriers faced by farmers of color due to race or ethnic discrimination or the legacy of such discrimination." S1263 (Stabenow). For instance, a 2017 study focused on "the challenges faced by Latinx farmers," including the "failure of agricultural agencies to engage in appropriate outreach or account for language barriers" with respect to them. H766 (citing Minkoff-Zern & Sloat, *A New Era of Civil Rights? Latino Immigrant Farmers and Exclusion at [USDA]*, Ag. & Human Values 34 (2017)) (attached as Ex. B). The study concluded: "These processes

---

[23] In recent congressional testimony, Congress heard of black farmers receiving "supervised bank accounts which required white loan officers to co-sign every transaction." Comm. Hr'g, State of Black Farmers, 2021 WL 1154123 (2021) (John Boyd, Nat'l Black Farmers Ass'n) (Mar. 25, 2021).

have succeeded in creating agricultural racial formations, resulting in the ownership and operation of US farms remaining in primarily white hands." Minkoff-Zern & Sloat, *A New Era* at 634.

Two additional GAO reports, generated at Congress's request, looked at the "challenges SDFRs reportedly face in obtaining agricultural credit[.]" GAO-19-539, 2. In the first report, GAO concluded that the "long-standing and well-documented" "allegations of unlawful discrimination against SDFRs in the management of USDA programs" were substantiated by the data and were continuing to affect SDFRs' ability to access credit. *Id.* at 28-29. In the second report, specific to Native Americans, GAO noted that some Native American stakeholders believed "discrimination ... contribute[d] to the lack of commercial lending on tribal lands," which may also have "deter[ed] them from applying for credit" at all. GAO-19-464, 19-20.

That same year, Congress held a hearing on civil rights compliance at USDA "to ensure the Department ... functions equally for everyone it serves and employs, regardless of race, gender, ethnicity, or any other protected class." 2019 Civil Rights Hr'g 1 (Fudge). By that time, the "controversial history on civil rights at USDA" was "no secret." *Id.* Congress repeated some of the same concerns about discrimination that motivated its, and USDA's, prior efforts to revise the Department's programing, including the higher foreclosure rates for black farmland, *id.* at 9, and the faster decline of farm ownership "for black farmers than for other farmers." *Id.* at 8.

In 2021, GAO released another report underscoring the "racial and income disparities in access to financial services and availability of credit," including among "minority farmers and ranchers." GAO-21-399T, at 1. Drawing from previous reports and incorporating updated data, GAO reiterated that minority farmers, including tribal members, "had less access to credit than other agricultural businesses." *Id.* at 1, 2-3. All of this and additional evidence relied upon by

21

Congress in passing § 1005 was than sufficed to justify its conclusion that past discrimination in USDA loan (and other) programs was causing ongoing, negative effects.

    *c. The Strong Evidence That Allocation of Recent USDA Funds Perpetuated the Effects of Longstanding Discrimination in USDA Farm Loan Programs.* Congress also had a strong basis in evidence to conclude that, while COVID-19 was hitting minority farmers the hardest, recent agricultural funding and pandemic relief was unfortunately perpetuating historic inequalities, creating a need for targeted relief. Numerous sources have reported the pandemic's disproportionate impact on the health and welfare of minorities in this country. *See, e.g.,* COVID-19 Racial and Ethnic Health Disparities, CDC (Dec. 10, 2020), https://perma.cc/DJ3J-22DU. Congress recognized this, *see* H.R. Rep. No. 117-7, 2-3 (noting the "most vulnerable communities" had been "forced to bear the brunt of" the pandemic and economic crisis), and found that minority farmers were in a particularly vulnerable position, *see* CR S1265 ("[F]armers of color were in a far more precarious financial situation" than their white counterparts "before the … pandemic hit.") (Booker). For instance, while "[a]pproximately 13 percent of borrowers with FSA direct loans [we]re currently delinquent on their loans," that number increased to 35% for Black farmers and 24% for Hispanic, Asian-American, and Indigenous farmers, meaning that minority farmers were on the precipice of "yet another wave of foreclosures and potential land loss." *Id.* S1266.

    Despite minority farmers' disproportionate need for monetary relief, Congress noted that although "USDA spends billions of dollars annually to provide crucial support to American agricultural producers," "agricultural producers belonging to racial or ethnic minority groups have received a disproportionately small share of the farm loans and payments administered by USDA as a result of the longstanding and widespread discrimination against these groups." H.R. Rep. No. 117-7, 23; *see also id.* at 12 (noting that such programs "continue to disproportionately benefit

farmers who are not racial or ethnic minorities"). Indeed, Congress cited reporting that the overwhelming majority of recent agricultural funding and pandemic relief had not reached minority farmers, in large part due to the diminished relationships between SDFRs and USDA, the diminution of minority farms due to discrimination, and agricultural programs that tend to favor large farms. *See* BG III.A. The academic letter to Congress also explained that these were just the most recent examples of farm programs "perpetuat[ing] and exacerbate[ing] the problem" of discrimination against minority farmers by favoring large, non-minority landowners. CR S1266. Congress thus had a strong basis in evidence to conclude that its "tailored approach" in § 1005 was necessary "to address these longstanding inequities." H.R. Rep. 117-7, 23.

> *d. Plaintiff's Conclusory Arguments Do Not Rebut the Government's Strong Basis in Evidence.* Plaintiff bears the burden of rebutting the evidence on which Congress relied to conclude that it had a compelling interest in remedying, and not perpetuating, the lingering effects of decades-long discrimination at USDA. *Aiken*, 37 F.3d at 1162-63. Yet Plaintiff makes no attempt at any rebuttal here. The entirety of his argument consists of the blanket assertion that the Government lacks a compelling interest in remedying "societal discrimination." Pl.'s Mot. at 7. That ignores the voluminous evidence, outlined above, of specific instances of prior discrimination within USDA programs in particular—and in its loan programs more specifically.

The evidence illustrates the various shapes discrimination took in those loan programs. Minority farmers received smaller loan amounts; had those amounts arbitrarily reduced; received loans on a significantly delayed schedule, which negatively impacted seasonal crops; had their repayment schedules "accelerated without explanation"; were denied loan servicing that could have provided them with options to avoid default and foreclosure; and were assigned "supervised" loans that required white loan officers to approve and co-sign every transaction. *See* BG III; Arg

I.B.2.  This well-established history of discrimination in USDA's loan programs gave Congress good reason to conclude that the stark statistical disparities between minority farmers and white farmers today—showing that minority farmers have disproportionately smaller farms that bring in less revenue, disproportionately higher rates of delinquency and foreclosure, and less access to credit, among other things—were the lingering effects of past discrimination that Congress had a compelling interest in remedying. *Cf. Paradise*, 480 U.S. at 170 n.20 (finding that the "racial imbalances in the Department [we]re properly characterized as the effects of the Department's past discriminatory actions"). In addition, reporting that recent MFP funding and CFAP relief largely failed to reach minority farmers also gave Congress good reason to conclude that it had become a "passive participant" in a discriminatory system that consistently benefited white farmers over minority farmers, and it had a compelling interest in no longer contributing to, but "dismantl[ing]," that system. *Croson*, 488 U.S. at 492.

All of this shows that the Government had a strong basis in evidence to support its adoption of a remedy specific to USDA's loan programs, where discrimination against minority farmers had most frequently occurred and its effects were most acutely felt. Remedying the lingering effects of that history of discrimination in a specific government programs is undoubtedly "a national policy objective of the highest priority." *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 779 (1976); *Adarand*, 515 U.S. at 237 ("[B]oth the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it."); *Paradise*, 480 U.S. at 169 (race-conscious policy was necessary "to eradicate the continuing effects of [public safety department's] own discrimination"). As Plaintiff makes no effort to rebut this evidence, he fails to show that the

Government lacks a compelling interest in remedying the documented, lingering effects of discrimination specific to the administration of USDA loan programs. *Aiken*, 37 F.3d at 1163.

### iii.    The Provision of Debt Relief to Minority Farmers Is Narrowly Tailored to Serve the Government's Compelling Interests.

The targeted relief provided in § 1005 is also narrowly tailored to further the Government's compelling interests. To assess narrow tailoring, courts look to: "[i] the necessity for the relief and the efficacy of alternative remedies; [ii] the flexibility and duration of the relief, including the availability of waiver provisions; [iii] the relationship of the numerical goals to the relevant labor market; and [iv] the impact of the relief on the rights of third parties," *Paradise*, 480 U.S. at 171, as well as over- or under-inclusiveness, *see Croson*, 488 U.S. at 506. These factors show that USDA's provision of debt payments to minority farmers is narrowly tailored.

First, the necessity for USDA's remedial action is firmly rooted in the evidence set forth above, showing longstanding discrimination against minority farmers in USDA programs that often resulted in minority farmers receiving loans in lower amounts and with adverse terms as compared to non-minority farmers. *See* Arg. I.B.2. That discrimination, and its lingering effects, contributed to a situation where minority farmers were hit hardest by COVID-19, such that they were on the brink of foreclosure at higher rates than white farmers, and yet were short-changed again, reportedly receiving a tiny fraction of CFAP funds less than a year after being largely left out of the single largest U.S. agricultural subsidy. *See* BG III.A. Targeted relief to minority farmers with outstanding USDA loans was thus necessary to remedy the effects of USDA discrimination against them, made even more acute by a pandemic that disproportionately affected them. *See* Vilsack Stmt. And it was necessary to ensure that these funds (unlike prior funds) were not allocated in a manner that perpetuated existing inequities. *See id.*

The necessity of this debt relief is underscored by the inefficacy of the race-neutral

alternatives that Congress tried for years before enacting § 1005. *See Fisher*, 136 S. Ct. at 2213 (race-conscious admissions program was narrowly tailored where university failed to achieve compelling interest after trying to do so for seven years via race-neutral means). As explained, Congress changed the role of county committees in USDA loan programs and enacted measures to achieve greater minority representation on those committees in 2002 and 2008, *see* BG I; and yet testimony and reporting, as recent as one month before Congress passed § 1005, shows continuing disparities in the number, amounts, and servicing of USDA loans for minority farmers as compared to non-minority farmers. *See id.* III.A. Also, in 2002, Congress created an Assistant Secretary of Civil Rights at USDA, to address the agency's poor civil rights record; and yet subsequent testimony and reports showed continuing issues in processing civil rights complaints, *see* Arg. I.B.2, including "inconsistencies and missing information in [USDA] data" and a dearth of findings of wrongdoing as recently as 2019, *see* 2019 Civil Rights Hr'g (Fudge). Congress created the 2501 Program in 1990 to increase minority farmers' awareness of and access to USDA resources, and permanently funded the program in 2018; and yet recent reporting indicated that minority farmers were still unaware of USDA resources, including recent pandemic relief, *see* BG III.A. Most recently, Congress created the MFP program and CFAP to help farmers adversely impacted by tariffs and the pandemic; and yet reporting showed that the vast majority of the billions in funding under those programs did not reach minority farmers due to structural biases in federal farm programs. *See id.*

Second, in addition to being necessary, the debt relief for minority farmers is both flexible and time-limited. Although five minority groups are included in USDA's definition of "socially disadvantaged groups," USDA's definition is "not limited to" those groups. 86 Fed. Reg. 28330. Rather, the Secretary will consider written requests on a case-by-case basis to determine whether

26

other groups should be eligible for debt relief. *See id.* The debt relief under § 1005 is also "a one-time occurrence," extended to SDFRs with qualified loans as of January 1, 2021. USDA's implementation of § 1005 is thus "flexib[le] in administration," *Fullilove v. Klutznick*, 448 U.S. 448, 460 (1980), and "temporary in application," *Paradise*, 480 U.S. at 178, thereby ensuring that the race-conscious measure endures no longer than necessary to serve its purposes.

Third, USDA's provision of debt relief to minority farmers does not impose an unacceptable burden on third parties, namely white farmers. Plaintiff points to no evidence that white farmers generally (or that he in particular) were historically denied equal treatment by USDA. In fact, Plaintiff himself has received more than $100,000 in agricultural subsidies just in the last decade. *See* https://perma.cc/C7Y8-SC5V. Nor does Plaintiff address the reports showing that the overwhelming and disproportionate majority of recent agricultural subsidies and pandemic relief before ARPA remained out of minority farmers' reach. *See* BG III.A. The temporary and comparatively small debt relief under § 1005[24] to relieve the sizeable burden minority farmers have long borne does not impose an impermissible burden on white farmers, who Congress found had been the overwhelming beneficiaries of recent funding. *See* BG III.A; *Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 481 (1986) (29.3% nonwhite union membership goal to remedy past discrimination had "only a marginal impact on the interests of white workers" where whites were "denied certain benefits available to their nonwhite counterparts" but still constituted "a majority of those entering the union").

Fourth and finally, USDA's provision of loan payments to minority farmers is neither over-nor under-inclusive. As explained, there is a large body of evidence that the minority groups

---

[24] The MFP alone is a $25.1 billion program, while USDA estimates that payments under § 1005 will be roughly over $4 billion. *See* https://perma.cc/R69N-AL5K.

included in USDA's definition of "socially disadvantaged groups" for purposes of § 1005 have suffered from discrimination in USDA programs with nationwide scope. USDA has defined SDGs to include those same racial and ethnic groups since at least 2001. *See* BG III.B. And reporting before and since then has recounted discrimination in federal programs against those groups. Some reports have singularly focused on one particular group. For instance, some earlier reports focused on concerns related to African Americans, 1965 Rep., 1982 Rep., CRAT Rep.; the GAO has analyzed credit issues specific to Native Americans, *see* GAO 19-464; and other reports looked to the plight of Hispanics, Minkoff-Zern & S. Sloat, *A New Era*. Other publications have investigated obstacles faced by all groups included in USDA's definition of SDG as a whole. *See* CRAT Rep.; JL Rep.; GAO 19-539. And recent reports on the distribution of agricultural funding showed that it had gone disproportionately to those who do not fall within USDA's definition of SDGs. *See* Jared Hayes, *USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers*, EWG (Feb. 18, 2021), https://perma.cc/PVZ7-QMFD. Thus, the Government tailored § 1005 to the specific racial and ethnic groups who, all of the reports showed, had suffered discrimination in USDA programs and been largely left out of relief efforts. It is not overinclusive to include each group affected by discrimination and its lingering effects, *see Paradise*, 480 U.S. 149; nor is it underinclusive to leave out white farmers who have not suffered the same history of discrimination and lingering effects, *see Croson*, 488 U.S. at 506 (noting that if relief program was meant "to compensate black contractors for past discrimination, one may legitimately ask why" remedial relief must be shared with those who were not shown to have been discriminated against).

None of Plaintiff's arguments undercuts the conclusion that § 1005 loan payments are a narrowly tailored form of relief. At the outset, Plaintiff contends that Congress should have adopted a remedy that "simply grant[ed] priority consideration" for loan payments "to all [farmers]

who have not yet received coronavirus relief funds." Pl.'s Mot. at 8. That type of relief, however, would come up short for at least two reasons. For one, it would not address Congress's compelling interest in reversing the many effects of longstanding discrimination in USDA loan programs. That minority farmers were largely left out of prior pandemic relief due to USDA discrimination that led to their having disproportionately smaller farms is just one effect of that discrimination. Other effects include, as Congress recognized, the fact that minority farmers had for decades received disproportionately smaller loans on delayed schedules and with adverse terms—without the benefit of USDA outreach and loan servicing that could have provided them with options to avoid delinquency and foreclosure. All of that has resulted in minority farmers generally holding smaller farms, having higher delinquency rates, and sitting on the brink of foreclosure at a higher rate than white farmers. Section 1005 seeks to address these and other multi-layered effects of historic discrimination at USDA loan programs; not receiving pandemic funds is just one of many such effects. For another, distributing funds based on individualized inquiries, as Plaintiff suggests, would undermine the Government's interest in moving "with alacrity" to provide timely and meaningful relief to minority farmers disproportionately in need of it, in the midst of an unprecedented global health crisis. *See Paradise*, 480 U.S. at 172. That is not a workable alternative. *See id.* at 171-77, n.28 (approving of a race-conscious measure that provided for "immediate promotions" of black officers in order to compensate for past delays, and rejecting alternative remedies as ineffective because they could not have been administered swiftly enough).

Similarly without merit is Plaintiff's assertion that the program is underinclusive because it does not include all farmers who did not receive prior pandemic relief. But Congress found that its prior funds remained largely out of reach to minority farmers because longstanding discrimination in USDA programs led them to have disproportionately smaller farms (as

confirmed in the 2019 GAO Report and elsewhere in the record) and resulted in a system that tends to favor large farms generally owned by white farmers. With § 1005, Congress sought to remedy the lingering effects of *that* historical discrimination and *that* discriminatory system. That Congress did not cast a broader net to include all farmers who did not receive CFAP funding just shows that the remedy it adopted in § 1005 is narrowly tailored to the problem it identified. With that problem in mind, the debt relief in § 1005 is not underinclusive because it did not include other farmers who Plaintiff does not allege have experienced the same historical discrimination in USDA loan programs and, as a result, were not left out of prior relief efforts.

Equally unpersuasive is Plaintiff's argument that § 1005 is overinclusive because it provides relief to farmers who may have been successful claimants in *Pigford* and other settlements. In enacting § 1005, Congress considered compelling evidence that prior settlements failed to provide complete relief to victims of discrimination, including because they were eroded by state taxes and left victims with burdensome tax debt. S1264 (Stabenow) (citing Zucchino, *Sowing Hope*, *supra* n.19). Indeed, Congress enacted § 1005 partly because these prior efforts, "taken mostly on a case-by case basis," "ha[d] still not remedied the discrimination" against minority farmers in USDA programs, as evidenced by their disadvantaged position today. *Id*.

Finally, Plaintiff's question as to "why these particular racial groups" were included in USDA's definition of SDFR, Pl.'s Mot. at 8, is already answered by the record before Congress—a record which Plaintiff fails to engage with at all. His reliance on *Vitolo* is mistaken, as that case involved an entirely separate program, based on a different record from the one supporting § 1005. And Plaintiff is wrong to assert that the § 1005 program is governed by *Vitolo* because it adopts a "scattershot" approach to providing relief that includes certain minority and ethnic subgroups as beneficiaries of the program but not others. *See* Pl.'s Mot. at 8. Plaintiff appears to be relying on

a passage in *Vitolo* in which the court found fault with government regulations that targeted only certain subsets of minority groups for benefits and not others, without explanation. 2021 WL 2172181, at *7 (citing 13 C.F.R. § 124.103). But those regulations do not apply to USDA, and the *Vitolo* court's finding in that regard is thus inapposite here. For purposes of § 1005, USDA provides debt relief to SDFRs who self-identify as falling within one of the racial or ethnic groups included in its definition of SDFR. *See* Cobb Decl. ¶¶ 12-13, 15. And that definition was adopted based on the robust record evidence before Congress showing how each minority group has suffered historic discrimination in the administration of USDA loan programs and continue to suffer the adverse effects of that discrimination today.

Plaintiff does not identify, in this case, where the record is lacking as to specific SDFRs. Nor can he do so. As just explained, the many reports before Congress at times analyzed the condition of one specific minority group, while others focused on those included in USDA's definition of SDG as a whole. The JL Report alone provides 674 pages of findings and analysis based on an 18-month investigation into the experiences of all minority farmers included within USDA's definition of SDFR. Myriad other reports considered by Congress in the hearings leading to § 1005's enactment report similar findings with respect to specific racial groups, or all minority groups as a whole. All together, these studies, reports, and investigations provide strong evidence that each group recipient of § 1005 loan payments has suffered from discrimination and its lingering effects. The program, in short, is narrowly tailored, and Plaintiff fails to show otherwise.

2.   **Claims Two and Three: Denial of Equal Protection and "Illegally Allowing Future Eligibility" to Socially Disadvantaged Farmers Who Receive Debt Relief**

Plaintiff does not address the merits of claims two and three in his preliminary-injunction motion, but he relies on them substantially as a basis for irreparable harm, both to himself and to

the socially disadvantaged farmers § 1005 "aimed to help." Pl.'s Mot. at 8-10, 12. Because Plaintiff cannot prevail on the merits of these claims, they do not support his allegations of harm.

In claims two and three, Plaintiff alleges that USDA plans to allow those who receive § 1005 loan payments to remain eligible for future USDA loans, despite a statutory prohibition against providing or guaranteeing loans to those whose debts have been forgiven. Compl. ¶¶ 75-85. According to Plaintiff, § 1005 payments constitute "debt forgiveness" under a pre-ARPA statute, and if an SDFR accepts such a payment, they should be statutorily prohibited from obtaining another USDA loan. *Id.* Nonetheless, Plaintiff asserts, USDA intends to "disregard" that statutory bar to allow SDFRs who receive § 1005 loan payments to remain eligible for future USDA loans. Compl. ¶ 81; Pl.'s Mot. at 10 (explaining that USDA is "informing individuals that they remain eligible for future loans on its [§ 1005] FAQ page"). Plaintiff argues that, in doing so, USDA violates the statute and his right to equal protection, as USDA is not waiving that bar for farmers whose loans are forgiven in other ways. He seeks a "declaratory judgment that providing further loans to those who receive [debt] forgiveness is illegal and unconstitutional, both facially and as applied." Compl., Relief Requested at B.

These claims lack merit because they are based on the incorrect premise that, through § 1005, USDA is providing "debt forgiveness" as that term is statutorily defined. Plaintiff correctly asserts that the Secretary is generally (with some exceptions not relevant here) prohibited from making or guaranteeing loans to borrowers who have received "debt forgiveness." 7 U.S.C. § 2008h(b)(1). But the loan payments provided under § 1005 do not constitute "debt forgiveness" and thus do not fall within that statutory prohibition. To qualify as "debt forgiveness," a loan must be reduced or terminated "in a manner that results in a loss to the Secretary." 7 U.S.C. § 1991(a)(12)(A). Section 1005 payments do not result in any loss to the Secretary, because

Congress appropriated funds to the Secretary from "the Treasury" to cover the full "cost of loan modifications and payments under" that Section. ARPA § 1005(a)(1). The cash payments coming from the Treasury's funds will completely pay off SDFRs' eligible loans under § 1005—and those Treasury payments guarantee that the Secretary will remain whole. Because the payments under § 1005 do not result in any loss to the Secretary, they do not fall within the meaning of "debt forgiveness" for purposes of the statutory bar against providing or guaranteeing future loans.

Plaintiff's contrary position that § 1005 loan payments are "debt forgiveness" triggering the statutory bar on future loan eligibility rests entirely on a House provision that did not make it into ARPA as enacted. The proposed language stated that "the provision of a payment under" § 1005 "to a socially disadvantaged farmer or rancher shall not affect the eligibility of such farmer or rancher for a farm loan after the date on which the payment is provided." *See* American Rescue Plan Act of 2021, 117 H.R. 1319, Title I, § 1005(3). Plaintiff says that language shows that Congress "[o]bviously" did not "intend[] to provide loan forgiveness at the expense of forever rendering the 'socially disadvantaged' farmer ineligible for future loans," but that Congress inadvertently left "intact the prohibition on future loans" for recipients of § 1005 debt relief when it failed to include that language in ARPA as enacted. Pl.'s Mot. at 9.

But Plaintiff's assertion that Congress inadvertently barred § 1005's beneficiaries from eligibility for receiving future USDA loans is not only implausible—it is contrary to the pre-ARPA statutory definition of "debt forgiveness." Plaintiff's theory "lacks persuasive significance, because several equally tenable inferences may be drawn from" the omission of that sentence, "including the inference that the existing legislation" already addressed the issue and rendered the proposal superfluous. *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990). Here, the most likely explanation for the provision's absence from the enacted version of ARPA is that

33

Congress concluded it was unnecessary because § 1005 does not result in a loss to the Secretary and thus does not constitute "debt forgiveness," as that term is statutorily defined. In sum, Plaintiff's allegations in claims two and three that § 1005 relief constitutes "debt forgiveness" are contrary to law and fact. Plaintiff thus cannot show that he is substantially likely to prevail on these claims and consequently, that he is entitled to the preliminary injunction he requests.

### B. Plaintiff Fails to Show a Substantial Likelihood of Irreparable Harm.

Plaintiff also fails to show a substantial likelihood of irreparable harm, "the hallmark of injunctive relief." *Patton v. Shelby Cty. Sheriff's Dep't*, 2021WL640833, at *11 (W.D. Tenn. Feb. 18, 2021). Plaintiff must show that absent an injunction he "will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

Under current circumstances, any harm Plaintiff could possibly face is not "actual and imminent," much less irreparable. Plaintiff sues to enjoin § 1005 payments from "being dispensed," Pl.'s Mot. at 11, but USDA is already subject to a nationwide injunction prohibiting disbursement of those payments, *See Wynn* Op. Where the challenged action has already been enjoined, courts have recognized that a redundant preliminary injunction would be a misuse of judicial resources. *See, e.g., Nat'l Urb. League v. DeJoy*, 2020WL6363959, at *8 (D. Md. Oct. 29, 2020). The equitable power to enter an injunction should be reserved for those circumstances necessary to avert irreparable harm. Where the challenged action could not be expected to occur, a second injunction would serve no function.

Even if the *Wynn* preliminary injunction were not in place, no injunction would be warranted here, because Plaintiff's alleged harms are not irreparable. Plaintiff asserts that irreparable harm should be presumed because he is likely to succeed on his equal protection claim. Pl.'s Mot. at 10. Not so. As illustrated above, USDA's provision of debt relief to SDFRs is

34

narrowly tailored to further the Government's compelling interests in remedying the lingering effects of well-documented, historic discrimination in USDA loan programs, and ensuring that pandemic relief is not distributed in a way that perpetuates those lingering effects. Plaintiff is unlikely to succeed on his equal protection challenges to § 1005; therefore, the constitutional nature of Plaintiff's claims provides no basis for irreparable injury.

But even if Plaintiff could show a likelihood of success on the merits of any of his claims, that would not establish irreparable harm without more, under the facts of this case. While some courts in this Circuit have found that a likelihood of success on the merits of a constitutional claim mandates a finding of irreparable harm, they have done so in factual circumstances appreciably distinct from this case. In *Obama for America v. Husted*, for instance, the court found that the plaintiffs were likely to succeed on their claim that the State of Ohio's changed voting laws impermissibly burdened the right to vote in violation of equal protection. 697 F.3d at 425-27. In support of that claim, the "Plaintiffs introduced extensive evidence that a significant number of Ohio voters will in fact be precluded from voting" because of the changed law. *Id.* at 431. Given that the right to vote, once lost, is impossible to compensate, the court found the "restriction on the fundamental right to vote" an "irreparable injury" in and of itself. *Id.* at 436. Here, however, Plaintiff does not allege an inability to exercise a discrete fundamental right; he complains instead that other farmers are the beneficiaries of funds that he believes he should receive as well. But he fails to show how further delaying distribution of needed funds to others will remedy any harm to him. Similarly, in *Vitolo*, the court found that the plaintiffs alleging an equal protection violation faced the very real prospect that they would be unable to access the limited funds at issue before they ran out. 2021 WL 2172181, at *1 ("The key to getting a grant is to get in the queue before

the money runs out."). Despite Plaintiff's insistence to the contrary, the same is not true here given the terms of the congressional appropriation.

Indeed, Plaintiff asserts—incorrectly—that he will be independently irreparably harmed absent an injunction because the funds appropriated under § 1005 are "fleeting," such that if the Court does not "promptly halt" (or further delay) "all payments," those funds may run out before this case is resolved. Pl.'s Mot. at 10. Presumably, he is concerned that if the Court rules in his favor at the end of the case—and in doing so determines that the funding criteria must be broadened for Section 1005 to be constitutional—then any such ruling would come too late because the funds will likely evaporate by then. But ARPA's text belies Plaintiff's unsupported assertion that the money appropriated for debt relief may run dry. Congress appropriated "such sums as may be necessary, to remain available until expended," to cover the cost of loan payments provided by § 1005. ARPA § 1005(a)(1). That provision clarifies that funds will neither run out nor expire. By allocating "such sums as may be necessary," Congress placed no limit on the amounts to be made available to pay off qualifying loans under § 1005. And by providing that funds shall "remain available until expended," Congress placed no deadline for their expenditure. *See, e.g.*, *Shoshone-Bannock Tribes of Fort Hall Rsrv. v. Shalala*, 988 F. Supp. 1306, 1330 (D. Or. 1997) (recognizing that appropriation to "remain available until expended" is not a "cap" but instead, "segregate[s] such funds for 'no year' status which has no fiscal year limitation or expiration date"); *see also* Gen. Acc. Off., 1 *Principles of Fed. Appropriations L.* 5-7, 5-8 (2d ed. 1991). Therefore, Plaintiff's insistence that the Court must halt (or further delay) implementation of § 1005 to prevent those funds from running out has no merit.[25]

_____

[25] Additionally, even accepting Plaintiff's argument that the funds at issue could somehow be depleted—but, again, they cannot—Plaintiff's alleged harm on that basis would not be imminent, given the time it will take for USDA to implement Section 1005 and issue payments. *See generally*

Contrary to the *Wynn* district court's recent conclusion, the fact that the statute as drafted provides only for payments to "socially disadvantaged farmers and ranchers" would not be a bar to providing effective constitutional relief at the end of the case. *See Wynn* Op. 34-36. In other cases where an equal protection claim ultimately succeeds on the merits, the Supreme Court has "repeatedly affirmed District Court judgments ordering that [federal financial] benefits be paid to members of an unconstitutionally excluded class." *Califano v. Westcott*, 443 U.S. 76, 89 (1979). Whether to enjoin a program or instead expand it to additional groups turns on the legislature's intent. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 (2017); *cf. Westcott*, 443 U.S. at 89-90 (affirming decision that "ordered extension, rather than invalidation, by way of remedy" where "an injunction suspending the program's operation would impose hardship on beneficiaries whom Congress plainly meant to protect"). Thus, should this Court ultimately determine at the conclusion of this case that extension of benefits to additional classes of persons is necessary, it will be empowered to do so.[26]

Finally, the Court should reject Plaintiff's counterfactual assertion that an immediate injunction will prevent irreparable harm to those Congress "aimed to help" through Section 1005, because (Plaintiff says) it would keep socially disadvantaged farmers from unwittingly accepting

---

Cobb Decl. USDA has issued only one of two NOFAs that will address all loans eligible for debt relief, and the agency a months-long administrative process for identifying eligible recipients under each NOFA, processing letters, and disbursing payments. *Id.* ¶¶ 13-19, 27, 29-35.

[26] Plaintiff also asserts that Defendants' sovereign immunity precludes him from recovering damages. Pl.'s Mot. at 11. But damages are beside the point, because Plaintiff does not claim any past harm for which he would be entitled to damages; he seeks forward-looking injunctive relief. If he proves that such relief entitles him to receive § 1005 payments, then sovereign immunity would not bar recovery. *Bowen v. Mass.*, 487 U.S. 879, 892, 895 (1988) (APA's waiver of sovereign immunity for "relief other than money damages" does not preclude recovery of "specific remedies" such as "monetary relief" if such relief is "the very thing to which [the plaintiff] was entitled"); *Westcott*, 443 U.S. at 89-90 (collecting cases in which Supreme Court approved rulings that expanded access to statutory financial benefits as a remedy for equal protection violation).

"loan forgiveness" that would bar them from receiving future loans.  Pl.'s Mot. at 9.  As explained above, Plaintiff's "debt forgiveness" theory is wrong as a factual and legal matter.  Because USDA is not providing debt forgiveness through Section 1005 that would implicate any statutory bar to future loan eligibility, there is no basis for Plaintiff's contention that an injunction will somehow protect the recipients of Section 1005 loan payments.  In fact, as discussed below, an injunction would cause substantial harm to those denied the debt relief to which they are entitled.

### C.  The Balance of Equities and Public Interest Favor Defendants.

On the last factors, the balance of harms overwhelmingly favors Defendants, as the injunction Plaintiff seeks is manifestly contrary to the public interest.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009) ("These factors merge when the Government is the opposing party.").  Plaintiff's only point on these factors is a summary assertion that a preliminary injunction is necessarily in the public interest simply because he alleges the violation of a constitutional right.  Pl.'s Mot. at 12.  That ignores the substantial public interest—recognized by Congress—in ensuring that minority farmers have access to the funds necessary to prevent further harm caused by discrimination and exacerbated by a global pandemic, and the significant, real-world harms minority farmers may suffer due to a continued delay in obtaining that debt relief.

The Government and the public have a strong interest in the implementation of the laws enacted by their elected representatives.  *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").  Here, that interest is even more compelling, given Congress's conclusion that swift debt relief to minority farmers is necessary to remedy prior discrimination in USDA loan programs, which has only been exacerbated by a global pandemic and the failure of prior relief to reach minority farmers.  *Supra* Arg. I.A.1.  And the thousands of minority farmers entitled to that relief plainly have a strong interest in receiving those funds

without delay.  Indeed, hundreds of eligible recipients to whom USDA anticipates sending offer notices are currently in bankruptcy proceedings, *See* Cobb Decl. ¶ 33, and minority farmers are delinquent on FSA loans at higher rates—in some cases much higher rates—than white farmers, *see id.* ¶ 37 (explaining that current USDA data shows African American delinquency rate three times that of white borrowers; Hispanic delinquency rate six times that of white borrowers; Asian, American Indian, and Alaskan Natives also delinquent at a higher rate).  Further delaying relief to those farmers could result in foreclosure of their farms by non-USDA lenders, *id.* ¶ 38, and prevent them from obtaining new loans from FSA or other federal agencies, *id.* ¶ 37, 39.

Finally, the public interest weighs against any further injunction even assuming Plaintiff's legal claims have merit.  "When the right invoked is that to equal treatment, the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Morales-Santana*, 137 S. Ct. at 1698.  "The choice between these outcomes is governed by the legislature's intent, as revealed by the statute at hand." *Id.* at 1699; *see also Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 330 (2006).  Further delay of implementation of § 1005 would be appropriate only if Plaintiff could show, in addition to the other requisite preliminary injunction showings, that Congress would prefer as a remedy for any constitutional violation to provide no immediate relief for *any* minority farmer while the program is redesigned.  There is no basis for concluding that further delaying the provision of emergency relief to those farmers would be consistent with Congress's intent in enacting § 1005.  Plaintiff thus fails to show that his desired injunction constitutes an appropriate remedy under binding Supreme Court precedent.

**II.    If The Court Were to Conclude That An Injunction Is Warranted—and It Is Not—
Any Such Injunction Should Be Limited To Plaintiff.**

Should this Court determine that any form of injunctive relief is necessary (and it should

not), any such injunction should be limited to this Plaintiff.  A remedy "must be tailored to redress

the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and an injunction

should be "no more burdensome to the defendant than necessary to provide complete relief to the

plaintiff[]."   *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).   Nationwide

injunctions in particular should be avoided, *see Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018)

(Thomas, J., concurring), especially where, as here, similar cases are pending in multiple courts.

The Court may provide an immediate remedy that is specific to Plaintiff's particular injury

by issuing a limited injunction requiring the Government to set aside funds sufficient to pay off

any of Plaintiff's qualified loans pending the outcome of this litigation.   If the Court had any doubt

about whether Section 1005 funds might run out during the pendency of this case—but again, they

will not, *supra* Arg. I.B.—setting aside funds sufficient to cover Plaintiff's loans would ensure that

he could obtain debt relief should he demonstrate that he is entitled to it.  Plaintiff argues that this

narrow relief would fail to maintain the status quo, but in fact it is the disruptive nationwide

injunction that Plaintiff seeks that would continue to alter the status quo for farmers expecting

swift payments, *supra* Arg. I.C., while doing nothing to alter Plaintiffs' position as one who has

no expectation in those funds (and no alleged financial need to receive them).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for a preliminary

injunction.

DATE: June 24, 2021                           Respectfully submitted,

                                              JOSEPH C. MURPHY, JR.
                                              Acting United States Attorney

*s/ Audrey M. Calkins*
Audrey M. Calkins (TN BPR # 030093)
Audrey.calkins@usdoj.gov
167 N. Main Street, Suite 800
Memphis, TN 38103
901-544-4231
Fax: 901-544-4230

BRIAN M. BOYNTON
Acting Assistant Attorney General

LESLEY FARBY
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Kyla M. Snow*
EMILY SUE NEWTON (VA Bar No. 80745)
Senior Trial Counsel
KYLA M. SNOW (Ohio Bar No. 96662)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 514-3259 / Fax: (202) 616-8460
Kyla.snow@usdoj.gov

*Counsel for Defendants*