**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT HOLMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:21-cv-01085-STA-jay |
| | ) | |
| THOMAS J. VILSACK, in his official | ) | |
| capacity as Secretary of the United States | ) | |
| Department of Agriculture, and | ) | |
| | ) | |
| ZACH DUCHENEAUX, in his official | ) | |
| capacity as Administrator of the Farm Service | ) | |
| Agency, | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY
INJUNCTION**

**INTRODUCTION**

This Court should immediately halt enforcement of the government's racially discriminatory loan forgiveness program (Section 1005). The government fails to justify treating Americans differently based on their race. Indeed, the government concedes that it must overcome strict scrutiny by demonstrating that the program serves a compelling interest and is narrowly tailored (Doc. 31 at 13), "a very demanding standard, which few programs will survive." *Vitolo v. Guzman*, -- F.3d --, 2021 U.S. App. LEXIS 16101 at *11 (6th Cir. 2021). Section 1005 is not among the survivors. In the Sixth Circuit, the denial of equal protection is an irreparable harm, and "*that is dispositive here*." *Id.* at *24 (emphasis added).

Since Plaintiff filed his motion, two other courts have rejected the very evidence and arguments that the government makes here. *First*, faced with evidence that the government was rapidly beginning the loan forgiveness process, on June 10, 2021, the United States District Court for the Eastern District of Wisconsin issued a temporary restraining order against Section 1005, partly relying on *Vitolo*. *See Faust v. Vilsack*, No. 1:21-cv-00548-WCG, Doc. 21 (E.D. Wis. June 10, 2021) (attached as Ex. 1). Had the district court not issued a nationwide TRO halting issuance of payments, then, per the government's declaration, offer letters for "88% of the total number of ARPA-eligible payments," (Doc. 28-2, ¶ 26), representing 64% of the anticipated funds (*id.* at ¶¶ 23, 27) would have been issued by July. (*Id.* at ¶ 33-34.) *Second*, on June 23, 2021, the United States District Court for the Middle District of Florida issued a nationwide preliminary injunction, finding that "Plaintiff has established a strong likelihood" of proving that Section 1005 is unconstitutional. *See Wynn v. Vilsack*, No. 3:21-cv-514-MHH-JRK, 2021 U.S. Dist. LEXIS 117042 at *34 (M.D. Fla. June, 23, 2021).

The government dismisses *Vitolo* on the grounds that it was based on distinct record evidence. (Doc. 31 at 14.) True enough, but it was the exact same *kind* of evidentiary showing. The government has less to say about *Wynn*, which considered the same USDA program and found it likely unconstitutional on the exact same record evidence. The government never says why the *Wynn* Court erred. When it cites *Wynn* at all, it is to point out that another injunction is already in place. (*See, e.g.*, Doc. 31 at 2, 34.) It never engages with *Faust* whatsoever. (*Id.* at 12.) The weight of authority tips decisively in Plaintiff's favor.

I.    **Plaintiff Is Likely to Succeed in Showing That the Government Lacks a Compelling Interest.**

Under strict scrutiny, the government must show that it has a compelling interest and that its remedy is narrowly tailored. *Vitolo,* 2021 U.S. App. LEXIS 16101 at *11. For past discrimination to justify a race preference, (1) the discrimination must be intentional and (2) the government must have had an active or passive hand in the discrimination. *Id.* at *12-13. When the government relies on evidence at all, as opposed to conclusions or anecdotes, it relies on the exact sort of statistical disparities that failed to show *intentional* discrimination on the part of the government in *Vitolo. Id.* at *14. The government alleges that the need to remedy the USDA's purported history of systemic discrimination serves a compelling interest. (Doc. 31 at 14.) However important the goal of eliminating the vestiges of prior race discrimination, the government's efforts here cannot withstand scrutiny.

*First*, the government publicly relates that Section 1005 is a payout intended to "advance equity and remove systemic discrimination" and instances of discrimination in the remote past.[1] "[A]n effort to alleviate the effects of societal discrimination is not a compelling interest." *Vitolo*,

---

[1] < https://perma.cc/7SZW-G9VE>.

2021 U.S. App. LEXIS 16101, at *13 (quoting *Shaw v. Hunt*, 517 U.S. 899, 909-10 (1996)). The

government is careful to not advance such a flagrantly impermissible goal to the Court, but that

should prompt careful examination of "the sincerity" of the government's legal justifications.

*Grutter v. Bollinger*, 539 U.S. 306, 327 (2003); *see Shaw*, 517 U.S. at 908 n.4.

  *Second*, before discrimination can be a compelling state interest, it "must be reasonably

current." *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 50 F. Supp. 2d 741, 763 (S.D. Ohio

1999); *accord Brunet v. City of Columbus*, 1 F.3d 390, 409 (6th Cir. 1993) (finding government

could not justify affirmative action plan when it had not engaged in intentional discrimination in

over ten years); *Detroit Police Officers Ass'n v. Young*, 989 F.2d 225, 228 (6th Cir. 1993)

(proffered evidence "no longer serves the same compelling state interests as it once did under the

changed circumstances of almost two decades"). The government's evidence does not suggest any

intentional discrimination within two decades.[2] Its evidence is "too remote in time to establish the

compelling interest." *F. Buddie Contracting, Ltd. v. Cuyahoga Cmty. Coll. Dist.*, 31 F. Supp. 2d

571, 581 (N.D. Ohio 1998).

  The government provides only one instance of alleged discrimination that is current—the

alleged disparities in prior COVID-related relief for farmers. (Doc. 31 at 8, 22-23.) But as the

---

[2] The government cites testimony of allegations about USDA requiring dual signatures for Black farmers but not others (Doc. 31 at 19), "Hispanic and Asian farmers" reporting being "stereotyped," *id*. at 19, and "a dearth of findings of wrongdoing as recently as 2019." *Id*. at 26. This testimony is vague, second-hand, undated, and unsupported by any specific allegations. The government also points to a 2011 report, *id*. at 19, but does not identify any parts of the report— one the government describes as "anecdotal," *id*.—that discuss recent, intentional discrimination by USDA. The closest the JL Report gets is to say that there is a "strong perception" that USDA "continues to discriminate." JL Report at xi <https://perma.cc/8X6Q-GZ5V>. But the government cannot cite any case finding a compelling state interest based on evidence of a "strong perception" of "continued discrimination."

*Wynn* Court ruled, these disparities were largely attributable to farm size and crops grown—*not* to

farmers' race. 2021 U.S. Dist. LEXIS 117042 at *15.

Overall, the government relies on evidence that is not current, (Doc. 31 at 28 (citing 1965

Rep.)) or does not show intentional discrimination on the part of the USDA. (*Id.* at 16 (noting

decline in black farms since 1920).) The *Wynn,* 2021 U.S. Dist. LEXIS 117042 at *10-18, and

*Faust* (Ex. 1 at 5) courts both correctly found this evidence was not good enough.

*Third*, the government has already taken comprehensive steps to remedy the USDA's

troubling history of discrimination. (Doc. 31 at 7, 18-19.) It cannot now use past discrimination to

justify further racial discrimination. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,

551 U.S. 701, 721 (2007) (finding that once the government "remedied the constitutional wrong

that allowed race-based assignments[,] [a]ny continued use of race must be justified on some other

basis"); *Middleton v. City of Flint*, 92 F.3d 396, 409 (6th Cir. 1996) ("[O]ther evidence is adduced

to show that the governmental body has taken serious steps in subsequent years to reverse the

effects of past discrimination and to implement appropriate new standards[.]"). The government

claims its prior remedial steps were inadequate. (Doc. 31 at 30.) But the Court in *Wynn* found that

the government's claims of inadequacy were "limited and largely conclusory." 2021 U.S. Dist.

LEXIS 117042 at *12. Post-*Wynn*, the government resorts to the weak claim that "problems . . .

lingered" after the remedial settlements. (Doc. 31 at 576.) This cannot justify *another* race-based

program, this one far more expansive and overtly race-based.[3]

---

[3] In fact, the government's own data paints a hopeful picture. Data provided by FSA and included
in the JL Report assessing the effectiveness of USDA's remedial measures indicates that each
minority group's direct loan participation in Fiscal Year 2010 "reasonably well reflected their
respective Principal Operator populations." JL Report at xxi. Evidence that USDA continued to
discriminate against minority farmers in the attainment of farm loans after paying out billions of
dollars in settlements is conspicuously lacking in this report.

*Fourth*, the government expects to rely on assorted statistics scattered across decades. The Supreme Court "firmly reject[s] as insufficient" statistical showings. *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 736 (6th Cir. 2000). "The broad statistical disparities cited by the government are not nearly enough," especially when there is not a "single decisionmaker." *Vitolo*, 2021 U.S. App. LEXIS 16101 at *14. As is the case here, when the government resorts to "general social disparities, there are simply too many variables to support inferences of intentional discrimination." *Id.*

The government's statistics (Doc. 31 at 8 n.13, 14) were described by the *Wynn* Court as "less useful than they may appear to be." 2021 U.S. Dist. LEXIS 117042 at *15*. The government also cites statistics showing minorities were in a more precarious financial position during the pandemic (Doc. 31 at 22), but this same argument, using indistinguishable statistics, also failed in *Vitolo*. 2021 U.S. App. LEXIS at *14. As in *Wynn*, the government "has not connected" its statistics to any actual discrimination through any evidence "outside of conclusory remarks" of legislators, 2021 U.S. Dist. LEXIS 117042, at *16. (*See* Doc. 31 at 22.)

*Fifth*, while faulting Plaintiff, the government fails to show that *Congress* considered any of "the voluminous evidence" it cites in its brief (Doc. 31 at 23.) The best evidence of what Congress considered are the proposed findings contained in Section 1005's "predecessor," S.278. (*Id.* at 5.) Virtually none of the government's proffered evidence was included there.[4] Other than mentioning a 2019 GAO report that did not even find intentional discrimination, the most recent, specific date of alleged discrimination is *2008*. S.278 Sec. 2. Nor did Congress seriously debate

---

[4] In fact, the findings consist of the sort of impermissible systemic goals that will not justify a racial preference. *See e.g.*, *id*. SEC. 2(1)(B) (institutional civil rights violations); (4) Native American removal beginning in 1830.

discrimination against minority farmers when considering ARPA—a bill, after all, about pandemic relief. When it comes to what Congress considered *when enacting Section 1005*, the government leans on floor statements (Doc. 31 at 14-15) but the Supreme Court noted that "floor statements by individual legislators rank among the least illuminating forms of legislative history." *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 943 (2017). The *Wynn* Court correctly found these statements were "entitled to little weight." 2021 U.S. Dist. LEXIS 117042 at *33. Section 1005 lacks the "legislative . . . findings of constitutional or statutory violations" required for a race preference. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 307 (1978).

Congress, unsurprisingly, did not engage in any "serious, good faith consideration," *Grutter*, 539 U.S. at 339, of why it was necessary to resort solely to race in a loan forgiveness program crammed in a COVID relief bill, passed through reconciliation. It should now be clear; Section 1005 was designed to achieve a broad and impermissible goal. According to Defendant Vilsack,[5] "it's pretty clear" why Section 1005 discriminates against "white farmers": "They've had all the access of all the programs for the last 100 years . . . It's important, I think, for us to acknowledge the cumulative effect of discrimination." The government knows that the Constitution does not permit a race preference so as to "acknowledge the cumulative effect[s]" of 100 years of discrimination, but Defendant himself said that was "pretty clear[ly]" the goal. The government now scrapes all the evidence it can find without showing that the enacting Congress considered any of it, other than floor statements. It holds little sway. Plaintiff is likely to prevail.

**II.    Plaintiff is Likely to Show that Section 1005 Is Not Narrowly Tailored.**

The government's tailoring arguments (Doc. 31 at 25) all failed to persuade the *Wynn* Court. 2021 U.S. Dist. LEXIS 117042 at *19 ("little if anything about Section 1005 suggests that

---

[5] <https://perma.cc/88EJ-VMCM>.

it is narrowly tailored"). The government continues to ignore *Wynn*, but it is directly applicable.

Section 1005 benefits all minority farmers with qualifying loans, but the record "does not appear

to show that [minority farmers] with current loans suffered such discrimination." *Id*. at \*20 n.10.

Regardless, Section 1005 is "untethered to an attempt to remedy any specific instance of past

discrimination." *Id*. at \*24. It "manages to be both overinclusive and underinclusive." *Id*. at \*27.

It provides relief to minority farmers who were not victims of discrimination, or were fully

compensated, or received pandemic relief. It provides relief to new farmers who never suffered

under USDA's past practices. It includes races for which evidence of prior discrimination "appears

exceedingly thin."[6] *Id*. It overlooks actual victims of discrimination who no longer have

outstanding loans, perhaps because USDA's past discrimination was so severe that they lost their

farms. *Id*. at \*29. And it provides no relief to non-minority farmers who suffered from the

pandemic and got no aid. The ill-fitting nature of Section 1005 "casts doubt on its necessity." *Id.*

at \*27. The government argues it was incapable of making more individualized assessments of

need because it needed to move "with alacrity" (Doc. 31 at 29), but administrative convenience is

no excuse for a racial preference. *Wynn*, 2021 U.S. Dist. LEXIS 117042 at \*30. The government

succeeds only in showing that Congress never "engage[d] in a genuine effort" to evaluate any race-

neutral options as it folded loan forgiveness into a massive spending bill. *Vitolo*, 2021 U.S. App.

LEXIS 16101, at \*16.

### III.   Plaintiff Faces an Irreparable Harm.

---

[6] The government states that it has employed these racial categories since 2001 and that each group's inclusion or exclusion is supported by evidence. (Doc. 31 at 28.) But this is not so. Although a 2011 report mentions Alaskan Natives in a few contexts (such as underrepresentation in USDA offices, JL Report at 71), the report does not document *intentional* discrimination against, say, Alaskan Natives that must be remedied with loan forgiveness. (Doc. 31 at 19, n. 22, 20, 39.) The same is true for Hawaiians and Asians. *Id*.

7

The government asserts that because the *Wynn* Court has already entered an injunction, Plaintiff's harm is not irreparable. (Doc. 31 at 34.) The government cites authority where the government committed to settlement agreements in related actions and did not appeal the injunction. (*Id.* (citing *Nat'l Urban League v. DeJoy*, 2020 U.S. Dist. LEXIS 201295 at *13 (D. Md. Oct. 29, 2020))). Overlapping injunction are not uncommon. *See Doe 1 v. Trump*, 275 F. Supp. 3d 167, 217 (D.D.C. Oct. 30, 2017) (granting national injunction against President Trump's memorandum excluding transgender individuals from the military); *Stone v. Trump*, 280 F. Supp. 3d 747, 771 (D. Md. Nov. 21, 2017) (same); *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) (same); *Stockman v. Trump*, No. EDCV171799, 2017 WL 9732572 (C.D. Cal. Dec. 22, 2017) (same). The government's suggestion that an injunction is now moot might lead one to conclude that the government has accepted its loss. Yet its vigorous defense of Section 1005 speaks louder. *See Parents Involved,* 551 U.S. at 719 (whether government "vigorously defends" its program is important to the mootness inquiry). As a legal matter, the entry of a prior preliminary injunction is immaterial. The government may yet appeal. But even if it does not, it is common for cases to proceed at different speeds. As the government has made clear,[7] it is poised to issue all payments the minute it legally can. If the preliminary injunction in *Wynn* is lifted, Plaintiff in this case would be immediately and irreparably harmed because the government could begin forgiving loans before Plaintiff can return to the present stage.

Second, the government argues that a violation of Plaintiff's equal protection rights is not an irreparable harm. (Doc. 31 at 35.) This argument is foreclosed by *Vitolo*, where the Sixth Circuit unambiguously held that a finding of an equal protection violation was "dispositive." 2021 U.S.

---

[7] < https://perma.cc/7SZW-G9VE>.

App. LEXIS 16101 at *10, 24. The government acknowledges that "some courts in this circuit"

have found that an equal protection violation is an irreparable harm (Doc. 31 at 35), but it fails to

cite *any* decision finding otherwise. The Sixth Circuit authority on this point is one-directional.

The government tries to distinguish *Vitolo* on the dubious premise that Section 1005's loans are

unlimited,[8] whereas the restaurant funds at issue in *Vitolo* were not. (Doc. 31 at 35.) But the Sixth

Circuit left no doubt; the "impair[ment]" of a constitutional right, not fleeting funds, "mandated"

a finding of irreparable injury. *Vitolo*, 2021 U.S. App. LEXIS 16101, at *24.

**IV.    The Public Interest Lies with an Injunction.**

The government asserts that an injunction is against the public interest in ensuring that

minority farmers have access to Section 1005 funding.[9] (Doc. 31 at 38.) This argument is

foreclosed by binding Sixth Circuit precedent: "it is always in the public interest to prevent

violation a party's constitutional rights." *Vitolo*, 2021 U.S. App. LEXIS 16101 at *10; *Deja Vu of*

*Nashville v. Metro.*, 274 F.3d 377, 400 (6th Cir. 2001) ("no substantial harm to others can be said

to adhere to [an unconstitutional law's] enjoinment."). The government also suggests that the

remedy Plaintiff requests—halting Section 1005—may not be Congress's "prefer[red]" remedy.

(Doc. 31 at 39.) But the *Wynn* Court correctly found that no other remedy would be sufficient.

2021 U.S. Dist. LEXIS 117042 at *44-46, 52. Finally, there is no actual danger that distressed

minority farmers will face foreclosure. USDA has suspended foreclosures for eligible borrowers.[10]

---

[8] The government's argument (Doc. 31 at 37) that non-minority farmers may be able to access Section 1005 funds if they prevail in litigation was correctly discounted by the Court in *Wynn*. 2021 U.S. Dist. LEXIS 117042 at *38-40.
[9] While the government takes exception the term, "debt forgiveness," (Doc. 31 at 2), in *Wynn*, the government "took exception to the Court's use of 'loan forgiveness,' arguing that the relief is properly categorized as 'debt relief.'" 2021 U.S. Dist. LEXIS 117042 at *2 n. 3. Whether Section 1005 will disqualify recipients for future loans is ultimately irrelevant to the question at hand since, as pointed out above, it is "always" in the public's interest to halt a violation of the Constitution.
[10] <https://perma.cc/7SZW-G9VE>.

9

## V.      The Injunction Should Not be Limited to Plaintiff.

Limiting an injunction to Plaintiff (Doc. 31 at 40) would inadequately remedy the constitutional violation at issue and would trigger perverse consequences for judicial resources. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("The scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class."). This approach is fully consistent with case law in the Sixth Circuit. *See Washington v. Reno*, 35 F.3d 1093, 1103–04 (6th Cir. 1994) (affirming nationwide injunction in favor of inmates who objected to installation of new prison telephone system); *id.* at 1104 ("[A] nationwide injunction . . .  is the only way to preserve the integrity of the fund pending final resolution of the issues raised in this lawsuit."); *accord United States v. Hays*, 515 U.S. 737, 743-44 (1995) (the injury in an equal protection case accrues to "those person[s] who are personally denied equal treatment by the challenged discriminatory conduct"); *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020).

Should Plaintiff prevail, the Court will not be able to order non-minority farmers to have access to the program. *See Wynn*, 2021 U.S. Dist. LEXIS 117042 at *47-49 ("Here, despite exploring any possible more narrow option, the Court cannot identify any relief short of enjoining the distribution of Section 1005's payments and debt relief that will maintain the status quo and provide Plaintiff the opportunity to obtain any relief at all.") For such reasons, the government's effort to advance this argument in other fora have been rejected. *See id*. at *47 *Faust* (Ex. 1, at 9) ("A nation-wide injunction is appropriate in this case."); *Wynn*, 2021 U.S. Dist. LEXIS 117042 at *47.  The Court should do the same here.

10

Dated: <u>June 27, 2021</u>.                    Respectfully submitted,


  s/ B. H. Boucek
BRADEN H. BOUCEK
TN BPR No. 021399
CELIA H. O'LEARY*
GA Bar No. 747472
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA  30075
Telephone: (770) 977-2131
bboucek@southeasternlegal.org
coleary@southeasternlegal.org

William E. Trachman*
CO. Bar No. 45684
Corey C. Bartkus*
CO. Bar No. 54789
Mountain States Legal Foundation
2596 S. Lewis Way
Lakewood, Colorado 80227
Telephone: (303) 292-2021
Facsimile: (303) 292-1980
wtrachman@ mslegal.org
corey@mslegal.org
*Appearing Pro Hac Vice

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the date indicated below I filed the documents on the Court's electronic filing system. I future certify that I served the following persons in the manner indicated below.

| Counsel | Via |
|---|---|
| Emily Newton<br>U.S. Department of Justice<br>20 Massachusetts Ave. NW<br>Washington, DC 20530<br>202/305-8356<br>Fax: 202/616-8470<br>Email: emily.s.newton@usdoj.gov | ☐ United States mail, postage prepaid<br>☐ Hand delivery<br>☐ Fax<br>☐ Email<br>☐ FedEx<br>☒ Efile |
| Kyla Snow<br>DOJ-Civ<br>Federal Programs Branch<br>1100 L. St. NW<br>Washington, DC 20005<br>202/514-3259<br>Email: kyla.snow@usdoj.gov | |
| Audrey Calkins<br>United States Attorney – Western District of Tennessee<br>167 N. Main Street, Suite 800<br>Memphis, TN 38103<br>901/544-4231<br>Fax: 901/544-4230<br>Email: audrey.calkins@usdoj.gov | |

Dated: <u>June 27, 2021</u>.          Respectfully submitted,


 s/ B. H. Boucek
BRADEN H. BOUCEK