UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ADAM P. FAUST, et al.,

    Plaintiffs,

v.                                                    Case No. 21-C-548

THOMAS J. VILSACK, et al.,

    Defendants.

---

**DECISION AND ORDER GRANTING PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER**

---

Twelve plaintiffs, who reside in nine different states, including Wisconsin, brought this action against the Secretary of Agriculture and the Administrator of the Farm Service Agency (FSA), seeking to enjoin officials of the United States Department of Agriculture (USDA) from implementing a loan-forgiveness program for farmers and ranchers under Section 1005 of the American Rescue Plan Act of 2021 (ARPA).  Plaintiffs assert that Section 1005 denies them equal protection of the law because eligibility to participate in the program is based solely on racial classifications.  This matter comes before the Court on Plaintiffs' motion for a temporary restraining order pursuant to Rule 65 of the Federal Rules of Civil Procedure.  For the following reasons, the motion will be granted.

The American Rescue Plan Act of 2021 was enacted on March 11, 2021.  H.R. 1319, 117th Cong. (2021).  As part of the ARPA, Congress appropriated "such sums as may be necessary" to pay for the cost of loan modifications and payments to "socially disadvantaged" farmers and ranchers.  § 1005(a)(1).  Under Section 1005, "the Secretary shall provide a payment in an amount up to 120 percent of the outstanding indebtedness of each socially disadvantaged farmer or rancher

as of January 1, 2021, to pay off the loan directly or to the socially disadvantaged farmer or rancher." § 1005(a)(2).  Loans eligible for forgiveness include direct farm loans made by the Secretary or farm loans guaranteed by the Secretary.  *Id.*  The term "socially disadvantaged farmer or rancher" has the meaning given in 7 U.S.C. § 2279(a).  § 1005(b)(3).  Under that statute, "socially disadvantaged farmer or rancher" means a farmer or rancher who is a member of a "socially disadvantaged group."  § 2279(a)(5).  "Socially disadvantaged group" is then defined as "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities."  § 2279(a)(6).  In other words, the loan forgiveness program is based entirely on the race of the farmer or rancher.

Defendants have interpreted "socially disadvantaged farmer or rancher" to include individuals "who are one or more of the following: Black/African American, American Indian, Alaskan native, Hispanic/Latino, Asian, or Pacific Islander."  *American Rescue Plan Debt Payments*, U.S. DEPARTMENT OF AGRICULTURE, *available at* https://www.farmers.gov/americanrescueplan (last visited June 7, 2021).  The USDA describes how the loan-forgiveness plan will be administered on its website.  It explains, "Eligible Direct Loan borrowers will begin receiving debt relief letters from FSA in the mail on a rolling basis, beginning the week of May 24. . . . After reviewing closely, eligible borrowers should sign the letter when they receive it and return to FSA."  *Id.*  It advises that, in June 2021, the FSA will begin to process signed letters for payments, and "about three weeks after a signed letter is received, socially disadvantaged borrowers who qualify will have their eligible loan balances paid and receive a payment of 20% of their total qualified debt by direct deposit, which may be used for tax liabilities and other fees associated with payment of the debt."  *Id.*

2

Plaintiffs are twelve white farmers and ranchers from nine different states. Plaintiffs moved for a temporary restraining order seeking to enjoin the purportedly unconstitutional race-based program before all of the money is distributed. Defendants responded to the motion on June 8, 2021, and Plaintiffs filed a reply brief the following day. The motion is now ripe for the Court's consideration.

A temporary restraining order, as opposed to a preliminary injunction, is sought and heard on an emergency basis. The purpose of a temporary restraining order is to preserve the status quo pending the complete briefing and consideration of a motion for a preliminary injunction. *See Geneva Assurance Syndicate, Inc. v. Med. Emergency Servs. Assocs.*, 964 F.2d 599, 600 (7th Cir. 1992) ("The essence of a temporary restraining order is its brevity, its ex parte character, and . . . its informality."). In general, the showing required for a temporary restraining order and a preliminary injunction are the same. Specifically, a plaintiff must show that "(1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020) (quoting *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)). If a plaintiff makes such a showing, the court proceeds to a balancing analysis, to determine whether the balance of harm favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's interests. *Id.* A temporary restraining order "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (internal quotation marks and citations omitted).

Plaintiffs challenge the USDA's use of race classifications for allocating funds under the loan-forgiveness program as violative of the equal protection guarantee in the United States

Constitution. They assert that they are likely to succeed on their claim. "The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013). "Government policies that classify people by race are presumptively invalid." *Vitolo v. Guzman*, --- F.3d ---, 2021 WL 2172181, at *4 (6th Cir. May 27, 2021) (citing U.S. Const. amend. XVI; *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 234–35 (1995)). "[W]hen the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 721 (2007) (citations omitted). Under this standard, "the government has the burden of proving that racial classifications 'are narrowly tailored measures that further compelling governmental interests.'" *Johnson v. California*, 543 U.S. 499, 505 (2005) (quoting *Adarand*, 515 U.S. at 227). Because the program grants privileges to individuals based solely on their race, strict scrutiny applies.

Defendants assert that the government has a compelling interest in remedying its own past and present discrimination and in assuring that public dollars drawn from the tax contributions of all citizens do not serve to finance the evil of private prejudice. Dkt. No. 17 at 16. "The government has a compelling interest in remedying past discrimination only when three criteria are met." *Vitolo*, 2021 WL 2172181, at *4; *see also City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) (plurality opinion). The Sixth Circuit recently summarized the three requirements as follows:

> First, the policy must target a specific episode of past discrimination. It cannot rest on a "generalized assertion that there has been past discrimination in an entire industry." *J.A. Croson Co.*, 488 U.S. at 498. . . . Second, there must be evidence of *intentional* discrimination in the past. *J.A. Croson Co.*, 488 U.S. at 503. Statistical disparities don't cut it, although they may be used as evidence to establish intentional discrimination. . . . Third, the government must have had a hand in the

4

>past discrimination it now seeks to remedy. So if the government "shows that it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of a local industry," then the government can act to undo the discrimination. *J.A. Croson Co.*, 488 U.S. at 492. But if the government cannot show that it actively or passively participated in this past discrimination, race-based remedial measures violate equal protection principles.

*Vitolo*, 2021 WL 2172181, at *4–5 (alterations omitted).

Here, Defendants lack a compelling interest for the racial classifications. Defendants assert that "Congress targeted the debt payments in Section 1005 to the minority groups that it determined had suffered discrimination in the USDA programs and that had been largely left out of recent agricultural funding and pandemic relief." Dkt. No. 17 at 17. But Defendants have not established that the loan-forgiveness program targets a specific episode of past or present discrimination. Defendants point to statistical and anecdotal evidence of a history of discrimination within the agricultural industry. *Id.* at 16–17. But Defendants cannot rely on a "generalized assertion that there has been past discrimination in an entire industry" to establish a compelling interest. *J.A. Croson Co.*, 488 U.S. at 498; *see also Parents Involved*, 551 U.S. at 731 (plurality opinion) ("remedying past societal discrimination does not justify race-conscious government action"). Defendants' evidence of more recent discrimination includes assertions that the vast majority of funding from more recent agriculture subsidies and pandemic relief efforts did not reach minority farmers and statistical disparities. *Id.* at 17. Aside from a summary of statistical disparities, Defendants have no evidence of intentional discrimination by the USDA in the implementation of the recent agriculture subsidies and pandemic relief efforts. "An observation that prior, race-neutral relief efforts failed to reach minorities is no evidence at all that the government enacted or administered those policies in a discriminatory way." *Vitolo*, 2021 WL 2172181, at *5. Defendants have failed to establish that it has a compelling interest in remedying the effects of

past and present discrimination through the distribution of benefits on the basis of racial classifications.

In addition, Defendants have not established that the remedy is narrowly tailored. To do so, the government must show "serious, good faith consideration of workable race-neutral alternatives." *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). Defendants contend that Congress has unsuccessfully implemented race-neutral alternatives for decades, but they have not shown that Congress engaged "in a genuine effort to determine whether alternative policies could address the alleged harm" here. *Vitolo*, 2021 WL 2172181, at *6. The obvious response to a government agency that claims it continues to discriminate against farmers because of their race or national origin is to direct it to stop: it is not to direct it to intentionally discriminate against others on the basis of their race and national origin.

The Section 1005 program is a loan-forgiveness program purportedly intended to provide economic relief to disadvantaged individuals without actually considering the financial circumstances of the applicant. Indeed, Congress can implement race-neutral programs to help farmers and ranchers in need of financial assistance, such as requiring individual determinations of disadvantaged status or giving priority to loans of farmers and ranchers that were left out of the previous pandemic relief funding. It can also provide better outreach, education, and other resources. But it cannot discriminate on the basis of race. On this record, Defendants have not established that the loan forgiveness program under Section 1005 is narrowly tailored and furthers compelling government interests. The Court concludes that Plaintiffs are likely to succeed on the merits of their claim that Defendants' use of race-based criteria in the administration of the program violates their right to equal protection under the law.

Next, the Court finds that Plaintiffs will suffer irreparable harm absent a temporary restraining order. Defendants make the extraordinary argument that racial discrimination inflicts no harm at all. Though Defendants assert that Section 1005 is intended to help socially disadvantaged farmers affected by COVID-19, it does not provide relief based on losses sustained during the pandemic. Instead, the only consideration in determining whether a farmer or rancher's loans should be completely forgiven is the person's race or national origin. Plaintiffs are completely excluded from participation in the program based on their race. If the Court does not issue an injunction, the USDA will spend the allocated money and forgive the loans of minority farmers while the case is pending and will have no incentive to provide similar relief on an equitable basis to others. Plaintiffs are excluded from the program based on their race and are thus experiencing discrimination at the hands of their government.

Defendants assert that, even if Plaintiffs suffer irreparable harm, the harm is not imminent because the USDA is "just beginning" to administer the program and the funds are "statutorily unlimited." Dkt. No. 17 at 14–15. Congress has apportioned "such sums as may be necessary" to pay for the program. § 1005(a)(1). While there is no explicit cap on the funds allocated to the loan-forgiveness program, based on current estimates, 0.2% of the $1.9 trillion package in the ARPA has been allocated to the program. Defendants sent offer letters to eligible farmers and ranchers as early as May 24, 2021. On June 9, 2021, Defendants sent offer letters to 8,580 farmers, and intend to send another 6,836 letters beginning June 14, 2021. Dkt. No. 17-2, ¶¶ 32, 35. Defendants indicate that it will take an average of seven days to receive an accepted offer and that the FSA will process payment immediately upon receipt of the offer. *Id.* ¶¶ 29–31. Defendants have already started to forgive loans, and the 8,580 farmers and ranchers who were sent offer letters represent approximately 49% of the loans that will be forgiven under the program. The

entire $3.8 billion that has been allocated to the program may be depleted before briefing and consideration of the motion for a preliminary injunction. Plaintiffs' injuries are also irreparable in light of Defendants' sovereign immunity and Plaintiffs' inability to seek damages. For these reasons, the Court finds that Plaintiffs will suffer irreparable harm absent a temporary restraining order.

Finally, the Court considers the irreparable harm Defendants will suffer if preliminary relief is granted and the public interest. These factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the public interest and balance of harms weigh in Plaintiffs' favor. The public interest would be served by the entry of a temporary restraining order, as it is "always in the public interest to prevent the violation of a party's constitutional rights." *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, 274 F.3d 377, 400 (6th Cir. 2001). Because Plaintiffs have established a strong likelihood that Section 1005 of the ARPA is unconstitutional, the public interest favors the issuance of a temporary restraining order. Although Defendants assert that thousands of minority farmers have a strong interest in expeditiously receiving funds under the program, they acknowledge that there is no true urgency, as certain loan payments may take up to nine weeks to process. Dkt. No. 17 at 15. There is no reason that a temporary halt on payments will cause any harm. Defendants have advised that they will not foreclose on any delinquent loans and that banks holding USDA-backed loans will not foreclose on them. Though Defendants would be enjoined from allocating funds to eligible farmers and ranchers under a temporary restraining order, they would not be prevented from identifying eligible recipients, mailing notices, accepting and reviewing applications, responding to inquiries and providing guidance regarding the program, and making other determinations. The purpose of a temporary restraining order is to preserve the

status quo pending a decision on the merits.  Once a loan is forgiven, it cannot easily be undone.  A narrow temporary restraining order resolves any threat of serious delay.  The Court finds that the public interest and balance of equities weigh in favor of Plaintiffs.

Plaintiffs have satisfied the elements necessary to obtain a temporary restraining order.  Defendants argue that any temporary restraining order should be limited to Plaintiffs and not the thousands of other farmers across the country.  They suggest that the Court issue a limited injunction requiring that the government set aside funds to pay off Plaintiffs' qualified loans pending the outcome of the litigation.  While universal injunctions are rare, they "can be necessary to provide complete relief to plaintiffs, to protect similarly-situated nonparties, and to avoid the chaos and confusion that comes from a patchwork of injunctions."  *City of Chicago v. Barr*, 961 F.3d 882, 916–17 (7th Cir. 2020) (internal quotation marks and citations omitted).  A nation-wide injunction is appropriate in this case.  Defendants' proposal to set aside funds to pay off any of Plaintiffs' qualified loans is unworkable.  If the USDA forgave Plaintiffs' loans, it would be required to forgive every farmer's loan, since the only criteria for loan forgiveness is the applicant's race.  Plaintiffs estimate that this would increase the cost of the program to $400 billion.  Dkt. No. 19 at 3.  In addition, nothing would prevent Plaintiffs from amending the complaint to add other farmers and ranchers as plaintiffs to this action.  To ensure that Plaintiffs receive complete relief and that similarly-situated nonparties are protected, a universal temporary restraining order in this case is proper.

Rule 65(c) provides that a court may issue a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The

Court finds that no security shall be required because Defendants did not request such security and have provided no evidence that they will suffer financial loss from a temporary restraining order.

For these reasons, Plaintiffs' motion for a temporary restraining order (Dkt. No. 12) is **GRANTED**. Defendants are enjoined from forgiving any loans pursuant to Section 1005 until the Court rules on Plaintiffs' motion for a preliminary injunction.

**SO ORDERED** at Green Bay, Wisconsin this 10th day of June, 2021.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge