<pre>
1                          UNREDACTED

2            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TENNESSEE
3                       EASTERN DIVISION

4      --------------------------------------------------

5

   ROBERT HOLMAN                        )
6                                       )
   VS                                   )NO.1:21-CV-01085-STA
7                                       )JACKSON, TENNESSEE
                                        )
8  THOMAS J. VILSACK, in his            )
   official capacity as Secretary of the
9  United States, Dept of Agriculture,

10

11 ZACH DUCHENEAUX, in his
   official capacity as Administrator
12 of the Farm Service Agency

13     --------------------------------------------------

14                      MOTION HEARING

15                      JUNE 29, 2021

16

17

18        BEFORE THE HONORABLE S. THOMAS ANDERSON,

19             UNITED STATES CHIEF JUDGE

20

21

22

23               KRISTI HEASLEY, RPR
                OFFICIAL COURT REPORTER
24            U.S. COURTHOUSE, SUITE 450
               111 SOUTH HIGHLAND AVENUE
25              JACKSON, TENNESSEE 38301



                 UNREDACTED TRANSCRIPT
</pre>

1                        APPEARANCES

2

3

4    FOR THE PLAINTIFF:

5    BRADEN H. BOUCEK, ESQ.
     SOUTHEASTERN LEGAL FOUNDATION
6    560 West Crossville Road, Suite 104
     Roswell, GA 30075
7

8    WILLIAM EDWARD TRACHMAN, ESQ.
     MOUNTAIN STATES LEGAL FOUNDATION
9    2596 Lewis Way
     Lakeland, CO 80227
10

11

12

13   FOR THE DEFENDANTS:

14   KYLA SNOW, ESQ.
     DOJ—CIV
15   1100 L. St NW
     Washington, DC 20005
16

17   AUDREY M. CALKINS, ESQ.
     U.S. ATTORNEY'S OFFICE
18   WESTERN DISTRICT OF TENNESSEE
     167 N. Main Street
19   Suite 800
     Memphis, TN 38103
20

21

22

23

24

25

                    UNREDACTED TRANSCRIPT

1                          EXAMINATION INDEX

2                        NO TESTIMONY OFFERED

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              EXHIBITS

2                        NO EXHIBITS MARKED

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  This is Robert Holman versus

2    Thomas Vilsack, et al, NO. 21-1085.

3          Let's see, who is going to be appearing on

4    behalf of the plaintiff?

5          MR. BOUCEK:  Braden Boucek.  I'll be

6    appearing on behalf of the plaintiff.

7          THE COURT:  All right.  Mr. Boucek.

8          And on behalf of the defendant?

9          MS. CALKINS:  Morning, Your Honor.  This

10   is Audrey Calkins for the government.

11         THE COURT:  All right.  Ms. Calkins.

12         MS. CALKINS:  Ms. Kyla Snow is in from

13   Main Justice, and she'll be appearing for us.

14         THE COURT:  I'm sorry.  What is your name?

15         MS. SNOW:  Kyla Snow.

16         THE COURT:  Ms. Snow.  Okay.

17         MR. BOUCEK:  Your Honor, I would be remiss

18   in not pointing out my co-counsel, Mr. Will Trachman from

19   Mountain States Legal.

20         THE COURT:  Okay.  All right.  Well, let's

21   see where we are.

22         Mr. Boucek, where are we as far as you're

23   concerned in light of the other cases that have been

24   considered up to this point?

25         Give me an overview.  By the way, I'll let

1    everyone remain seated.  We won't make you stand because

2    of pandemic.  If you would like to remove your mask, I

3    don't mind.  That's an individual table decision, I

4    suppose, at this point, whatever you prefer to do.

5                    If you don't remove your mask, then you're

6    going to need to speak up so the court reporter can make

7    sure she hears everything clearly.

8                    But, Mr. Boucek, where do you say we are

9    this morning?

10                   MR. BOUCEK:  Thank you, Your Honor.

11                   The procedural posture of this case is

12   that we have filed a Motion for Preliminary Injunction.

13   As the Court, I think, is alluding to, there are several

14   other related cases percolating in other districts.

15                   There is a case in Eastern District of

16   Wisconsin that has resulted in a temporary restraining

17   order.  That case is Faust v Vilsack.

18                   And then just last week the Middle

19   District of Florida issued a preliminary injunction

20   halting enforcement of Section 1005.

21                   However, we persist in our request for

22   preliminary injunction for the reasons explained in our

23   motion as I'm happy to relate to the Court here today.

24   But that's in summary of review of where we stand.

25                   THE COURT:  Okay.  Ms. Snow or Ms.

UNREDACTED TRANSCRIPT

1    Calkins.

2              MS. SNOW:  Your Honor, opposing counsel

3    has accurately stated where things are at in the other

4    courts in Faust and the PI order that was recently

5    entered in Wynn.

6              We don't think that those cases govern the

7    outcome here, for various reasons.  But just a quick,

8    just two points that I just like to make up front is that

9    because of those orders that have been entered, there is

10   no imminent harm here that would warrant entering another

11   duplicative injunction.

12             But also more importantly, we think that

13   the plaintiff hasn't shown any irreparable harm, which I

14   can go into that further and address the Court's

15   questions on that.  We think that the analysis in Faust

16   and in Wynn should not be followed here.

17             But, again, I can go into that further and

18   address specific questions on that point.

19             THE COURT:  Okay.  Well, yeah, I have

20   several questions.  We'll get to those momentarily.

21             Would either side like to make any kind of

22   opening statement?  Obviously, I've read and we've read

23   all of the pleadings that have been filed.  And I think

24   I've got a pretty good understanding of the positions of

25   the parties.

1              Any kind of opening remarks you want to

2    make, Mr. Boucek?

3              MR. BOUCEK:  No.  Your Honor, I know the

4    Court has read our pleadings and they adequately relate

5    our positions.  Essentially, we think that the Court -- I

6    certainly agree with Ms. Snow, that the decisions in the

7    other districts are persuasive, but not mandatory.

8              However, that said, the reasoning in it is

9    totally correct.  The Courts there considered the very

10   same evidence that they've offered here today.  The

11   standard is strict scrutiny.  That is a very demanding

12   standard.  And we rely liberally on the recent Sixth

13   Circuit opinion from a month ago, Vitolo v Guzman.

14              THE COURT REPORTER:  Wait.  Of who?

15              THE COURT:  Slow down just a little.  Just

16   remember that the court reporter has to take down

17   everything that's said.  She's great, but there is only

18   so much she can get down in a few seconds.  So slow down

19   just a little.

20              MR. BOUCEK:  Thank you, Your Honor.

21              I need these reminders periodically.  It's

22   been a year since they've let me out, so I'm a little

23   rusty.

24              THE COURT:  Okay.

25              MR. BOUCEK:  But, Your Honor, the recent

1    Sixth Circuit opinion of Vitolo v Guzman, which we've

2    cited frequently in our brief, is binding authority on

3    this Court.  It's issued from a month ago.  It considered

4    a very similar provision of the American Rescue Plan Act

5    of 2021, this one dealing with socially disadvantaged

6    restaurant owners.

7                    And the Court there concluded that the

8    plaintiff faced an irreparable --

9                    THE COURT:  Slow down.

10                   MR. BOUCEK:  -- faced an irreparable harm.

11                   And for the reasons as explained in

12   Vitolo, Faust and in the Wynn opinions, we think that

13   this Court should find that there is a likelihood of

14   plaintiff prevailing.

15                   Candidly, we think based on what has been

16   proffered there is a certainty of the plaintiff

17   prevailing, and ask the Court for an immediate injunction

18   that halts the enforcement of Section 1005.

19                   THE COURT:  All right.  Ms. Snow, would

20   you like to make an opening statement, or any kind of

21   open remarks?

22                   MS. SNOW:  Yes, Your Honor.  I'll respond

23   to the points that opposing counsel raised.

24                   With respect to the other decisions,

25   they -- you know, they got the analysis wrong on

1    irreparable harm and on the merits of the claim here.

2    And the Vitolo decision does not control.

3              That was a decision that arose in the PI

4    posture.  And the Court did not -- it was reviewing a

5    preliminary injunction order, and the Court there was not

6    setting broadly applicable rules that apply to all equal

7    protection cases.

8              And importantly, the program that was at

9    issue there is very different from the program here.  And

10   one of the key differences is that the funds that were

11   allocated by the statute in that case were limited and

12   were only available to Africans on a priority basis.

13             And so because of the very -- the Court

14   said there was a very real risk that funds could run out

15   before the case was decided, and that warranted the

16   preliminary injunction there.

17             That is not an issue in this case.  We

18   have an unlimited pot of funds.  The statute does not set

19   any kind of deadline for their expenditure.  And the

20   Court can, at the end of this case, it can order relief,

21   and it should, that -- if it concludes that the statute

22   is -- or that the program as it's being implemented is

23   unconstitutional.

24             It would be more in line with Congress's

25   intent and consistent with Supreme Court case law

1    governing equal protection remedies to expand the

2    beneficiaries of the funds here, rather than withdrawing

3    them completely from the socially disadvantaged farmers,

4    who Congress was plainly attempting to protect, and who

5    face substantial harm if they are not able to receive the

6    funds that they have an expectation in receiving.

7                     With respect to the merits, the government

8    does have a -- well, the plaintiff has not shown that he

9    has a substantial likelihood of success on his equal

10   protection claim.  The government -- Congress relied on

11   substantial evidence documenting the history of

12   discrimination specific to USDA loan programs.  And the

13   situation of minority farmers as compared to non-minority

14   farmers today just underscores how that long history of

15   discrimination is having ongoing lingering effects.  And

16   that places them at a substantial disadvantage, facing

17   higher risk of foreclosure, higher rates of delinquency,

18   which a pandemic has only exacerbated.  And Congress's

19   has recent funds largely failed to reach minority

20   farmers.

21                     Congress was relying on all this evidence

22   when it adopted this measure in Section 1005.  It had a

23   strong basis in evidence for concluding that this

24   remedial relief was warranted.  And plaintiff has not

25   shown, and the other cases do not support the conclusion

1    that he is likely to succeed on the merits of showing

2    that this program is unconstitutional, which he bears the

3    burden of doing.

4                   Even apart from the preliminary injunction

5    posture, it is his burden to show the unconstitutionality

6    of the program.

7                   So for all those reasons, and

8    significantly because of the substantial harm that the

9    preliminary jurisdiction would impose, you know, further

10   delaying payments to socially disadvantaged farmers would

11   impose, a preliminary injunction is simply not warranted

12   here.

13                  THE COURT:  All right.  Let's break some

14   of this down.

15                  Ms. Snow, do you agree that strict

16   scrutiny is the appropriate standard in the case?

17                  MS. SNOW:  Yes, Your Honor.

18                  THE COURT:  Okay.  And one thing that I

19   think Mr. Boucek mentioned, he indicated that the

20   evidence in this case is identical to or comparable to

21   the evidence that was presented in the other two cases.

22   And by that I mean, out of Wisconsin and Florida.

23                  Do you agree with that or disagree with

24   that?

25                  MS. SNOW:  I agree with that, Your Honor.

1          THE COURT:  All right.  So we've got

2     strict scrutiny.  The evidence that you would present or

3     that you plan to present here today would be pretty much

4     identical.  Might be some small variances, but would be

5     pretty much identical to the evidence that was presented

6     to the Judges in the Middle District of Florida and in

7     Wisconsin.

8          MS. SNOW:  Yes.

9          THE COURT:  Okay.  Well, do you also

10     agree -- I'll just tell all of you, I've got a list of

11     questions.  And I'm just going to go through my questions

12     and give both sides an opportunity to respond.  I think

13     that may be the most productive way to approach this.

14          Ms. Snow, would you agree that government

15     policies that classify people by race are presumptively

16     invalid?

17          MS. SNOW:  No, Your Honor.  It depends on

18     the purpose of the program and whether it is narrowly

19     tailored to the purpose that, for which the government

20     has adopted the program.

21          So while it's strict scrutiny analysis, it

22     is a high bar.  It is not fatal in fact, as the Supreme

23     Court has stated.  So we think that there is substantial

24     evidence here that shows that this program is narrowly

25     tailored.

1                    THE COURT:  Well, are you saying then that

2    the government has the responsibility to show that there

3    is compelling interest.  Correct?

4                    MS. SNOW:  Yes, that's correct.

5                    THE COURT:  And that the program is

6    narrowly tailored?

7                    MS. SNOW:  Yes.

8                    THE COURT:  Would you agree with that?

9                    MS. SNOW:  Yes, I agree.

10                   THE COURT:  All right.  So just for the

11   record, what do you say is the compelling interest in

12   this situation?

13                   MS. SNOW:  Congress had a compelling

14   interest in remedying the effects of lingering

15   discrimination.  Which Adarand and Croson make clear that

16   that is -- the government has a compelling interest in

17   remedying past discrimination and its lingering affects.

18                   Paradise -- the Supreme Court's Paradise

19   case also states that at 167.  And Congress also had a

20   compelling interest in ensuring that its funds were not

21   used in a manner that perpetuated the effects of

22   discrimination.  Croson has also stated at, I believe

23   that's at 469, that the government has an interest in

24   ensuring that its funds are not being used in a way that

25   allows it to be a passive participant in systemic

1    discrimination.

2                    And so both of those interests are

3    based -- Congress had a strong basis in evidence for both

4    of those interests.

5                    With respect to the lingering affects of

6    discrimination, Secretary Vilsack stated to Congress in

7    the lead-up to Section 1005's passage that historic

8    discrimination has plagued programs at the USDA, and

9    especially the farm loan programs.

10                   Congress was targeting USDA's farm loan

11   programs --

12                   THE COURT:  Let me stop you there just a

13   minute.

14                   Would you agree that the government has

15   already taken steps previously to address or remedy the

16   history of discrimination?

17                   MS. SNOW:  The government -- yes, it has

18   taken steps that have been ineffective at --

19                   THE COURT:  Been ineffective?

20                   MS. SNOW:  Yes.

21                   THE COURT:  All right.  What steps or what

22   programs have previously been designed to address what

23   you refer to as the lingering discrimination or the

24   history of discrimination?

25                   MS. SNOW:  So Congress has taken steps

1    to -- as early as 1990 it created an outreach program in

2    Section 2501 to provide further outreach to minority

3    farmers who it had concluded were not being served or who

4    had been cut out of USDA programs and not been offered

5    USDA loans at the same rates or on the same types of

6    terms as non-minority farmers were receiving --

7                    THE COURT:  So the first one you are

8    referring to is the 1990 program.  Right?

9                    MS. SNOW:  Yes.  Yes.

10                    Then in 2002 and 2008 Congress took steps

11    to restructure county committees, to try to provide for

12    greater minority representation on county committees,

13    which were largely white and not attune to the interests

14    of minorities.  And just -- there was like a lack of

15    awareness in serving minority farmers and the particular

16    needs.

17                    So Congress took steps to restructure

18    those to ensure there would be greater representation.

19                    And in 2002, based on substantial evidence

20    that the civil rights complaints filed by minority

21    farmers were largely going ignored, or that there were

22    just substantial delays in processing them, or no

23    findings of violations despite this large volume of

24    complaints, in 2002 Congress took steps to establish a

25    secretary that, and a new office that would be -- to

1    better address those concerns and to provide for

2    structures that would actually address those civil rights

3    complaints.

4              And then there is the series of class

5    actions in, beginning in the late '90s, the Pigford and

6    related cases, in which different groups of minority

7    farmers, starting after African-Americans and Hispanics

8    and Native Americans filed complaints of discrimination

9    based on the adverse loans or failure to receive loans

10   and the civil rights complaints that were going ignored.

11             And the USDA set up -- engaged in

12   settlements and set up claims processes for those.

13             But as Congress stated, as it was

14   reviewing just those class action settlements, and the

15   lead-up to Section 1005 passage, those settlements failed

16   to provide complete relief.  Some of payments were eroded

17   by state taxes.  Those settlements were limited in time

18   with respect to the discrimination complaints that were

19   addressed to specific periods of time occurring in the

20   late '90s through -- sorry, the late '80s through some

21   time in the '90s.  And so there was a discreet period.

22             So it left out a lot of other individuals

23   who would have experienced discrimination.

24             THE COURT:  So there have been multiple

25   attempts --

UNREDACTED TRANSCRIPT

1          MS. SNOW:  Yes.

2          THE COURT:  -- by Congress to address --

3    and I just -- this term seems to be, permeate a lot of

4    the comments and legislation and talking points that you

5    hear -- systemic discrimination.  Right?

6          MS. SNOW:  Yes, Your Honor.  And I would

7    just like to say that the systemic -- those phrases

8    referring to systemic discrimination are specific to the

9    discrimination occurring at USDA and its farm loan

10   programs.

11         THE COURT:  Okay.  So there had been

12   multiple attempts by Congress to address systemic

13   discrimination within the USDA?

14         MS. SNOW:  Yes.

15         THE COURT:  Okay.  Mr. Boucek, do you

16   agree or disagree?

17         MR. BOUCEK:  With which portion, Your

18   Honor?

19         THE COURT:  That there have multiple

20   attempts made by Congress to address what Congress

21   believes, based on the record that Ms. Snow is referring

22   to -- that there has been systemic discrimination, one.

23   And that there have been multiple attempts by Congress to

24   address that type of discrimination.

25         MR. BOUCEK:  I agree on both fronts, Your

1    Honor.  The USDA has engaged in herculean efforts to try

2    and remedy its past discrimination.  And I also agree

3    that the USDA has shown a pattern in the remote past of

4    engaging in discrimination, such that the remedial

5    attempts that were undertook were appropriate.

6                    THE COURT:  All right.  Ms. Snow, let me

7    go back to you then.

8                    What evidence is there of current

9    discrimination?  What are you relying on that you believe

10   would demonstrate what I'll call current discrimination?

11                   Either the USDA in its current form, and

12   the current programs that it oversees and it administers,

13   that it's engaging in current discrimination?

14                   MS. SNOW:  So, Your Honor, Congress was

15   attempting to remedy -- it had a compelling interest in

16   remedying the lingering effects of this historic

17   discrimination.  So it was not relying on specific

18   present day discrimination occurring at USDA.  It was

19   pointing to the historic discrimination, as documented in

20   all of the reports that Congress discussed and which we

21   discussed in our briefing, that shows that discrimination

22   had been going on for decades.  And did -- and that did

23   occur up until at least 2011, based on the record that we

24   have.

25                   The JL report was produced in 2011.  And

20

1    that discussed how -- it stated in the beginning of that

2    report that the key to understanding its findings was

3    that the inequities faced by socially disadvantaged

4    farmers have over time been systematic and engrained in

5    every day Farm Service Agency operations.

6              That's at page 66 of the report, which is

7    discussing -- that's a portion of the report specifically

8    discussing the Farm Service Agency.

9              THE COURT:  But that's, that's a 10 year

10   old report.  Right?  I'm not saying it's not important.

11             But what evidence is there of current

12   discrimination, or do we have any?

13             MS. SNOW:  So the evidence that Congress

14   was relying on was specific to the lingering effects of

15   that discrimination.  And this is -- I'll get into that

16   briefly, but I just want to emphasize that this kind of

17   lingering discrimination based on historic acts of

18   discrimination, Congress does have a compelling interest

19   in remedying this as stated -- as the Paradise decision

20   makes clear at 162 through 163, where it was looking at

21   evidence of -- the claim there had been that a police

22   department had discriminated in hiring, its hiring

23   practices.

24             And 12 years later the Court was looking

25   at how those, that discrimination hiring practices had

UNREDACTED TRANSCRIPT

1    meant that there were virtually no officers in higher

2    ranked positions over a decade later.  And that was

3    part -- that was a lingering effect of discrimination in

4    the hiring decisions that had occurred in the past.

5                We have a similar situation here.  And the

6    2019 GAL, which Congress discussed, the point draws that

7    link out the most explicitly.  On page 29 of that report

8    it discusses how historic discrimination at USDA had

9    caused minority farmers to not have the same

10   opportunities to receive loans, or receive loans on fair

11   terms that would allow them to develop their land at the

12   same rate as, or with the same opportunities as

13   non-minority formers.  And that has led to them having

14   smaller farms generally today.

15               And also, you know, the congressional

16   record points to discrepancies between -- in rates of

17   delinquency and rates of foreclosure between minority and

18   non-minority farmers.

19               As Senator Booker pointed out, black

20   farmers are subject to 13 percent of USDA foreclosures,

21   even though they account for less than 3 percent of

22   direct loan --

23               THE COURT:  What time period does that

24   cover?  What you're referring to, what time period are we

25   talking about?

1          MS. SNOW:  I believe that what he was

2   citing to there, and I can go back and verify for sure,

3   but I believe that that was a current, a statistic that

4   was current as of when they were discussing Section 1005,

5   so earlier this year.

6          And we submitted a declaration from Bill

7   Cobb, from the Farm Service Agency.  And his statistics,

8   those statistics -- sorry, that declaration includes

9   statistics that are more updated as of May of this year,

10  and show just the vast disparity in the delinquency rates

11  between minority farmers and white farmers that -- as he

12  pointed out, there are 37.9 percent of black borrowers

13  are --

14          THE COURT:  Let me stop you one more time.

15  And I apologize for interrupting, but I'll forget what I

16  want to ask if I don't address it.

17          But everything you mentioned so far would

18  fall into the category of statistical information.

19  Correct?

20          MS. SNOW:  That's correct, Your Honor.

21          THE COURT:  So everything, whether it's

22  Senator Booker, what you mentioned, or the report that

23  you mentioned, the affidavit that was attached, we're

24  talking about statistical information that's been

25  compiled over a period of years?

1            MS. SNOW:  That's correct.  And the

2   statistical information kind of illuminates the

3   situation, the present situation today, and shows how the

4   information, which is anecdotal, statistical, complied in

5   various reports and investigations showing, outlining the

6   historical evidence of discrimination.  The statistical

7   disparities today just underscore how that past

8   discrimination is having an ongoing effect.

9            And that is consistent with Croson.  Which

10  Croson stated, at page 501, that goes statistical

11  disparities can give rise to an inference of

12  discrimination.

13           And here, because these disparities are

14  linked to specific findings of discrimination in the

15  past, they just underscore the fact that this

16  discrimination is having ongoing effects.

17           THE COURT:  Okay.  Well, do you want to

18  respond, Mr. Boucek, about current discrimination,

19  whether the government had shown or can show any

20  instances or evidence to support what I'm calling current

21  discrimination?

22           MR. BOUCEK:  The government cannot make a

23  showing of current discrimination.  The Court's question

24  adequately illustrated that.

25           I understand the government comes back

UNREDACTED TRANSCRIPT

1    with a mouthful of information when the Court asked that

2    question.  But all of that information can be grouped,

3    categorized and swept away under one of two principles.

4                    The first is, as the Court alluded to, the

5    government has to show discrimination that is ongoing.

6    It cannot be too remote or in the distant past.

7                    In fact, the Sixth Circuit has discounted

8    evidence from 14 years ago.  So we at least have that

9    benchmark as being 14 years is just too far in the

10   distant past.

11                   And the second point is that the

12   government's evidence can be discounted because it

13   doesn't show intentional discrimination.  So even the

14   stuff that is reasonably current, and I'll use that term

15   liberally and generously, but even the stuff that is

16   relatively recent does not suggest intentional ongoing

17   discrimination on the part of USDA.

18                   So, for instance, if it's true that

19   minorities are underrepresented in FSA or USDA hires,

20   there is no evidence that that is a product of

21   intentional discrimination.

22                   If there are disparities in farm sizes,

23   there is no suggestion that it is attributable to

24   anything that is intentional on the part of USDA.

25                   And both the Supreme Court and the Sixth

1  Circuit have been insistent that because race

2  categorizations are so pernicious, the government has to

3  not just show that there are lingering effects, but that

4  they are a product of intentional and ongoing

5  discrimination.

6          And those are the reasons why the Wynn

7  Court discounted everything that she just related as

8  falling short.

9          Again, you cannot take the real

10  discrimination that the governments can show from the

11  remote past, warp past the Pigford settlements, and then

12  try and permit an inference based on ongoing statistical

13  disparities that there are shortcomings today.

14          I'll just briefly address this statistical

15  question, because the Court delved into that too.

16          The Wynn Court found all the statistics

17  that they have cited to you to be insufficient.  And this

18  Court should do the -- this Court should find that's

19  inadequate for the same reasons as Wynn.

20          But, if fact, there is only more reason to

21  do it here because of the recent Vitolo opinion.  In the

22  Vitolo opinion, a month ago, the government proffered

23  very similar, not the same, but similar source of broad

24  statistical categories.

25          And the Sixth Circuit made short work of

1    it, Your Honor.  The Sixth Circuit said, we understand

2    that there are cases out there that address statistical

3    disparities.  However, those take place in things like in

4    employment context.  Like the city of Memphis's fire

5    fighting decisions, where there is one single decision

6    maker.

7                    So if you see glaring statistical

8    disparities when there is one decision maker, well, that

9    actually tells us something.  But just like with

10   restaurant owners in Vitolo, the Sixth Circuit said you

11   cannot permit any kind of an inference from something

12   this broad, these broad statistical disparities.  And

13   things like farm loan size just tell us nothing.  There

14   is too many variables that are responsible for it.

15                    So I would go so far as to say that per

16   Vitolo, as a mater of law, that statistical showings that

17   they proffered are just not helpful at all.

18                    THE COURT:  All right.  Ms. Snow,

19   Mr. Boucek has pealed back another layer of the onion.

20                    Intentional discrimination.  Is that a

21   component of the analysis that the Court needs to engage

22   in?

23                    MS. SNOW:  As long as the Court concludes

24   that there has been, that there is evidence -- that it

25   was reasonable for Congress to conclude that there is

UNREDACTED TRANSCRIPT

1    evidence, that there was intentional discrimination by

2    the government unit involved, then, yeah, yes, that is a

3    requirement.

4              But here we do have evidence of

5    intentional discrimination.  The evidence of intentional

6    discrimination does not need to be present day.  It is

7    clear that it has occurred in the past, and even in the

8    somewhat recent past.

9              But when it comes to the ongoing effects

10    of discrimination, that's a separate question.  And the

11    government need not show that there is current specific

12    instances of intentional discrimination before it can

13    take action to remedy the effects of discrimination.

14              THE COURT:  Talk about the part that was

15    mentioned as far as in the cases that were mentioned --

16    generally there has been a discussion about a single

17    decision maker.

18              Do you agree with that?

19              MS. SNOW:  Yes.  And what Croson and

20    Vitolo were referring to with respect to a single

21    decision maker, is that there is a specific government

22    unit, which here would be the Farm Service -- the USDA,

23    and more specifically the Farm Service Agency --

24              THE COURT:  The entire USDA?

25              MS. SNOW:  There is evidence of a lot of

UNREDACTED TRANSCRIPT

1    discrimination occurring at all levels of USDA.  But we

2    are here focused on the Farm Service Agency, which

3    provides these loans.  And there is substantial evidence

4    of intentional discrimination by Farm Service Agency in

5    providing loans.

6                 And so if -- Congress could rely on that

7    past evidence of intentional discrimination and the

8    evidence that that discrimination is having lingering

9    effects to take action to remedy those lingering effects.

10                And that is not inconsistent with the

11   Court's conclusion in Wynn.  In Wynn the Court stated, on

12   page 16, at note 9, that on -- the Court's concern was

13   with the record as it stands.  And it stated that on a

14   more fully developed record the government may be able to

15   establish that despite past remedial efforts, the harm

16   caused by the disgraceful history of the discrimination

17   by the USDA in farm loans and programs is ongoing.

18                So that's focusing on the harm caused and

19   its ongoing affects.  And so we don't read the Wynn

20   opinion as requiring specific ongoing intentional

21   discrimination today.

22                THE COURT:  You don't read the Wynn

23   opinion that way?

24                MS. SNOW:  No, Your Honor.  That would be

25   one way of showing that the government has a compelling

1    interest.  But another way is to show that because of

2    specific acts of intentional discrimination that have

3    occurred in the past, there are lingering effects that

4    the government has a compelling interest in remedying

5    today.  And that's what Congress is focused on.

6                     THE COURT:  So be sure I'm understanding.

7                     So it's your position that at least the

8    Farm Services Administration has engaged in systemic

9    discrimination.

10                    MS. SNOW:  Yes.

11                    THE COURT:  Right?

12                    MS. SNOW:  Yes.

13                    THE COURT:  That it was intentional?

14                    MS. SNOW:  Yes.

15                    THE COURT:  That you're trying to

16   characterize that division as a single decision maker, if

17   I'm reading -- understanding what you are saying.

18                    MS. SNOW:  Yes, I think that would be

19   similar to a city --

20                    THE COURT:  And so that, obviously, then

21   that the agency participated in the discrimination.

22                    MS. SNOW:  Yes.

23                    THE COURT:  The whole agency, is the only

24   way I know to say it.  And by that I mean the Farm

25   Services Administration.

1            MS. SNOW:  Yes, that's correct.

2            THE COURT:  Do you want to respond to

3    that, Mr. Boucek?

4            MR. BOUCEK:  Well, Your Honor, I would be

5    remiss if I didn't point out that if USDA was guilty of

6    being such invidious racists that their discrimination is

7    persistent and ongoing, then the solution rights itself.

8    The USDA needs to get rid of the farm service loan agents

9    who are responsible for administering discrimination in

10   its loan policies.

11           But I respectfully submit that the

12   evidence of that showing is just wanting.  The Court in

13   Wynn never found it.  I've never seen it.

14           It is true undoubtedly that the USDA has a

15   sad history.  But the lion share of the government's

16   evidence of intentional discrimination predates the

17   Pigford Settlements.  And the evidence of everything that

18   is reasonable current is just weak, anecdotal, doesn't

19   suggest intentional discrimination.

20           I respectfully submit that the Wynn court

21   had it exactly right.

22           THE COURT:  All right.  Let's see what

23   else do I want to ask you, Ms. Snow.  And I -- obviously,

24   I'll give both of you a chance at some point to address

25   anything else that you would like to.

1          Ms. Snow, you said something in your

2   opening remarks about the amount of funds that were

3   available for this program.

4          Are the funds unlimited?  Is there no

5   limit on the amount of anticipated funds that are

6   available?

7          MS. SNOW:  Yes, Your Honor, that's

8   correct.

9          In Section 1005, Congress appropriated,

10  quote, such sums as may be necessary to remain available

11  until expended, unquote.

12         THE COURT:  What does that mean, until

13  it's –– available until expended.  That sounds like

14  congressional legalese.  But what does that mean?  Put a

15  dollar amount on that for me, if you can.  Or is there a

16  dollar amount?

17         MS. SNOW:  There is no dollar amount.

18  That's the point, Your Honor.  Congress just simply

19  allocated such sums as may be necessary to carry out the

20  program.

21         THE COURT:  Well, why does it say until

22  expended?  How does that factor in –– the amount

23  necessary would seem to say that is no cap.  Right?

24         MS. SNOW:  Yeah.

25         THE COURT:  But then it says until

1    expended.  Which would make one think, well, there is a

2    cap here somewhere.

3                    MS. SNOW:  Your Honor, that language

4    simply indicates that those funds will continue to be

5    available as long as the government needs them to pay for

6    the loans or to pay off the loans under, the qualifying

7    loans under Section 1005.  It's not setting any kind of

8    monitary cap or deadline for their -- the point of that

9    phrase is to emphasize that there really is no deadline

10   by which those funds, those unlimited funds need to be

11   expended.  That they will be, they will be available to

12   the government to carry out the purposes of the program.

13                    And we cited to case law in our brief,

14   which I can cite to you, that is interpreting similar

15   language, similarly for the -- that that there is no --

16   that that type of language does not set a cap on funding

17   or a deadline for its expenditure.

18                    THE COURT:  All right.  I remember your

19   citation there.

20                    MS. SNOW:  Okay.

21                    THE COURT:  Mr. Boucek.

22                    MR. BOUCEK:  Your Honor, we respectfully

23   disagree with Ms. Snow on this.

24                    THE COURT:  What is your position?

25                    MR. BOUCEK:  Our position is the funding

1    is limited by the plain text of ARPA.  And the Court in

2    Wynn directly addressed this issue, and they've never

3    explained why the Court in Wynn got it wrong.

4              If you are to look at the text of Section

5    1005 it reads, and I quote, there is appropriated to the

6    secretary for fiscal year 2021 -- here's the salient

7    part -- out of amounts in the treasury not otherwise

8    appropriated -- and then we get to the part that they've

9    been quoting -- which is such sums as may be necessary.

10             So the such sums as necessary may be open

11   ended when looked at in a vacuum, but it's qualified by,

12   out of amounts in the treasury not otherwise

13   appropriated, which is a finite amount of funds.

14             I further point out, Your Honor, that if

15   Congress had really given an unending, open ended funding

16   mandate, we would have seen that discussed rather

17   publically.  And on the contrary, until the government

18   became concerned with these injunctions, all of the

19   public statements out of the USDA was that this was a

20   limited pot of funds and that it was 4 billion.

21             If I may switch to my monitor for just a

22   momentarily?

23             THE COURT:  All right.  Mr. Bryson, will

24   you switch us over, I guess.

25             MR. BOUCEK:  I'm showing the Court a press

1   release from USDA from about March 10th, I believe it is.

2   I would ask the Court to take judicial notice of it.

3             But the Court can look at it right here,

4   first bullet point.  4 billion toward debt relief for

5   socially disadvantages farmers to pay off burdensome

6   debts.

7             So the idea that these were unlimited and

8   not, rather, a specific number, is a new founded position

9   by the government and is contradicted by their more

10  timely pronouncements during the time.

11            I respect submit, Your Honor, all of this

12  is somewhat an academic exercise when considering whether

13  or not to grant the preliminary injunction.

14            In the Sixth Circuit the law is clear that

15  the intangible harm of an equal protection violation is

16  sufficient to constitute an irreparable harm, which was

17  not the case in 11th Circuit, which is why an injunction

18  is only more warranted here.

19            However, the Court should certainly raise

20  an eyebrow at the patently incredible claim that Congress

21  intended to just give an open ended funding mandate.

22            THE COURT:  All right.  Ms. Snow, I'll

23  give you an opportunity.

24            It says what it says.  You see it, as well

25  as I do.

1          You disagree with that statement, or did
2     someone misunderstand or --
3               MS. SNOW:  I do disagree with the
4     statement, Your Honor.  That is providing an estimate of
5     the amount of money that it will take to pay off -- you
6     know, with the current date that USDA had at the time the
7     statement was made, that it would take, you know,
8     roughly -- it would cost roughly $4 billion to pay off
9     the qualifying loans held by socially disadvantaged
10    farmers.
11              This statement does not indicate anywhere
12    that USDA believes that Congress has set a cap on the
13    funding available.  And importantly, the estimate may
14    change, and this $4 billion number is -- that was based
15    on USDA's calculations at the time.  But it's in the
16    process of identifying still all of the qualifying loans
17    under the statute, and how much money -- the amounts of
18    those loans, and how much money it will take to pay them
19    off.
20              THE COURT:  So this is just an estimate of
21    the amount of qualifying -- what they anticipate will be
22    the number amount of qualifying loans?
23              MS. SNOW:  That's correct, Your Honor.
24              THE COURT:  All right.  Well, let's go
25    back to something.  This is going to be critical to the

1    decision here.

2              Obviously, we're in the Sixth Circuit.

3    And Vitolo is a recent decision out of the Sixth Circuit.

4              If systemic racism was not a compelling

5    justification in Vitolo, or the restaurant relief, why is

6    it not equally inadequate as a justification in this

7    case?

8              MS. SNOW:  Your Honor, the evidence in

9    Vitolo was very different from the evidence that we have

10   here.

11             And in Vitolo the Court was not analyzing

12   the ongoing effects, the lingering effects of

13   discrimination, it was looking to the government's

14   asserted interest in remedying specific discrimination

15   that was happening present day.

16             And the record just did not support the,

17   Congress's compelling interest in that case.  So that's

18   the key difference.

19             And with respect to the record, the Vitolo

20   Court found that Congress was generally relying on

21   discrimination society wide, and that Congress was just

22   -- was citing more general statics that were not specific

23   to the restaurant industry or a specific government

24   entity that had committed discrimination intentionally.

25             And here we have an entirely different

1   record.  Congress was looking specifically to the Farm

2   Service Agency.  And it had specific evidence that there

3   had been intentional discrimination in the Farm Service

4   Agency.

5              So the record is just entirely different

6   here.  Congress was not citing discrimination society

7   wide to justify this program, it was looking specifically

8   to the Farm Service Agency.

9              THE COURT:  Okay.  Do you want to respond?

10             MR. BOUCEK:  Yes, Your Honor.  I think

11  it's important to point out there is kind of two

12  components to the Court's question.

13             The first is the broad justification of

14  remedying societal discrimination.  The Courts have been

15  very clear, both the Supreme Court and the Sixth Circuit,

16  that just generally remedying societal discrimination is

17  not good enough.  The Court has, the Supreme Court has

18  given a very narrow window to use past discrimination as

19  a justification for a race-based program.

20             Obviously, if the government had a

21  compelling interest in addressing societal

22  discrimination, race-based policies would be the reality

23  of the every American policy.  The Courts have been very

24  sensitive to say we are not going to allow that.  We are

25  just going to allow a very narrow window that is subject

1    to many of constraints we have talked here today.

2    Intentional discrimination within the agency, and so on,

3    and so on.

4                    So Vitolo clearly said that remedying

5    societal discrimination is not a compelling interest,

6    period.  Then the Court in Vitolo turned to the question

7    of whether or not the government had made the requisite

8    showing that it needed to make to show that it was, that

9    it was remedying past discrimination on the part of the

10   specific industry in question.  Which is a permissible

11   interest.

12                   Then the Court looked at truly a different

13   evidentiary record, but the same kind of evidence, and

14   said that's not good enough.  So there is a little bit of

15   a bait and switch that goes on here with remedying

16   societal discrimination.

17                   The evidence that has been proffered truly

18   does show that there has been a history of

19   discrimination.  But that does not rise to the level of

20   establishing a strong basis in evidence for the actual

21   legitimate compelling interest, which is remedying past

22   discrimination that remains stubborn, persistent,

23   ongoing, that they had an intentional hand in.  And

24   that's were the shortcoming comes in.

25                   So, respectfully, Vitolo did arrive at the

1    conclusion that societal discrimination was not good

2    enough, and that dismissed the evidence that they had

3    supported the actual justification that they could rely

4    on.  And the Court should do the same here.

5            I think that there is -- much like with

6    the number, there is a variance between the government's

7    legal position and its public pronouncements.  And we

8    cited a number of these statements in our brief.

9            But to the entire world, defendant Vilsack

10   and the agency are going around saying, this is intended

11   to achieve equity and remedy systemic racism.  That's

12   what they're saying.  We've put any number of quotes in

13   there.  Most recent pronouncement from defendant Vilsack

14   attacking the litigation said it was pretty clear what it

15   had to achieve, why they had to discriminate on the basis

16   of race.  And we quoted this is our brief.  But he guess

17   on to say it was addressing the public perceptions of

18   systemic racism.

19           Now the government are very good

20   attorneys.  They know that that is, no way that that is a

21   justification that will pass constitutional muster.  But

22   the government's justifications have to be sincere under

23   strict scrutiny.

24           And so the variance between the

25   government's stated positions in court, and the stated

1  pronouncements of defendants when they're talking to the

2  public or Congress, should trigger a scepticism from the

3  Court about the sincerity of the government's proffered

4  justifications.

5                  I think the Court in the Sixth Circuit,

6  what it said was exactly correct by implication, which is

7  that your evidence supports a systemic racism approach,

8  but that's not a compelling justification.  I think the

9  same is true here today.

10                 THE COURT:  I'll let you respond, Ms.

11 Snow.

12                 But would you agree that there is some

13 disconnect between the public statements and what

14 Mr. Boucek referred to?

15                 There appears on the surface to be.  I'm

16 just wondering if you agree or disagree that there is

17 some disconnect, I'll call it, between the public

18 pronouncements and the position that's being taken in

19 these legal proceedings.

20                 MS. SNOW:  Your Honor, I disagree that

21 there is a disconnect.

22                 If you look at those statements that are

23 being cited by Secretary Vilsack, he is referring to

24 systemic discrimination, but he is referring to systemic

25 discrimination at USDA in USDA Farm Service Agency

1    programs.  He is not referring to systemic discrimination

2    society wide.  And that is the key difference between

3    this case and Vitolo.

4              In Vitolo there was an absence of evidence

5    that was specific to the restaurant industry, specific to

6    the Small Business Association that was providing this

7    program.  Here we have specific evidence that is directed

8    to Farm Service Agency, and Secretary Vilsack's

9    statements are specific to that as well.

10             Just because he uses the term "systemic

11   discrimination" does not mean that he is talking about

12   society wide discrimination.  Again, if you look at

13   the -- if your look at those quotes in their context, he

14   does point back directly to USDA.  So we don't see any

15   inconsistency.

16             THE COURT:  Did Congress consider all this

17   plethora of information that you are now relying on?  Did

18   Congress actually consider all of that in enacting the

19   legislation?

20             MS. SNOW:  It did, Your Honor.

21             In particular, the floor statements of

22   Senator Booker and Stabenow and House Chairman David

23   Scott.  They go through all of this evidence in detail.

24             When we were -- the government pulled from

25   those statements and the studies that they cited in

1    preparing this briefing and explaining the findings in

2    those investigations and reports that Congress

3    specifically cited to.

4              So all of this evidence was before

5    Congress.  They were drawing from all of these reports

6    and concluding they had a compelling interest in adopting

7    this program.

8              THE COURT:  Do you agree or disagree?

9              MR. BOUCEK:  I disagree.

10             I suppose it depends on what you mean by

11   "Congress".  The best evidence of what Congress

12   considered is contained in the findings.  There really

13   were no findings in ARPA that addressed Section 1005 or

14   farm loans or any of those kind of issues.  That's really

15   not surprising.  ARPA was a pandemic relief bill.

16             Really what Section 1005 is is derivative

17   of Senate Bill 278, which was geared towards this exact

18   issue.  In fact, the government refers to Senate 278 as

19   the predecessor bill in its brief.  And I agree, I think

20   that's accurate.  That did contain findings.

21             In all of the findings, all of the

22   findings in Senate Bill 278 addressed system wide

23   systemic racism issues that fall short of the showing

24   about systemic intentional racism.

25             And to the Court's question in particular,

1  virtually none of the government's evidence was

2  referenced in the findings for Senate 278.

3              I think the only one that is possible is a

4  2019 GAL Report.  And the GAL report from 2019 does not

5  make a finding of intentional racism, and it's just sort

6  of weak anecdotal second-hand information.

7              And the Wynn report specifically addressed

8  the 2019 reports.  It said this isn't nearly good enough.

9  And even if we believed everything in here, it doesn't

10  recommend a broad wholesale approach of forgiveness of

11  farm loans as the approach.

12              So, you know, it's just another instance

13  of the evidence that was actually considered falling

14  short of showing recent intentional discrimination on the

15  part of USDA that corresponds with the relief in Section

16  1005.

17              THE COURT:  Ms. Snow.

18              MS. SNOW:  Your Honor, what is important

19  in what was considered in leading up to the enactment of

20  the Section 1005, and not a predecessor bill that was not

21  adopted.  The findings in the predecessor bill do show

22  that Congress had the same compelling interest in mind.

23  But when it was considering Section 1005, it was

24  reviewing -- Congress reviewed a substantial amount of

25  evidence that we have gone through in our brief.  And

44

1    those statements by senators are probative of what

2    Congress was considering.

3                    So in Croson -- I believe in plaintiff's

4    brief they state that floor statements are not probative.

5    But Croson states that statements from officials are not

6    probative when they are not supported by evidence.  Here

7    they are supported by evidence.  And so those statements

8    are probative of what Congress had in mind, what it

9    considered when it was enacting Section 1005.

10                   THE COURT:  Okay.  What race-neutral

11   alternatives did the government consider?

12                   MS. SNOW:  Well, significantly, Your

13   Honor, the most recent race-neutral form of relief that

14   Congress had provided in order to address the effects of

15   the pandemic was recent -- well, agricultural funding

16   that addressed -- that was not pandemic related, that was

17   related to tariffs that were having a -- retaliatory

18   tariffs from China that were affecting farmers.  Congress

19   provided some funding to assist farmers with that.

20                   But then recently after that, in

21   additional COVID relief that Congress provided to assist

22   farmers as well, both of those funding measures went

23   largely to non-minority farmers.  And Congress had an

24   interest in, when -- upon reviewing these reports,

25   showing that the majority of its funding did not reach

UNREDACTED TRANSCRIPT

1    minority farmers, despite the fact that they were facing

2    a disproportionate need, they were disproportionately

3    affected by the pandemic, congress concluded that it had

4    a compelling interest, and kind of reversing the way that

5    its disproportionate funding had exacerbated the effects

6    of the pandemic, perpetuated the lingering effects of

7    discrimination, made worse by the pandemic --

8                    THE COURT:  But what race-neutral

9    alternatives?  Can you be specific?  I'm not following

10   your argument here.

11                   Think about the question.  Race-neutral

12   alternatives.  What specifically are race-neutral

13   alternatives that Congress considered?

14                   That's what I'm trying to focus on.

15                   MS. SNOW:  Right.  Yes, Your Honor.

16                   So Congress had considered the ways that

17   its other efforts to kind of remedy discrimination toward

18   minority farmers had come up short.  And then considered

19   the failures of its prior relief, COVID and agricultural

20   relief, to reach minority farmers.  Which was -- a

21   provision of that relief was race neutral, but it went

22   largely went to non-minority farmers.  And so that was

23   not addressing the needs of minority farmers.

24                   THE COURT:  But didn't the Wynn decision

25   sort of address that from a different standpoint as far

1  as farm size and crops and so forth?  Wasn't that the

2  analysis that -- out of the Middle District of Florida?

3              MS. SNOW:  Yes, Your Honor, that was the

4  conclusion of Wynn.

5              But, respectfully, Your Honor, we disagree

6  with that, with the Court's reasoning there.

7              The 2019 GAL report kind of -- which I

8  referenced earlier, discusses how the effect the

9  lingering -- the ongoing discrimination at USDA had

10 prevented farmers from developing, or minority farmers

11 from developing their farms with the same opportunities

12 as non-minority farmers, which has led to them having

13 smaller farms today.  And which explains, you know --

14 that shows that it's not just the neutral fact that

15 funding went to smaller farms, it's smaller -- minority

16 farmers generally had smaller farms, in large part

17 because of this discrimination from the past, which the

18 GAL report of 2019 draws that link.

19             And similarly, Senator Stabenow cited a

20 study from Tufts University that was discussing just the

21 land loss over time over the last century.  In

22 particular, black farmers losing 80 percent of their land

23 over the last century, and how that represented more than

24 $120 billion in lost opportunities.

25             So these losses over time have accrued so

1    that minority farmers generally have smaller farms,

2    diminished opportunities.  And that explains, that

3    provides a link between the historic discrimination and

4    the way that it affects farmers today.  And why the

5    funding, if it went to mostly larger farms, is due in

6    part to discrimination.

7              Lastly, there is a letter that was

8    introduced into the congressional record from

9    agricultural academics that also are supporting,

10   providing evidence for this position that the effects of

11   discrimination, decades long discrimination, which has

12   affected minority farmers for generations in their

13   ability to develop land, has meant that they have been

14   deprived of the same opportunities that go to larger

15   farms generally, and USDA programs targeting larger

16   farms.

17             THE COURT:  Did Congress consider

18   race-neutral alternatives?

19             MR. BOUCEK:  No, Your Honor.  And nor does

20   the government ever cite and instance where they did so.

21             And, of course, they didn't.  This is a

22   bill about pandemic relief that was passed through

23   reconciliation.

24             And before the government can justify a

25   blunt instrument, like Section 1005, the Supreme Court

1    has said you have really got to go through very careful

2    consideration to show that there is nothing you could

3    have done short of making race at the fore when you

4    discriminate against Americans in the dissemination of a

5    government program.

6                    And here I'll point out, Your Honor, that

7    a program like Section 1005, I would go so far as to say

8    it's entirely unprecedented in affirmative action

9    jurisprudence.  I don't know that any of the other cases,

10   even in the heyday of affirmative action, considered such

11   a program that would so wildly and glaringly based on

12   race for a government benefit.

13                   The government's evidence falls way short

14   of showing a compelling interest.  But that's not

15   pertinent to the Court's narrow tailoring analysis.

16                   The narrow tailoring analysis addresses,

17   how did you choose to achieve these goals?  And here the

18   government has given us two general justifications.

19                   The first justification is pandemic

20   relief.  Here Vitolo is directly on point.  In Vitolo

21   they pointed out that it's really true that minorities

22   had been left out of prior pandemic relief efforts, then

23   the thing to do would be to just give priority to

24   everybody who had been left out of prior pandemic relief

25   efforts.

1          That is, obviously, the most narrowly

2   tailored way of achieving that goal.  Congress didn't

3   choose it.  There is no good reason to have not chosen

4   that, if that was the goal.  And the government succeeds

5   only in proving that they did not consider that goal when

6   it points out that minority groups were differently hit

7   by the pandemic.

8          That may or may not be true.  But that has

9   nothing to do with why didn't you just choose to give

10  people who had been left out of prior pandemic relief,

11  have priority access to the program.

12         Nor is it true that every minority who

13  would have been left out of the prior pandemic relief has

14  a farm loan.  The better way to do it would be to say

15  everybody, irrespective of whether you have a farm loan,

16  who was left out of prior pandemic relief, can go have a

17  cash of $2000, or whatever it would be.  All of those are

18  more tailored ways of achieving the goal.

19         And then when -- again, Vitolo addressed

20  that directly.

21         And when it comes to the more slippery

22  goal that they have articulated of remedying past

23  discrimination, again, we have the Pigford settlements.

24         In the other cases the government was much

25  more specific in it's arguments about why the Pigford

1    settlements were inadequate.

2                The government has not been as specific in

3    its brief before this Court.  Probably because the Wynn

4    Court was so dismissive of the evidence that they had

5    proffered that the Pigford settlements were weak.

6                But even if we concede that it's true that

7    the Pigford settlements left somebody out because of

8    state taxes, or because of statute of limitations, or for

9    whatever issues, the thing to do would be to just find

10   the people who were excluded from the Pigford settlements

11   and give them an award.  Or find the people who got

12   settlement awards and make them whole by paying whatever

13   they owed in state taxes.

14               But giving farm loan relief to current

15   recipients is so wildly out of whack with that goal --

16   you might be a young farmer whose farm practice totally

17   antedates or totally postdates any of the overt farm loan

18   discrimination that the government has identified.

19               And this says nothing about the racial

20   categories that the government has broadly swept under

21   this umbrella.

22               I mean, most of the government's evidence

23   addresses it's historic discrimination of

24   African-American farmers, which is truly odious and

25   noxious.  But the government's evidentiary showing for

UNREDACTED TRANSCRIPT

1  Hawaiians or Natives, it's so weak as to honestly almost

2  be called not even there.

3                    The Wynn Court addressed that as well, as

4  well as Vitolo granted on a different evidentiary record.

5                    But, you know, Your Honor, I just think

6  that the tailoring aspect of this makes this case an

7  absolutely slam dunk.  Which is why I go so far as to say

8  plaintiff is not likely to prevail, I think plaintiff is

9  certain to prevail based on the record that we have now,

10  which contains no real meaningful evidence.

11                    MS. SNOW:  Your Honor, I think when it

12  comes to the narrow tailoring analysis it's important to

13  remember the purpose that Congress had in mind, which was

14  to provide timely and meaningful relief to minority

15  farmers in the midst of a pandemic that had exacerbated

16  the disproportionate opportunities that they already,

17  that they had before the pandemic.

18                    The pandemic only exacerbated the

19  lingering effects of discrimination that had placed

20  minority farmers at a disadvantage before.  And it was

21  that purpose that Congress had in mind when it designed

22  Section 1005.  It was targeting those, the

23  discrimination —— the effects of discrimination.

24                    And but it was trying to do so in a timely

25  way.  And so the program is narrowly tailored to

1    providing that kind of timely relief.  As in the Supreme

2    Court's decision in Paradise, which approved of a one for

3    one hiring and promotion remedy as a need which was

4    designed as a, quote, ephemeral remedy to address a

5    emergency situation where, you know, the prior efforts at

6    resolving or remedying discrimination had come up short.

7                    This is a similar situation where the

8    lingering effects of discrimination have just been

9    exacerbated by a global pandemic that put minority

10   farmers at risk, at great risk of foreclosure, facing

11   higher rates of delinquency.  And so Congress --

12                    THE COURT:  All right.  Let me interrupt

13   you one more time, because this is a another question I

14   have written down.

15                    Does the program target farmers and/or

16   ranchers who suffered economic pain during COVID-19 or

17   those who actually contracted COVID-19?

18                    Does the program itself target farmers and

19   ranchers who suffered economic pain during COVID-19,

20   that's one part of it, and/or those who actually

21   contracted COVID-19?

22                    Does it zero in on those two groups?

23                    MS. SNOW:  Your Honor, it doesn't.  It

24   focuses on minority farmers who have USDA direct or

25   guaranteed loans.

1              THE COURT:  That's the only requirement,

2    is minority farmers who have -- say what you just said

3    again.  Repeat that.

4              MS. SNOW:  Minority farmers who have

5    direct or guaranteed USDA loans.  So --

6              THE COURT:  So this was a pandemic bill,

7    right, a COVID relief bill?

8              MS. SNOW:  That's correct.

9              THE COURT:  And in Section 1005 targed

10   those who just had USDA loans?

11             MS. SNOW:  That's correct, Your Honor.

12             And the reason for that is, again,

13   Congress was acting in emergency situation, trying to

14   provide relief to farmers as quickly as possible.  And so

15   it was doing what it had in its power to do to provide

16   relief on a timely basis.

17             And so farmers who have direct or

18   guaranteed loans with USDA, first of all, are those who

19   have been, belong to groups that have been victims of

20   discrimination and are experiencing its lingering

21   effects.  So that makes sense that Congress would have

22   targeted those farmers having -- but --

23             THE COURT:  So they would be entitled to

24   debt forgiveness, even though they may not have been

25   affected in any way by the pandemic?

54

1          MS. SNOW:  Your Honor, Congress had before

2    it information or evidence showing that minority farmers

3    as a whole have been aversely --

4          THE COURT:  Well, I know there is some --

5    that sort of goes back, I think, to maybe what we

6    addressed earlier about the statistical information that

7    you pointed out to the Court.

8          But my point is, this relief bill in this

9    particular section, 1005, really doesn't take into

10   consideration, does it, or am I missing something here,

11   how the pandemic has impacted these particular group of

12   farmers who had loans through USDA?

13         MS. SNOW:  So it does in the -- to the

14   extent that Congress was also looking at how its prior

15   more recent funds had largely been, or gone to

16   non-minority farmers.  And so because as a whole minority

17   farmers had been left out of those recent funding

18   efforts, based on that evidence, and in this emergency

19   situation, Congress was using the tools that it had to

20   provide relief expediently to minority farmers.

21         THE COURT:  Okay.  Again, just move on

22   down the line, my list.

23         The plaintiffs made the argument, Ms.

24   Snow, that if the Court doesn't intervene, that the

25   plaintiff cannot avail himself of damages in light of

UNREDACTED TRANSCRIPT

1    sovereign immunity and the plaintiff's inability to seek

2    damages.

3              Do you agree or disagree?

4              MS. SNOW:  We disagree, Your Honor.

5              Damages are not at issue here, because

6    plaintiff has not made a claim for damages.  He's seeking

7    forward-looking injunctive relief.

8              Under Supreme Court case law governing the

9    appropriate remedies in equal protection cases, when it

10   comes to the benefits available under a statute, Courts

11   do have power to enter remedies that would expand the

12   class of recipients under the statute.

13             We cited Sessions v Morales-Santana in our

14   brief, which summarizes the case law on this point.

15             In Morales-Santana, the Supreme Court

16   stated that when the right invoked is equal treatment,

17   the appropriate remedy is to mandate equal treatment,

18   assuming the Court -- if the Court were to find this is

19   unconstitutional -- and that mandate of equal treatment

20   can be accomplished in one of two ways.  Either

21   withdrawing benefits from the favored class, or extending

22   benefits to the excluded class.

23             And that depends on the legislature's

24   intent.  So here, based upon this case law, the Court

25   does have the power to expand the class beneficiaries if

1   it determines that that is appropriate --

2                   THE COURT:  That's not what Congress

3   intended, was it?

4                   MS. SNOW:  It is, Your Honor.

5                   Congress would have intended -- so this

6   analysis looks to what the effect would be of withdrawing

7   benefits to a class that Congress intended to protect.

8                   As the Supreme Court in Califano v

9   Westcott also analyzed -- you know, in that case the

10  Court approved an order that extended Social Security

11  benefits to an otherwise excluded class, in large part

12  because it found that an injunction suspending the

13  program's operation would impose hardship on

14  beneficiaries whom Congress plainly meant to protect.

15                  And here, the same result would follow.

16                  Congress plainly meant to protect socially

17  disadvantaged farmers, those who are in need of this

18  relief.  And an injunction completely suspending the

19  allocation of those benefits would impose substantial

20  hardship.

21                  And given the emergency nature of this

22  relief, Congress's intent that it get to all of those who

23  need it, in part, which is also shown by the fact that it

24  did set, appropriate unlimited funds --

25                  THE COURT:  Mr. Holman is not a socially

UNREDACTED TRANSCRIPT

1    disadvantaged farmer, is he?  He doesn't fall in that

2    category.

3                    MS. SNOW:  No, Your Honor.

4                    And the way that -- if you -- in Califano

5    v Westcott, it illustrates how the Court would order this

6    kind of relief, if it were to conclude the program is

7    unconstitutional.  In that case, the statute provided

8    Social Security benefits to families within -- if the

9    male parent was unemployed.

10                    And so the Court concluded that that was

11   unconstitutional, and the appropriate remedy would be to

12   expand the class of beneficiaries.  And it do so by

13   striking language in the statute that would limit the

14   beneficiaries -- that would allocate funds based on

15   gender.

16                    And so the Court would have in its

17   power -- again, we would like to brief remedies in the

18   future, if the Court were to determine that this is

19   unconstitutional --

20                    THE COURT:  What you are saying is

21   basically the Court would have to rewrite the

22   legislation.

23                    MS. SNOW:  It would not be rewriting, Your

24   Honor.  Because, again, this is just getting to the issue

25   of remedy and what Congress's intent would be.

1    And in Califano v Westcott Supreme Court

2  case it approved of a remedy that would involve striking

3  specific language in order to expand the class of

4  beneficiaries, because that is in line with Congress's

5  intent.  And it would protect, it would protect those who

6  Congress plainly meant to protect within the statute.

7    And so this type of remedy is entirely

8  consistent with Supreme Court case law and mandated by

9  Supreme Court case law that the Court consider Congress's

10  intent in fashioning the appropriate remedy.  And the

11  appropriate remedy here would be to expand the class of

12  beneficiaries.  That would be more in line with

13  Congress's intent, than just withdrawing it entirely.

14    MR. BOUCEK:  Well, Your Honor, again we

15  respectfully disagree.  This Court cannot grant funding

16  to Mr. Holman or anybody else even if plaintiff prevails.

17    To just briefly address her first point,

18  which was that plaintiff did not request damages because

19  he just requested forward-looking relief.  That is

20  precisely because sovereign immunity precludes us from

21  requesting damages, and we are not in the habit of asking

22  the Court for remedies that the Court cannot award.  So

23  we were left with asking for forward-looking relief.  And

24  we came to court promptly to ask for a preliminary

25  injunction to halt this program for ever going into

1  effect.

2           To more directly address whether or not

3  the Court can award funding to Mr. Holman, or other

4  similarly situated plaintiffs, the Court cannot.

5           As the Wynn Court correctly found, the

6  Court cannot rewrite Section 1005 so as to include non

7  socially disadvantaged farmers.

8           The clear and manifest point of Section

9  1005 was based on race.  And so if the Court is to come

10 back and say that all races, or potentially some races,

11 but not others, can access these funds, that's really

12 doing Congress's job for it.

13          And Ms. Snow is a very capable attorneys.

14 But I dare say that it's not within any attorney's skill

15 set to predict what Congress actually intended or would

16 have done under different circumstances.

17          With respect to the Westcott decision that

18 she cited, the Wynn Court directly addressed it and said

19 that the government had its understanding of that case

20 wrong.  That concerned a case where the plaintiff was

21 coming and saying, I am entitled to these benefit per the

22 term of the statute and the regs.

23          And then Court awarded -- said, you're

24 right, and, therefore, said you are eligible for these

25 programs.

1          That's very different from what we have

2     here.  As the Court pointed out, Mr. Holman is not

3     eligible for loan relief under Section 1005.  So for the

4     Court to say you have funding available would call into

5     very serious questions about whether or not the Court is

6     awarding damages or what that would look like.

7          And that would be, implicate things like

8     the apportionments clause, which again was addressed by

9     the Court in Wynn.  Because, obviously, if we're going to

10    forgive every single farm loan that's eligible out there,

11    irrespective of race of the farmer, that's going to be a

12    very different budgetary obligation for the government

13    than the one that Congress actually approved of.

14         And that runs afoul of the Constitution.

15    This Court cannot apportion funding.

16         Finally, Your Honor, I'll close on the

17    point by saying, the ultimate remedy that this Court

18    orders, whether it's funding or not, is irrelevant.

19         In the Sixth Circuit an equal protection

20    harm is an irreparable harm.  So it doesn't matter

21    whether or not he can get funding later on, he faces an

22    immediate irreparable harm.

23         Again, that is distinct from the 11

24    Circuit, because that is the law of the land in the Sixth

25    Circuit.

1          Moreover, the Court's job at preliminary

2    injunction stage, is doesn't have to fashion the ultimate

3    remedy or decide this thorny question of what the

4    ultimate remedy is, we can do that another day.  The

5    Court's job at the PI stage is just to preserve the

6    status quo.

7          The status quo is that nobody was getting

8    funding.  And stated differently, if the Court enjoins

9    any payments, and plaintiff is wrong about the Court's

10   ability to award funding, the Court can still come back

11   again in this case and just decide that that's the

12   appropriate remedy and we are going to award funding.

13   But the opposite is not true.

14          If the Court limits funding to just the

15   plaintiff, or just says we're going to set aside funds

16   for the plaintiff, and plaintiff is right about the

17   funds, either that they're disappearing on that the Court

18   can't do it, then the Court will be left in the

19   unfortunate position where they have to figure out a way

20   to get back all the funding that has been sent out to the

21   socially disadvantaged farmers.  That, obviously, is

22   going to be a much more disruptive way of trying to

23   fashion a remedy.

24          So the appropriate thing to do here is to

25   preserve the status quo, and that's just hault these

1    payments from going out.

2                    THE COURT:  I've got -- let me tell both

3    of you, I've got just two or three more questions, then

4    I'm going to take a break and give both sides an

5    opportunity to make any closing remarks you would like to

6    make.  Or if there is any areas that you're not

7    comfortable that I delved into deep enough and you want

8    to address those, then you'll be giving an opportunity

9    to.

10                   Ms. Snow, what discrimination have current

11   farmers with loans suffered?  What discrimination have

12   current farmers or farmers with current loans -- maybe

13   that's better said.

14                   What discrimination have farmers with

15   current loans suffered?

16                   MS. SNOW:  Your Honor, the farmers with

17   current loans may have been suffering from discrimination

18   or -- they may have suffered specific acts of

19   discrimination or experiencing its lingering effects.

20                   But the farmers -- it's well documented in

21   the history of, in the reports before Congress that they

22   discussed that discrimination in the administration of

23   the farm loan programs would affect the terms of the

24   loans that were given out and the amounts that they were

25   provided in, and the time lines in which they were

1    provided.

2              So, for instance, the CRAT report details

3    this very specifically, many complaints by all minority

4    farmers falling into the racial groups that are included

5    in USDA's definition of socially disadvantaged farmers.

6    All of these different groups have complained of

7    receiving loans on a delayed basis at a time where it was

8    just too late to be useful for that season's crops.  So

9    they lost out on the economic benefits of obtaining the

10   loan to be able to produce that season's crop.

11             A lot of them complained of receiving

12   loans in smaller amounts then non-minority farmers, or

13   receiving loans in specific amounts and then having them

14   arbitrarily reduced, or the terms, the repayment terms

15   changed and arbitrarily accelerated.

16             There is also specific accounts of

17   farmers -- this is also detailed in the Pigford

18   litigation -- farmers discussing receiving loans with

19   supervised accounts.  Which meant that the county

20   commissioner, who was most likely white, had to sign off

21   on any, you know, any use of the loan before the minority

22   farmers could actually make use of it.

23             That's explained in the CRAT report in the

24   Pigford litigation.

25             And then finally, not receiving loan

 1    servicing options if they were at risk of default or they

 2    were not extended the same kind of options that

 3    non-minority farmers received.

 4                 THE COURT:  All right.  Do you want to

 5    respond?

 6                 MR. BOUCEK:  Briefly, Your Honor.

 7                 The Court's questions is what evidence is

 8    there that current farm loan holders, holders of farm

 9    loans are victims of discrimination.  And there isn't.

10                 My first point is that, in fact -- I think

11    this goes directly to the tailoring analysis -- the

12    biggest victims of USDA's historic discrimination

13    probably don't hold farm loans any longer.  They are

14    people who probably lost the farm.  And those people are

15    not addressed in any way by this program.  Which is one

16    of the ways that the Wynn Court said that the program is

17    widely under inclusive, which is one of the ways of

18    showing it's not tailored.

19                 The second point is that the government's

20    evidence that Ms. Snow points out is weak and anecdotal.

21    It was all discounted by the Wynn Court.  When they talk

22    about the CRAT report, what they are really talking about

23    are these vague, second-hand accounts that certain

24    minorities feel, quote, stereotyped when they deal with

25    farm service agents.  That's not the sort of hard

1    evidence that can merit a race based preference.

2                Obviously, if it remains the case in 2021

3    that the USDA is employing discriminatory loan service

4    agents, the appropriate remedy is for USDA to get rid of

5    those loan service agents immediately and start dealing

6    one on one on an individualized case with the victims of

7    those discriminatory loan practices.

8                The government is not going to tell you

9    that that's happened, because they don't have evidence of

10   it.

11               THE COURT:  Ms. Snow, will persons who

12   receive loan forgivenesses under ARPA be eligible for

13   future Farm Service Administration loans?

14               MS. SNOW:  Your Honor, those who are

15   entitled to receive debt relief are eligible for future

16   loans.  This is not debt forgiveness, as that is defined

17   by the statute, because it does not result in a loss to

18   the secretary, which is a requirement for -- under the

19   statute, debt forgiveness is by definition modifying or

20   altering a loan in a way that results in a loss to the

21   secretary.

22               THE COURT:  I think the terminology is

23   debt relief versus debt forgiveness.  Right?

24               MS. SNOW:  Yes.  We have been using the

25   term debt relief as a way of distinguishing it.

1          So because that provision that applies to

2    debt forgiveness that would otherwise provide or trigger

3    eligibility borrowers to receiving future loans, that's

4    just is not applicable here, because this doesn't fall

5    within the category of debt forgiveness under the

6    statute.

7          So, yes, those who receive debt relief

8    under Section 1005 are eligible for future USDA direct or

9    guaranteed loans.

10          THE COURT:  Do you agree or disagree?

11          MR. BOUCEK:  We disagree.  But it's not

12    necessary for the Court to resolve in the preliminary

13    injunction stage.  We didn't cite that as a basis of

14    plaintiff's likely harm for the injunction.

15          This may be one of those things that

16    require a little bit of evidence to -- we just cited it

17    solely for the basis of pointing out that when it comes

18    to harm to others, by actually entering an injunction the

19    Court may actually be doing even the socially

20    disadvantaged farmers a favor, because it may be stopping

21    them from unwittingly agreeing to debar themselves from

22    future loans.

23          But, again, that's not a requirement for

24    the Court to resolve the PI.

25          THE COURT:  All right.  Tell you what,

1    let's take about a 10 minute recess.  Give you an

2    opportunity to sort of pull your final thoughts together.

3    And if there are any salient points that you definitely

4    want to make, then we'll give you the opportunity to do

5    so.

6                    All right.  Mr. Bryson.

7                    (Recess taken.)

8                    THE COURT:  One final question that one of

9    my law clerks brought up, and it seemed like a good

10   question to me. I'll ask that, then I'll hear from both

11   sides.

12                   Is there any kind of moratorium on

13   foreclosures currently?

14                   MR. BOUCEK:  I assume the Court's talking

15   about the eviction moratorium.  In fact, our organization

16   has been involved in some of that litigation.

17                   So multiple courts have found that the

18   CDC's eviction moratorium was either illegal or

19   unconstitutional.  There has been a variety of rationales

20   proffered.  My understanding is that the CDC is still

21   enforcing the eviction moratorium, irrespective of the

22   Court's findings.

23                   THE COURT:  Across the board?  I mean, the

24   one that always, that I'm most familiar with would be

25   like foreclosure on evictions, that you can't evict

1    tenants or whatever.

2                    MR. BOUCEK:  Correct.  I think that I'm

3    accurately stating that.  I don't know if there is some

4    variance between the states.  And I hope the attorneys

5    will correct me if I'm wrong here.

6                    MS. CALKINS:  I can clarify that for the

7    Court, because I was local counsel on that case.

8                    Judge Norris issued an order that enjoined

9    the enforcement of the CDC order in this district.

10                   THE COURT:  But did that just apply to

11   landlord evictions?  Isn't that what that case was about?

12                   MS. SNOW:  Yes.  So are you asking about

13   foreclosures on farmland?

14                   THE COURT:  Nonpayment of farm loans,

15   yeah.

16                   MS. SNOW:  Yes.  So currently USDA is not

17   foreclosing on loans, on USDA loans.  And that's specific

18   to USDA direct loans.

19                   With respect to loans that USDA

20   guarantees, those are provided by private lenders and

21   then guaranteed by USDA.  For those loans, USDA has

22   encouraged private lenders not to initiate any

23   foreclosures, but it can't guarantee that lenders won't

24   do so.

25                   And so with respect to, only to direct

1    loans, there is currently -- currently USDA is just not

2    taking action.

3                    THE COURT:  But -- I'm assuming that's

4    just a policy decision there.

5                    MS. SNOW:  That's correct, yes.

6                    THE COURT:  But as far as private loans --

7                    MS. SNOW:  Right.

8                    THE COURT:  -- USDA is encouraging lender

9    not to foreclose.

10                   MS. SNOW:  Yes.  But it has no control --

11                   THE COURT:  But no legally enforceable

12    prohibition against doing so.

13                   MS. SNOW:  That's correct, yes.

14                   THE COURT:  All right.  Any final remarks

15    or arguments or issues that I've overlooked that you want

16    to address?

17                   Mr. Boucek, I'll start with you.

18                   MR. BOUCEK:  No, sir.  Not unless the

19    Court has any questions.  We thank the Court for its

20    time.

21                   Just one final point.  We did offer the

22    plaintiff's declaration as an attachment.  I ask that

23    that be entered into evidence.

24                   If there is any objection, please let me

25    know.

UNREDACTED TRANSCRIPT

1              THE COURT:  Any objection to that?

2              MS. SNOW:  No objection, Your Honor.

3              THE COURT:  All right.  Ms. Snow.

4              MS. SNOW:  Yes, Your Honor.  I would like

5    to address a few points on irreparable harm.

6              THE COURT:  Okay.

7              MS. SNOW:  So I just would like to start

8    with the point that any injunction here would not help

9    plaintiff, but would only impose harm on others.

10             And in keeping in mind the appropriateness

11   of an injunction, the Court should be considering the

12   harm that would be imposed on others who are expecting

13   this type of relief and are in need of it.

14             But there are a few specific points I just

15   want to make on the law that, with respect to damages and

16   the appropriate remedy that we were discussing

17   previously.

18             And first of all, this, again, is not a

19   case -- this is not a damages case.  Plaintiff has not

20   made a claim of past harm for which damages would be

21   applicable.  He has made a claim for injunctive relief,

22   which under -- in Bowen v Massachusetts --

23             THE COURT REPORTER:  Wait.  Which one?

24             MS. SNOW:  Bowen v Massachusetts, at 895

25   in particular, makes this distinction clean.  When you're

1    talking about entitlement to monitary relief provided by

2    a statute, that is not damages.  That's -- there is a

3    distinction between monitary damages and monitary relief.

4    We're dealing with monitary relief.

5                Plaintiffs claim that others are entitled

6    to funds under a statute that he is saying he's not

7    entitled to.  But that's not damages; and, therefore,

8    sovereign immunity is not an issue.

9                Secondly, because sovereign immunity is

10    not an issue, the Court does have power to order relief

11    here that would expand the class of beneficiaries under

12    the statute.  Again, that's in Califano v Westcott.  The

13    Wynn Court did not address Califano v Westcott, it only

14    addressed Bowen v Massachusetts, which deals with the

15    damages distinction.

16                Califano v Westcott states, at 89 through

17    90, that in other cases where an equal protection claim

18    is ultimately, ultimately succeeds on the merits,

19    Califano states that the Supreme Court has repeatedly

20    affirmed District Court judgments ordering that Federal

21    financial benefits be paid to members of an

22    unconstitutionally excluded class.

23                And, again, as Sessions v Morales-Santana

24    states, whether the Court issues, orders that kind of

25    remedy depends on the intent of Congress.

1          So that gets to my next point, which as we

2    discussed earlier, the intent of Congress here would be

3    to extend benefits.  And that is illustrated first by the

4    fact that Congress did appropriate unlimited funds under

5    this statute, and did not set a deadline for their

6    expenditure.

7          And second, Congress was plainly acting

8    with the interests of farmers, socially disadvantaged

9    farmers in mind who had a need for this relief.

10          And under Califano v Westcott, if

11   withdrawing funds -- if a remedy that would withdraw

12   funds from the targeted class would impose hardship on

13   them, that is a significant concern that the Court should

14   keep in mind that illustrates that Congress would have

15   intended that the class of beneficiaries actually be

16   expanded in order to prevent harm to those who Congress

17   meant to protect.

18          And then, finally, plaintiff has not --

19   plaintiff's harm here is essentially or basically that

20   funds are going to others, but not to him.  And that kind

21   of harm is compensable for all the reasons just

22   explained, that the Court could order a remedy that

23   expands funds to others.  And that distinguishes this

24   case from other Sixth Circuit cases where the likelihood

25   of success on the merits has also meant that there is

1    irreparable harm.

2               Under Sixth Circuit law, even in Vitolo,

3    the Court did not say that there is a just blanket

4    one-size-fits-all rule that any time you are likely to

5    succeed on the merits in a constitutional claim there is

6    per se irreparable harm.  It's simply a general principle

7    that does not apply in all cases.

8               And that general principle does not apply

9    here, because it cannot override the substantive law on

10   equal protection remedies, a stated in Sessions v

11   Morales-Santana, which looks to the legislature's intent

12   as to what kind of remedy to order in equal protection

13   cases.  So the Sixth Circuit's general statements cannot

14   override that.

15              And Vitolo is not applicable to this

16   situation because, as discussed earlier, the funds

17   allocated under the statute in Vitolo were limited.

18   Under the text of the statute, it was undisputed that the

19   funds were limited.  They were very likely to run out

20   during the litigation.  And the individuals who were not

21   prioritized to receive funds, who were suing in that

22   case, were very likely to be deprived of any right to

23   obtain them without an injunction.

24              But in this case, the situation is

25   entirely different.  There is no limited allocation of

1    funds that the plaintiff would not be able to access if

2    you shows he's entitled to them in the normal course of

3    litigation.

4              So for all of those reasons -- you know,

5    the Sixth Circuit case law does not apply.  And

6    plaintiff's requested injunction is actually contrary to

7    the substantive case law on equal protection remedies

8    which looks to Congress's intent.

9              Again, an injunction here would not help

10   him in any way.  He doesn't -- in the -- during the -- he

11   doesn't allege any need for these funds.  His only

12   complaint is that they're going to others.  But that kind

13   of harm can be remedied, because the Court can order more

14   expansive relief at the end of this case, if it

15   determines that's warranted.

16             So for all those reasons, and because

17   plaintiff is unlikely to succeed on the merits, the PI

18   motion should be denied.

19             THE COURT:  Any final words, Mr. Boucek?

20             MR. BOUCEK:  I'll just briefly respond on

21   irreparable harm.

22             Respectfully, the government's position on

23   this is trying to distinguish something out of Vitolo

24   that the opinion will not permit.  The Vitolo opinion was

25   very careful and very unequivocal on this point.  An

1    irreparable harm results from differential racial

2    treatment, period.

3              Here I'm quoting from the very next to

4    last paragraph of the Vitolo opinion.  The plaintiffs are

5    entitled to an injunction pending appeal.  Since the

6    government failed to justify its discriminatory policy,

7    the plaintiff will win on the merits of their

8    constitutional claim.  And like in most constitutional

9    cases, that is dispositive here.

10             The Sixth Circuit then went on to cite

11   four different Sixth Circuit opinions reaching back to

12   2001 in support of this proposition.

13             It is very clear that in the Sixth

14   Circuit, perhaps not in the Fifth, perhaps not in the

15   Eighth, but in the Sixth Circuit a finding of a

16   constitutional violation is a per se irreparable harm.

17             We disagree that funding is an appropriate

18   remedy.  However, even if funding could be the ultimate

19   remedy, the funding at the end of the case would never be

20   able to repair the irreparable injury that occurred in

21   the interim time period between the Court, between

22   Mr. Holman filing his complaint, the program being

23   administered, and the resolution of the case.  Each and

24   every day that goes on during that interim period

25   Mr. Holman will be suffering a depravation of his

1  constitutional rights.

2         The suggestion of government is that

3  Mr. Holman won't be harmed by differential treatment on

4  the base his race if he's later compensated for it.  This

5  is -- absent a showing of economic need at least.

6         This is a suggestion that the Faust Court

7  took exception to.  In fact, the Faust Court said that is

8  an astonishing suggestion for the government to make.  It

9  is, of course, an intangible and irreparable harm for the

10  government to deny its citizens a benefit that accords to

11  other citizens on the basis of race.

12         It doesn't matter whether or not he needs

13  access to those funds right now.  Of course, the

14  government isn't only giving, only giving 1005 fund

15  available to socially disadvantage farmers who actually

16  make a showing of need.

17         Your Honor, for those reasons, I would

18  respectfully point out that what the Court should do at

19  the preliminary injunction stage is preserve the status

20  quo.  Perhaps we are wrong, and the Court can order

21  funding.  I don't think we are.  The Wynn Court didn't

22  think we are.

23         But even if we're wrong, the Court can

24  still order that remedy if it halts enforcement now.  If,

25  however, we're right, and the Court doesn't fault

1   enforcement of the program, then the Court will be left

2   with no remedy other than to somehow order the government

3   to reclaim all of these funds that it sent out.  And

4   there is no public interest in that.

5                The Sixth Circuit a finding of likelihood

6   of harm is dispositive.  That's the holding in Vitolo.

7   And for that reason, we respectfully submit that

8   plaintiff's entitled to an injunction.

9                THE COURT:  All right.  Anything --

10               MS. SNOW:  If I can make one or two final

11  point here,Your Honor.

12               THE COURT:  Okay.

13               MS. SNOW:  Just with respect to Vitolo,

14  again, it did not say that likelihood of success on the

15  merits of a constitutional claim is per se irreparable in

16  every case.  And in that case, the Court did not consider

17  the Supreme Court substantive case law on equal

18  protection remedies, because it wouldn't have had -- it

19  really wouldn't have been applicable there, where there

20  was a limited pot of funds.  Here we have an unlimited

21  pot of funds.  Damages -- sovereign immunity is not at

22  issue.

23               And so because Congress would have

24  intended that the beneficiaries of this fund be protected

25  and still receive them, it would have intended that the

1    appropriate, that the remedy here be to expand the class

2    of other, of eligible recipients instead withdrawing them

3    entirely.

4              The Wynn Court did not address Califano v

5    Westcott, which discusses that type of remedy in detail.

6    And neither did Vitolo.  And because of the factual

7    differences in that case, its conclusion that in general

8    constitutional violations constitute irreparable harm is

9    just not applicable here.

10             And because plaintiff is, can be

11   compensated at the end of this case by an order that

12   would expand remedy, expand relief to others, he just has

13   not shown any irreparable harm. And that is kind of a

14   fundamental understanding of how, of preliminary

15   injunctions.  When the harm is compensable, then it is

16   not irreparable.

17             And then one final point I would like to

18   make, Your Honor.  With respect to the harm to others

19   that an injunction would impose, even plaintiff agrees

20   that harm to others should be considered.  He made a very

21   significant portion of his briefing making that point

22   that, you know, that harm to others should be considered.

23   He just relied on an incorrect legal theory that this is

24   debt forgiveness, and it's not.

25             But the point is that all parties are in

1    agreement that harm to others should be considered.  And

2    so because an injunction that entirely would immediately

3    cut off benefits to others, would cause substantial harm

4    to others, that, you know, weighs against ordering a

5    preliminary injunction in this case.

6                    And I guess just one final brief point is

7    that it is clear that Congress would have intended more

8    expansive, more expansive relief to those who are not

9    already included within the statute as the appropriate

10   remedy.  The extent of what that more expansive relief

11   would be, we would like to brief in the future, if the

12   Court determines that this program as being implemented

13   is unconstitutional.

14                   But we think the Court can conclude at

15   this time that the appropriate remedy would be an

16   expansion of benefits; and, therefore, an injunction is

17   not warranted here.

18                   THE COURT:  All right.  Thank you,

19   Counsel.  We'll get you an opinion out very soon.

20                   MS. SNOW:  Thank you.

21                   THE COURT:  Have a good day.

22                   Audrey, good to see you.

23                   MR. BOUCEK:  Thank you, Your Honor.

24                   THE COURT:  Thank you.

25                   MS. CALKINS:  Good to see you too, Judge.

1          THE COURT:  Thank you.

2          (End of Proceedings.)

81

1          I, Kristi Heasley, do hereby certify that the

2    foregoing 80 pages are, to the best of my knowledge,

3    skill and ability, a true and accurate unredacted

4    transcript from my stenotype notes in the matter of:

5    ROBERT HOLMAN

6                                        )
     VS                                  )NO.1:21-CV-01085-STA
7                                        )JACKSON, TENNESSEE
                                         )
8    THOMAS J. VILSACK, in his           )
     official capacity as Secretary of the
9    United States, Dept of Agriculture,

10

11   ZACH DUCHENEAUX, in his
     official capacity as Administrator
12   of the Farm Service Agency

13

14          Dated this 8th day of July, 2021.

15

16

17   /s/  Kristi Heasley

18   ----------------------------------
     Kristi Heasley, RPR
19   Official Court Reporter
     United States District Court
20   Western District of Tennessee
     Eastern Division

21

22

23

24

25

UNREDACTED TRANSCRIPT