IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT HOLMAN, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. 21-1085-STA-jay |
| | ) | |
| THOMAS J. VILSACK, | ) | |
| in his official capacity as Secretary | ) | |
| of the United States Department | ) | |
| of Agriculture, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ZACH DUCHENEAUX, | ) | |
| in his official capacity as Administrator | ) | |
| of the Farm Service Agency, | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Robert Holman, a non-minority[1] farmer in Union City, Tennessee, filed this action against Thomas J. Vilsack, Secretary of the United States Department of Agriculture ("USDA"), and Zach Ducheneaux, Administrator of the Farm Service Agency ("FSA"), seeking a declaratory judgment that Section 1005's loan forgiveness program in the American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 1005 (2021) ("ARPA"), is violative of the Fifth Amendment's Equal Protection Clause under the United States Constitution and seeking to enjoin the program. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this

---

[1] The complaint alleges that the USDA has Plaintiff's race on file as white and that he "would generally be considered white or Caucasian." (Cmplt. p. 3, ECF No. 1.)

case presents a substantial question of federal law, specifically whether Section 1005 of the ARPA, facially and as applied, violates the Constitution's guarantee of equal protection of the law.

Section 1005 of the ARPA allots funds for debt relief to "socially disadvantaged" farmers and ranchers.[2] The USDA interprets the phrase "socially disadvantaged" to mean the racial classifications of "Black, American Indian/Alaskan Native, Hispanic, or Asian, or Hawaiian/Pacific Islander." *See American Rescue Plan Debt Payments FAQ*, Question 1, https://www.farmers.gov/americanrescueplan/arp-faq. The program erases the debts of those farmers falling within the specified racial classifications who took out qualifying loans and provides an additional 20% to cover tax liabilities, thus providing a payment in an amount up to 120% of the outstanding indebtedness, without any consideration of need.  Qualifying loans are either USDA direct loans or USDA backed loans.  Farmers, such as Plaintiff, who have USDA loans and who are white/Caucasian are not considered to be socially disadvantaged and, thus, are not eligible for debt relief regardless of their individual circumstances. The Government has not disputed that Plaintiff, as the holder of two USDA direct farm loans, would be eligible for debt relief if he was a member of one of the specified racial classifications.

Defendants Vilsack and Ducheneaux are responsible for the implementation of Section 1005.  Defendant Vilsack, as Secretary of Agriculture, is responsible for leading the USDA, which includes the FSA.  Defendant Ducheneaux, as Administrator of the FSA, oversees Section 1005.  Defendants are sued in their official capacities.

On June 6, 2021, Plaintiff filed a motion for preliminary injunction (ECF No. 7) pursuant to Rule 65 of the Federal Rules of Civil Procedure, asking the Court to preliminarily enjoin

---

[2] Although Section 1005 refers to both "farmers and ranchers," the parties have focused on farmers in their briefing.

Defendants from enforcing Section 1005. Defendants have filed a response to the motion (ECF No. 31), and Plaintiff has filed a reply to the response.  (ECF No. 36.)  With the Court's permission, the National Black Farmers Association ("NBFA") and the Association of American Indian Farmers ("AAIF") have submitted a brief as *amicus curiae* in opposition to Plaintiff's motion for preliminary injunction.[3]  (ECF No. 34.)

A hearing on Plaintiff's motion was held on June 29, 2021, with both parties represented by counsel.  No testimony was taken, although Plaintiff's Declaration (ECF No. 7-3) was admitted as an exhibit.  After reviewing the briefs, statements and arguments by counsel at the hearing, and the entire record, for the reasons discussed below, the Court **GRANTS** Plaintiff's motion for a preliminary injunction.[4]

<u>History/Background of Section 1005</u>

As explained by Defendants, Congress enacted Section 1005 to provide debt relief to "socially disadvantaged" farmers holding certain USDA loans in an attempt to remedy "the lingering effects of the unfortunate but well-documented history of racial discrimination" in USDA loan programs.[5]  (Resp. p. 1, ECF No. 31.) Congress considered evidence that "discriminatory loan practices at USDA have placed minority farmers at a significant disadvantage today;" statistically these farmers generally own smaller farms, have disproportionately higher delinquency rates, and are at a significantly higher risk of foreclosure

---

[3]  The NBFA and AAIF have also filed a conditional motion for leave to intervene as defendants in this matter. However, because, at present, NBFA and AAIF purport to share the same objective as the Government in defending the challenged law, the organizations have requested that the Court defer consideration of the motion until such time as developments in this lawsuit indicate that the organizations' interests diverge from the Government's. (ECF No. 27.)

[4]  This Court has authority to order injunctive relief and other relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202.

[5]  Plaintiff has not disputed the USDA's long-term history of racially discriminatory practices.

than non-minority farmers. (*Id.*)  Defendants contend that Congress concluded that paying off qualifying USDA loans of minority farmers[6] was "necessary to further its interests in remedying the lingering effects of racial discrimination in USDA loan programs and ensuring that its pandemic relief efforts did not perpetuate those lingering effects." (*Id.* at pp. 1 – 2.)

According to Defendants, "decades of evidence shows that not all USDA stakeholders have benefitted equally from its services — particularly its farm loan services," and the evidence indicates "that throughout USDA's history minority farmers have been 'hurt' more than helped due to discrimination in USDA's farm loan programs."  (*Id.* at p. 3 (relying on "A Report by the Civil Rights Action Team" (CRAT) 6 (1997) ("CRAT Report"))).  To support their proposition that "[m]inority farmers have long experienced inequities in FSA's administration of farm loans, including with respect to loan approval rates, amounts, and terms," Defendants have cited a 1982 report from the U.S. Commission on Civil Rights, *The Decline of Black Farming in America* 84-85, the 1997 CRAT Report, and the 2002 Civil Rights Hearing on the USDA's Civil Rights Program for Farm Program Participants.  (*Id.*)

Defendants also point to a "series of lawsuits against USDA by groups of minority farmers" beginning in 1997 and continuing over the next decade.  "African-American, Native American, Hispanic, and female farmers alleged that USDA systematically discriminated against them in the administration of farm loans and other benefits and failed to investigate discrimination complaints."[7]  (*Id.* at p. 4 (listing *Pigford v. Glickman* ("*Pigford I*"), No. 97-1978

---

[6]  Defendants have used the terms "socially disadvantaged farmers" and "minority farmers" interchangeably. However, as explained above, not all "minority famers" are included in the definition of "socially disadvantaged farmers."

[7]  There has been no explanation as to why female farmers were not included within the ambit of Section 1005 even though female restaurant owners were included in the restaurant portion of the ARPA. Additionally, little to no evidence has been presented concerning discrimination toward Hawaiian/Pacific Islander farmers.

(D.D.C.); *Keepseagle v. Veneman*, No. 99-03119 (D.D.C.); *Garcia*, No. 00-2445 (D.D.C.); *Love v. Glickman*, No. 00-2502 (D.D.C.); *In re Black Farmers Discrimination Litigation* ("*Pigford II*"), No. 08-mc-0511 (D.D.C.) (collectively "*Pigford*")).  According to Defendants, "[a]lthough USDA has settled the lawsuits and paid more than $2.4 billion to claimants, State taxes eroded recoveries, debt relief was incomplete, and reports before Congress have shown that the settlements did not cure the problems faced by minority farmers."  (*Id.*)  Even after the lawsuits, a 2011 report – Jackson Lewis LLP, "Civil Rights Assessment" (Mar. 31, 2011) ("JL Report") – showed that socially disadvantaged groups "continued to experience discrimination with respect to the requirements, availability, and timing of FSA loans."  (*Id.*)  A 2021 Government Accountability Office report commented on long-existing "concerns about discrimination in credit markets" and surmised that minority farmers continued to have less access to credit.  (*Id.*)

Defendants rely on a 1982 agriculture report to link "discrimination in USDA's loan programs" to "a dramatic loss of minority-owned farmland. (*Id.* at p. 5 (citing Arg. II.B; 1982 Rep. 176 (reporting that from 1920 to 1978, the number of all minority-owned farms fell from 926,000 to less than 60,000)).  Moreover, "over the last century, Black farmers dwindled from 14 to two percent of all farmers and lost about 80% of their land."  (*Id.* at pp. 5-6.)

According to Defendants, Congress considered this report, and others,[8] which show "the pattern of discrimination in USDA programs and its consequences for minority farmers" when

---

[8]  (Resp. at p. 5 n.8 (citing Hr'g on USDA's Civil Rights Progs. and Responsibilities before The House Subcomm. on Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Ag., 106th Cong. 37 (1999) (Goodlatte) (recognizing that "[c]ivil rights at the [USDA] has long been a problem"); 2002 Civil Rights Hr'g 16, 18, 26 (hearing testimony about the disparities in loan processing times and approval rates for Hispanic farmers; underrepresentation of minorities in USDA; and continuing delays in the resolution of civil rights complaints); Hr'g to Review the USDA's Farm Loan Progs. before the Senate Comm. on Ag., Nutrition, and Forestry, 109th Cong. 800 (2006) (Karen Krub, Farmers' Legal Action Group, Inc.) ("[T]here is still no meaningful process for investigation and resolution of allegations of discrimination [against]

passing Section 1005.  (*Id.* (citing S.278,[9] "Emergency Relief for Farmers of Color Act of 2021")).

In their response, Defendants ask the Court to consider "previous efforts to remedy discrimination against minority farmers in USDA programs and its lingering effects" which have purportedly "fallen short." (*Id.* at pp. 6-7.)  In particular, in 1990 Congress created a program "to provide outreach and technical assistance" to help minority farmers and then permanently funded the program in 2018.  (*Id.* at p. 7.)  In 1998 Congress suspended statutes of limitations for Equal Credit Opportunity Act claims; in 2010, it provided $1.25 billion to ensure that *Pigford II* claimants received settlement payments; in 2002 it created an Office of the Assistant Secretary for Civil Rights at USDA to ensure better compliance with civil rights laws; and in 2014 it created a permanent Office of Tribal Relations at USDA.  (*Id.*)  Defendants contend that, despite these efforts, socially disadvantaged farmers continue to have difficulty getting loans and credit from the USDA.  (*Id.*)

Defendants note that Congress found that, even before the pandemic, "Black farmers and other farmers of color were in a far more precarious financial situation," than non-minority farmers, and, "a year into the pandemic, some 'ha[d] simply not been able to weather the storm.'" (*Id.*)  Statistically, "a disproportionate number of Black, Hispanic, Asian-American, and

---

FSA decision-makers."); Hr'g to Review Availability of Credit in Rural America before the House Subcomm. on Conserv., Credit, Energy, and Research, Comm. on Ag., 110th Cong. 8 (2007); Hr'g on Mgmt. of Civil Rights at the USDA before the House Subcomm. on Gov't Mgmt., Org., and Procurement, Comm. on Oversight and Gov't Reform, 110th Cong. 137 (2008) (hearing testimony about, and recognizing, the continued problem of USDA discrimination against minority farmers, including the inability of Native American and Hispanic farmers to receive loans; underrepresentation of minorities on county committees; and delayed processing of civil rights complaints, including allegations that complaints were shredded and not processed, all despite creation in 2002 of the Assistant Secretary of Civil Rights); House Ag. Comm. Hr'g on U.S. Ag. Policy and the 2012 Farm Bill (Apr. 21, 2010); House Ag. Comm. Hr'g on USDA Oversight 45, 50 (July 22, 2015)).

[9]  S.278 was the predecessor of Section 1005.

Indigenous farmers were in default on their direct loans, putting farmers of color at risk of 'facing yet another wave of foreclosures and potential land loss.'" (*Id.* at p. 8.)

Defendants have provided evidence purportedly relied on by lawmakers to show that "the overwhelming majority of recent agricultural subsidies and pandemic relief prior to ARPA went to non-minority farmers, despite minority farmers occupying a more vulnerable financial position." (*Id.*) For example, "reporting indicated that nearly the entirety of USDA's $25 billion Market Facilitation Program (MFP) payments, and almost all of the $9.2 billion provided through USDA's first Coronavirus Food Assistance Program (CFAP), went to non-minority farmers." (*Id.* (citations omitted.)) According to Defendants, Congress found that this disparity was "partly due to the lingering effects of discrimination in USDA programs." (*Id.* at pp. 8-9.) Defendants reference a letter from thirteen agriculture professors who explained that federal farm programs "have perpetuated and exacerbated the problem" of discrimination, by preferring crops that tend to be produced by white farmers and "rewarding" large farms "which are predominantly owned by white farmers." (*Id.* at p. 9.)

Congress passed Section 1005 of the ARPA to "provide targeted and tailored support for … farmers," CR H.765 (Scott), who "have for many decades suffered discrimination by [USDA],' *id.* S.1265 (Booker), and had not benefited from prior pandemic relief efforts, *id.* H.1273 (Rep. Neal) (explaining as much with respect to Black farmers); *id.* S.1264-65 ('Congress includes these measures to address the longstanding and widespread systemic discrimination within the USDA, particularly within the loan programs, against [socially disadvantaged famers].') (Stabenow); S.278, Sec. 4, ¶ (a)(1)-(2) (stating that § 1005 addressed 'historical discrimination against' socially disadvantaged farmers and 'issues relating to … COVID-19 … in the farm loan programs')." (*Id.* at p. 10.)

7

<u>Arguments</u>

Plaintiff, a white farmer with two USDA loans that had outstanding balances as of January 1, 2021, contends that the government should be enjoined from carrying out Section 1005's farm loan forgiveness program because it is entirely based on race, and the denial of a government benefit based on race is a violation of the right to be treated equally under the law. He argues that, because he can show that he faces a colorable constitutional violation, a preliminary injunction is appropriate.

Defendants have responded that Congress enacted Section 1005 to remedy the lingering effects of long-standing racial discrimination in USDA programs. They claim that, in doing so, Congress looked at evidence that discriminatory loan practices at the USDA placed minority farmers at a significant disadvantage pre-pandemic and that minority farmers' positions were made worse by the pandemic, which disproportionately burdened them.  Defendants argue that, in authorizing debt relief in Section 1005, Congress adopted a measure that was narrowly tailored to remedy the lingering effects of discrimination in USDA programs and to correct the ways prior funding had perpetuated those lingering effects.

<u>Legal Standard and Analysis</u>

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  It is an "extraordinary and drastic" remedy, and "[t]he party seeking [it] bears the burden of justifying such relief."  *Am. Civil Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015).  The Sixth Circuit Court of Appeals recently reiterated the standard for issuing a preliminary injunction.

We consider four factors in determining whether a preliminary injunction should issue: (1) whether the moving party has shown a likelihood of success on the

merits; (2) whether the moving party will be irreparably injured absent an injunction; (3) whether issuing an injunction will harm other parties to the litigation; and (4) whether an injunction is in the public interest. *Nken v. Holder*, 556 U.S. 418, 434, 129 S. Ct. 1749, 173 L.Ed.2d 550 (2009). In constitutional cases, the first factor is typically dispositive. *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (order) (per curiam). That's because "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). And no cognizable harm results from stopping unconstitutional conduct, so "it is always in the public interest to prevent violation of a party's constitutional rights." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) (citation omitted). We thus focus our analysis on the plaintiffs' likelihood of success on the merits.

*Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. May 27, 2021).

Likelihood of Success on the Merits

At the outset, the Court notes that four cases in particular have informed its decision: *Vitolo* (enjoining the restaurant relief portion of the ARPA), which is binding precedent for this Court, and *Faust v. Vilsack*, 2021 WL 2409729 (E.D. Wis. June 10, 2021) (enjoining Section 1005's farm loan relief portion of the ARPA), *Wynn v. Vilsack*, 2021 WL 2580678 (M.D. Fla. June 23, 2021) (same), and *Miller v. Vilsack*, No. 4:21-cv-0595-O (N.D. Tex., July 1, 2021), which are persuasive.[10]  All four courts determined that the plaintiff had shown, *inter alia*, a likelihood of success on the merits in challenging portions of the ARPA that purportedly violated the plaintiff's equal protection rights by allocating funds based on race (and in *Vitolo* also based on gender) and enjoined the distribution of those funds.  At the hearing in this Court, the parties agreed that the evidence that was presented in *Faust* and in *Wynn* is the same as the evidence presented in this case.[11]

---

[10]  Although decisions from other circuits are not binding on this Court, those opinions may constitute persuasive authority.  *See Moldowan v. City of Warren*, 578 F.3d 351, 381 n. 9 (6th Cir. 2009).

[11]  The hearing pre-dated the *Miller* decision.

The parties also agree that, because Section 1005 on its face makes a distinction among applicants for relief on the basis of race, it must satisfy strict scrutiny – that is, it must be narrowly tailored to serve a compelling state interest. *See Johnson v. California*, 543 U.S. 499, 505 (2005) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995), and reiterating that "all racial classifications [imposed by government] ... must be analyzed by a reviewing court under strict scrutiny.") Under strict scrutiny, the government has the burden of proving that racial classifications "are narrowly tailored measures that further compelling governmental interests." *Johnson*, 543 U.S. at 505. "When race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied." *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003). Thus, the government must adopt "the least restrictive means of achieving a compelling state interest," *McCullen v. Coakley*, 573 U. S. 464, 478 (2014), "rather than a means substantially related to a sufficiently important interest." *Americans for Prosperity Foundation v. Bonta*, __ S. Ct. __, 2021 WL 2690268 (July 1, 2021).

Because "[g]overnment policies that classify people by race are presumptively invalid," and "[t]o overcome that presumption, the government must show that favoring one race over another is necessary to achieve a compelling state interest," *Vitolo*, 999 F.3d at 360, the Court begins by looking at the Government's asserted compelling state interest in its race-based farm loan forgiveness program. Defendants have offered as "a compelling interest" the need to remedy past discrimination suffered by "socially disadvantaged" farmers at the hands of the USDA. It is undisputed that the USDA has a sad history of discriminating against certain groups of farmers based on their race. The evidence in the record reveals systemic racial discrimination by the USDA (and in particular the FSA) throughout the twentieth century which has

10

compounded over time, resulting in bankruptcies, land loss, a reduced number of minority farmers, and diminished income for the remaining minority farmers. Defendants argue that Section 1005 is necessary to reverse the years of economic discrimination against minority farmers. However, *Vitolo*, *Faust*, *Wynn*, and *Miller* all rejected systemic racial discrimination as a compelling state interest to support race-based legislation.

In *Vitolo*, the Sixth Circuit explained when the government may attempt to remedy past discrimination by using preferential treatment based on race.

> First, the policy must target a specific episode of past discrimination. It cannot rest on a "generalized assertion that there has been past discrimination in an entire industry." [*City of Richman v.*] *J.A. Croson Co.*, 488 U.S. [469] at 498, 109 S. Ct. 706 [1989]; *see also Adarand*, 515 U.S. at 226, 115 S. Ct. 2097; *Aiken v. City of Memphis*, 37 F.3d 1155, 1162–63 (6th Cir. 1994) (en banc) (explaining that societal discrimination is not enough to justify racial classifications and that there must be prior discrimination by the governmental unit involved).

> Second, there must be evidence of intentional discrimination in the past. *J.A. Croson Co.*, 488 U.S. at 503, 109 S. Ct. 706 (requiring an "inference of discriminatory exclusion"). Statistical disparities don't cut it, although they may be used as evidence to establish intentional discrimination. *See Aiken*, 37 F.3d at 1163; *United Black Firefighters Ass'n v. City of Akron*, 976 F.2d 999, 1011 (6th Cir. 1992).

> Third, the government must have had a hand in the past discrimination it now seeks to remedy. So if the government "show[s] that it had essentially become a "passive participant" in a system of racial exclusion practiced by elements of [a] local ... industry," then the government can act to undo the discrimination. *J.A. Croson Co.*, 488 U.S. at 492, 109 S. Ct. 706 (plurality opinion). But if the government cannot show that it actively or passively participated in this past discrimination, race-based remedial measures violate equal-protection principles.

*Vitolo,* 999 F.3d at 361.

Here, Defendants cannot meet the first prong because the evidence does not show that Section 1005 targets a specific episode of past discrimination. Defendants have pointed to statistical and anecdotal evidence of a history of discrimination by the USDA. But it is well-settled that a "generalized assertion that there has been past discrimination in an entire industry"

11

cannot establish a compelling interest. *J.A. Croson Co.*, 488 U.S. at 498; *see also Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 731 (2007) (plurality opinion) ("remedying past societal discrimination does not justify race-conscious government action"). Moreover, as recognized in *Wynn*, "[d]ue to the significant remedial measures previously taken by Congress, for purposes of this case, the historical evidence does little to address the need for continued remediation through Section 1005." *Wynn*, 2021 WL 2580678, at * 5. Any evidence that there is such a need "is not tied in any way to a governmental interest in affording [socially disadvantaged farmers] broad race-based debt relief and does not support a finding that USDA continues to be a participant, passive or active, in discrimination."[12] *Id.*

Also, although Defendants have asserted that the majority of funding in pandemic relief efforts did not reach minority farmers, they have not provided evidence of "specific episodes" of present intentional discrimination by Defendants. At the hearing, Defendants conceded that Congress attempted to remedy the lingering effects of historic discrimination when enacting Section 1005 and did not rely on specific present-day discrimination occurring at the USDA.

In *Wynn*, Judge Marcia Morales Howard analyzed the evidence presented by Defendants on this issue and found it to be lacking.

> [T]he Government cites to two statistics related to recent USDA programs that have disproportionately benefited White farmers. The first statistic shows 99.4% of relief under USDA's Market Facilitation Program (MFP) went to White farmers. The second statistic shows 97% of the $9.2 billion in pandemic relief provided through USDA's Coronavirus Food Assistance Program in 2020 went to nonminority farmers. Even taking these statistics at face value, they are less useful than they may appear to be.

---

[12]   Defendants will have the opportunity to present such evidence at a trial on the merits. *See Wynn*, 2021 WL 2580678, at *6 n.9 ("On a more fully developed record, the Government may be able to establish that despite past remedial efforts the harm caused by the disgraceful history of discrimination by the USDA in farm loans and programs is ongoing or that the Government is in some way a participant in perpetuating that discrimination such that further narrowly tailored affirmative relief is warranted.")

> The first statistic is qualified by the fact that: "[a]pproximately seven percent of the funds went to entities owned by corporations or individuals whose race was not reported." The report also identifies farm size and specific crops—namely, soybeans—as being the target of MFP funding, not racial identity. As to the second statistic, both parties at least tacitly acknowledge the 2020 relief went primarily to nonminority farmers because the legislation targeted large farms that were disproportionately owned by nonminority farmers — not because the relief efforts were facially discriminatory. Where a race-neutral basis for a statistical disparity can be shown, the Court can give that statistical evidence less weight. Here, the statistical discrepancies presented by the Government can be explained by non-race related factors — farm size and crops grown — and the Court finds it unlikely that this evidence, standing alone, would constitute a strong basis for the need for a race-based remedial program.

*Wynn*, 2021 WL 2580678, at *6 (citations omitted). *See also Hilbert v. Ohio Dep't of Rehab. & Corr.*, 121 F. App'x 104, 110 (6th Cir. 2005) (explaining in an alleged racial discrimination employment context that, although statistical data, if unrebutted, can create an inference of discrimination, such data must not only show a significant disparity between two groups, but must also "eliminate the most common nondiscriminatory explanations for the disparity." (citations omitted)).  Defendants have presented no additional evidence to this Court than that presented in *Wynn*, and, as discussed above, Defendants stated at the hearing that the evidence before this Court is the same as the evidence presented in *Wynn*.  "An observation that prior, race-neutral relief efforts failed to reach minorities is no evidence at all that the government enacted or administered those policies in a discriminatory way." *Vitolo*, 999 F.3d at 362.

As for the second prong, other than statistical disparities, Defendants have presented no evidence of current intentional discrimination by Defendants, and they acknowledged this lack of evidence at the hearing.  Instead, Defendants attempted to rely on statistical and anecdotal evidence, even though this type of evidence to show intentional discrimination has been rejected by the Sixth Circuit.  *See Vitolo*, 999 F.3d at 361 ("When the government promulgates race-based policies, it must operate with a scalpel. And its cuts must be informed by data that suggest

intentional discrimination. The broad statistical disparities cited by the government are not nearly enough.")[13]

Looking at the third prong, the Court finds evidence that the USDA played a role in past discrimination toward socially disadvantaged farmers but no evidence of current discrimination by the USDA. That is, no evidence has been presented that the USDA or FSA played a role in creating the disparities in pandemic relief given to minority farmers versus non-minority farmers.

Accordingly, Defendants here, as in *Vitolo*, have failed to establish that the government has a compelling interest in remedying the effects of past and present discrimination through the distribution of benefits on the basis of racial classifications.

However, even when the government has shown a compelling state interest in remedying some specific episode of discrimination, the discriminatory legislation must be narrowly tailored to further that interest. *Id.*

> For a policy to survive narrow-tailoring analysis, the government must show "serious, good faith consideration of workable race-neutral alternatives." *Grutter v. Bollinger*, 539 U.S. 306, 339, 123 S. Ct. 2325, 156 L.Ed.2d 304 (2003); *J.A. Croson Co.*, 488 U.S. at 507, 109 S. Ct. 706. This requires the government to engage in a genuine effort to determine whether alternative policies could address the alleged harm. And, in turn, a court must not uphold a race-conscious policy unless it is "satisfied that no workable race-neutral alternative" would achieve the compelling interest. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312, 133 S. Ct. 2411, 186 L.Ed.2d 474 (2013). In addition, a policy is not narrowly tailored if it is either overbroad or underinclusive in its use of racial classifications. *J.A. Croson Co.*, 488 U.S. at 507–08, 109 S. Ct. 706; *Gratz v. Bollinger*, 539 U.S. 244, 273–75, 123 S. Ct. 2411, 156 L.Ed.2d 257 (2003).

---

[13] The *Vitolo* court distinguished between cases based on racial statistical disparities involving a single decisionmaker, such as when a city hires one race at a disproportionate rate, and statistics showing "general social disparities" because "there are simply too many variables to support inferences of intentional discrimination." *Vitolo*, 999 F.3d at 362. Although *Vitolo* addressed societal discrimination, the court also considered whether the government had shown a compelling interest in remedying past industry-wide discrimination. *Id.* at pp. 361-62.

*Vitolo*, 999 F.3d at 362 – 63. "[T]he strict scrutiny standard ... forbids the use even of narrowly drawn racial classifications except as a last resort." *J.A. Croson Co.*, 488 U.S. at 519 (Kennedy, J., concurring).

Here, Defendants have not presented any race-neutral alternatives that Congress considered when discussing Section 1005. Instead, they contend that the loan relief program is narrowly tailored to its constitutional aims because race-neutral alternatives have failed. However, as pointed out in *Vitolo*, in attempting to mitigate the failure of prior pandemic relief efforts to reach socially disadvantaged farmers (minority and female restaurant owners in *Vitolo*), Congress could have given priority to those farmers who did not receive prior pandemic aid instead of passing race-based legislation. ("But an obvious race-neutral alternative exists: The government could grant priority consideration to all business owners [farmers] who were unable to obtain needed capital or credit during the pandemic.") "Because these race-neutral alternatives exist, the governments use of race is unconstitutional." *Vitolo*, 999 F.3d at 363.

The *Vitolo* court also looked at whether the legislation at issue in that case was underinclusive or overinclusive and found that it was both.

> For example, individuals who trace their ancestry to Pakistan and India qualify for special treatment. But those from Afghanistan, Iran, and Iraq do not. Those from China, Japan, and Hong Kong all qualify. But those from Tunisia, Libya, and Morocco do not. This scattershot approach does not conform to the narrow tailoring strict scrutiny requires.

*Id.* at 363-64. Under Section 1005, "Black, American Indian/Alaskan Native, Hispanic, or Asian, or Hawaiian/Pacific Islander" farmers qualify for debt relief but not farmers of other races or ethnicities regardless of their financial condition and regardless of whether they obtained any financial relief during the pandemic.

The *Wynn* court also specified ways in which Section 1005 is both underinclusive and overinclusive. For instance, Section 1005 benefits only those socially disadvantaged farmers who received qualifying USDA farm loans, "but the evidence of discrimination provided by the Government says little regarding how this particular group of [socially disadvantaged farmers] has been the subject of past or ongoing discrimination." *Wynn*, 2021 WL 2580678, at *7. Additionally,

> [a]lthough the Government argues that Section 1005 is narrowly tailored to reach small farmers or farmers on the brink of foreclosure, it is not. Regardless of farm size, [a socially disadvantaged farmer] receives up to 120% debt relief. And regardless of whether [a socially disadvantaged farmer] is having the most profitable year ever and not remotely in danger of foreclosure, that [a socially disadvantaged farmer] receives up to 120% debt relief. Yet a small White farmer who is on the brink of foreclosure can do nothing to qualify for debt relief. Race or ethnicity is the sole, inflexible factor that determines the availability of relief provided by the Government under Section 1005.

*Id.* The *Wynn* court also commented on the dearth of evidence of prior discrimination by the USDA in farm loans toward Asians, Native Hawaiians, and Pacific Islanders, groups which are included in Section 1005, thus leading to an inference that Section 1005 is overinclusive as well as being underinclusive. *Id.* at *10. Finally, "there is little evidentiary support for the magnitude of relief provided by Section 1005 — up to 120% debt relief to all [socially disadvantaged farmers] with qualifying farm loans — which appears to duplicate or in some instances exceed the relief provided to those who actually suffered the well-documented historic discrimination Congress sought to remedy through prior settlements" such as *Pigford*.

> To the extent Section 1005 is intended to address the alleged erosion of prior relief identified by Senators Booker and Stabenow in their floor statements, the Government presents no evidence that the recipients of Section 1005's relief are the same persons or in any way — but race — similarly situated to the persons that received the previous, potentially inadequate relief. Nor does it explain how providing this debt relief to current loan holders is narrowly tailored to address the concern of previously inadequate relief. On the record before the Court at this

16

stage in the case, it does not appear that Section 1005 is narrowly tailored such that it "eliminates no more than the exact source of the 'evil' it seeks to remedy."

*Id.* (citation omitted).

Defendants contend that Congress has unsuccessfully implemented race-neutral alternatives for decades, but no evidence was presented that Congress ever engaged "in a genuine effort to determine whether alternative policies could address the alleged harm" here. *Vitolo*, 999 F.3d at 362. As indicated in *Faust*, "[t]he obvious response to a government agency that claims it continues to discriminate against farmers because of their race or national origin is to direct it to stop: it is not to direct it to intentionally discriminate against others on the basis of their race and national origin." *Faust*, 2021 WL 2409729, at *3.

The *Faust* court listed ways in which Congress could have implemented race-neutral programs to help farmers in need of financial assistance "such as requiring individual determinations of disadvantaged status or giving priority to loans of farmers and ranchers that were left out of the previous pandemic relief funding. It can also provide better outreach, education, and other resources." *Id.* at *3. Because "[n]arrow tailoring requires evaluating the "efficacy of alternative [race-neutral] measures," *United States v. Paradise*, 480 U.S. 149, 171 (1987) (plurality opinion), and Congress did not do so, the Court finds that Section 1005 is not narrowly tailored to remedy the ills that Congress sought to alleviate.

However important the goal of eliminating the vestiges of prior race discrimination, and it is important, the government's efforts cannot withstand strict scrutiny. Therefore, Plaintiff has shown a likeliness of success on the merits at trial.

Irreparable Injury[14]

Section 1005(a)(1) appropriates "out of amounts in the Treasury not otherwise appropriated, such sums as may be necessary, to remain available until expended .…" Plaintiff contends that, if the Court does not halt all payments, then the limited funds available will be depleted by the time this case is resolved, and he will suffer irreparable harm. Defendants counter that the funds are not limited and that, if Plaintiff prevails at trial, he can be made whole by being made eligible for debt relief.[15] In rejecting that argument, the *Miller* court noted that "[w]hile the Government may at times act like it, the public fisc is not bottomless, and at any time, Congress may turn off the spigot." *Miller*, No. 4:21-cv-0595-O at p. 20 (citing *Baker v. Concord*, 916 F.2d 744, 749 (1st Cir. 1990)).

Not only is the "public fisc" not "bottomless," there are strong indications that Section 1005's "bottom" is $4 billion.[16] Plaintiff maintains that Section 1005's language stating that funds for debt relief will be expended "out of amounts in the Treasury not otherwise appropriated" indicates some limit to the funds. Additionally, at the hearing, Plaintiff pointed out that public statements surrounding Section 1005 indicated that $4 billion was available for farm debt relief. *See*, *e.g.*, *Delta Farm Press*, 2021 WLNR 18455848 (June 8, 2021) (noting Defendant Vilsack's testimony that $4 billion would be given away to socially disadvantaged farmers); *The Daily Citizen* (Dalton, GA), 2021 WLNR 17135549 (May 26, 2021) (relying on

---

[14]  Even though, in constitutional cases, a finding of likelihood of success on the merits "is typically dispositive," *Vitolo*, 999 F.3d at 360 (citing *Roberts*, 958 F.3d at 416), the Court has considered the remaining factors in its analysis.

[15]  Defendants also contend that Plaintiff has not shown a need for debt relief under Section 1005. Because Section 1005 is not based on need, this argument is unavailing.

[16]  At the hearing, Defendants stated that the $4 billion figure was arrived at by calculating the amount needed to pay off the qualifying loans held by socially disadvantaged farmers.

statements by Defendant Vilsack and United States Senator Raphael Warnock that the "U.S. Department of Agriculture will begin doling out $4 billion in payments to farmers of color as part of the most recent COVID-19 relief package."); *International New York Times*, 2021 WLNR 16517301(May 22, 2021) ("The Congressional Budget Office estimated that the loan forgiveness provision would cost $4 billion over a decade."); *Reuters News* (May 21, 2021) ("The U.S. Agriculture Department said on Friday it will start erasing an estimated $4 billion dollars in debt to minority farmers in June, as it seeks to address racial discrimination.").

The *Faust* court discussed the subject of the amount of funding provided by Section 1005.

> While there is no explicit cap on the funds allocated to the loan-forgiveness program, based on current estimates, 0.2% of the $1.9 trillion package in the ARPA has been allocated to the program. Defendants sent offer letters to eligible farmers and ranchers as early as May 24, 2021. On June 9, 2021, Defendants sent offer letters to 8,580 farmers, and intend to send another 6,836 letters beginning June 14, 2021. Defendants indicate that it will take an average of seven days to receive an accepted offer and that the FSA will process payment immediately upon receipt of the offer. Defendants have already started to forgive loans, and the 8,580 farmers and ranchers who were sent offer letters represent approximately 49% of the loans that will be forgiven under the program. **The entire $3.8 billion that has been allocated to the program may be depleted before briefing and consideration of the motion for a preliminary injunction.**

*Faust*, 2021 WL 2409729, at *4 (emphasis added and citations to the record omitted).

The Court concludes that, while it is not clear that relief under Section 1005 is limited to $4 billion, it not believable that Congress intended to appropriate open-ended funding. Therefore, if the program is not enjoined, even if Plaintiff is later determined to be eligible for the program, he would suffer irreparable injury in the likely case that all the funds allotted for the program would have already been spent.

Next, Defendants contend that rather than enjoining the program, the Court could, at a later date, "re-write" Section 1005 to include Plaintiff. That is, instead of withdrawing benefits

from the favored class ("socially disadvantaged farmers"), the Court could extend benefits to the excluded class (white farmers such as Plaintiff). In support of their argument, Defendants rely on the Supreme Court's decision in *Califano v. Westcott*, 443 U.S. 76 (1979). In that case, the Supreme Court looked at a federal statute that provided benefits to families whose fathers had become unemployed but denied those same benefits when mothers lost their jobs, and the Court ultimately expanded the statute to include mothers as well as fathers. *Id.* at 79. Prior to 1968, the provision of assistance to families whose dependent children were deprived of support because of a parent's unemployment was gender neutral. *Id.* at 79-80. In 1968, as part of a revision to the Social Security Act, Congress added the gender qualification to the statute. *Id.* at 80. The Court upheld the lower court's remedy of "extension rather than invalidation" because the Social Security Act's "strong severability clause" … "evidence[d] a congressional intent to minimize the burdens imposed by a declaration of unconstitutionality upon innocent recipients of government largesse." *Id.* at 90.

In *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320 (2006), the Court considered when it was appropriate "to devise a judicial remedy that does not entail quintessentially legislative work." 546 U.S. at 330. The Court looked to *Westcott* to find that "the touchstone for any decision about remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.'" *Id.* (quoting *Westcott*, 443 U.S. 94 (Powell, J., concurring in part and dissenting in part)). "After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?" *Ayotte*, 546 U.S. at 330 (citations omitted).

The legislative intent of Section 1005 is to remedy past discrimination suffered by those farmers defined as "socially disadvantaged" and to give those farmers a more level playing field

with non-minority farmers. Opening eligibility for debt relief to all farmers would gut that intent. Additionally, Defendants have not pointed to a severability clause in the ARPA or Section 1005 to show that Congress would rather have race-neutral debt relief for farmers than no debt relief at all. Accordingly, the Court finds that *Westcott* does not support Defendants' argument.

Defendants also contend that there is no need for a preliminary injunction in this case because the courts in *Faust* and *Wynn* have already enjoined Section 1005's distribution of funds. However, Defendants have given no assurance that they will not appeal those decisions. Moreover, *Faust*, *Wynn*, and *Miller* are all out-of-circuit decisions, and the standard for issuing an injunction in the Sixth Circuit is not necessarily the same as in other circuits. And, as the *Miller* court noted, "the existence of overlapping injunctive relief from other courts does not serve to automatically eliminate irreparable harm in parallel litigation, and the Government cites no authority to suggest otherwise." *Miller*, No. 4:21-cv-0595-O at p. 21.

Finally, Plaintiff will be irreparably harmed if he is denied his constitutional right to equal protection. *Vitolo* was clear that the impairment of a constitutional right supports a finding of irreparable injury. *Vitolo*, 999 F.3d at 365 (quoting *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) ("[W]hen reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated.")).[17] Therefore, even if Plaintiff obtained financial relief after a trial on the merits, he

---

[17] The parties disagree as to whether a farmer who receives debt forgiveness under Section 1005 will be eligible for future debt forgiveness under 7 U.S.C. § 2008h(c), which prohibits the USDA from providing debt forgiveness on a direct loan to any person who has previously received debt forgiveness. *See* 7 U.S.C. § 2008h(c). The Court need not decide the dispute at this juncture based on Plaintiff's statement at the hearing that he is not relying on this point of law as a basis for his motion for injunctive relief.

would have suffered irreparable harm merely by the deprivation of his constitutional rights during the pendency of this matter.

Substantial Harm to Others

Defendants contend that Plaintiff has not shown that any injury to him absent an injunction would outweigh the harm to the socially disadvantaged farmers who are at a disproportionately higher risk of foreclosure and whose economic position in the midst of the pandemic worsens the longer payments are delayed. While this factor militates in favor of not granting the injunction, the potential economic harm to minority farmers is lessened by the USDA's present policy of not foreclosing on USDA direct loans, as acknowledged by Defendants at the hearing. Additionally, the USDA has encouraged private lenders not to foreclose on their loans.

Public Interest[18]

This factor weighs in favor of granting the injunction. Plaintiff is asserting a violation of the Equal Protection Clause, and, as reiterated by *Vitolo*, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Vitolo*, 999 F.3d at 360 (quoting *Deja Vu of Nashville,* 274 F.3d at 400 (citation omitted)).

Summary and Conclusion

The Court finds that Plaintiff has shown a substantial likelihood that he will prevail on his claim that Section 1005 violates his right to equal protection under the law. Absent action by the Court, socially disadvantaged farmers will obtain debt relief, while Plaintiff will suffer the irreparable harm of being excluded from that program solely on the basis of his race. Despite the arguments of Defendants, the Court cannot re-write Section 1005 and order that Plaintiff receive

---

[18] The factors of irreparable harm and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

equivalent relief.  While an injunction may harm socially disadvantaged farmers, the Court has

balanced the equities and determines that they favor enjoining Section 1005.  The Court agrees

with Judge Howard's reasoning that "the remedy chosen and provided in Section 1005 appears to

fall well short of the delicate balance accomplished when a legislative enactment employs race in

a narrowly tailored manner to address a specific compelling governmental interest."  *Wynn*, 2021

WL 2580678, at *17.

Although this Court has reservations about issuing a nationwide injunction, in this type of

case such an injunction is warranted.[19]  As explained by Judge Howard,

> Here, despite exploring any possible more narrow option, the Court cannot
> identify any relief short of enjoining the distribution of Section 1005's payments
> and debt relief that will maintain the status quo and provide Plaintiff the
> opportunity to obtain any relief at all. As noted by the Supreme Court, "[o]nce a
> constitutional violation is found, a federal court is required to tailor the scope of
> the remedy to fit the nature and extent of the constitutional violation." *Dayton Bd.
> of Ed. v. Brinkman*, 433 U.S. 406, 420, 97 S. Ct. 2766, 53 L.Ed.2d 851 (1977)
> (internal quotations and citations omitted); *see also Califano v. Yamasaki*, 442
> U.S. 682, 702, 99 S. Ct. 2545, 61 L.Ed.2d 176 (1979) (noting, in the context of a
> nationwide class action, "the scope of injunctive relief is dictated by the extent of
> the violation established, not by the geographical extent of the plaintiff class.").
> Plaintiff has shown a likelihood of success on the merits of his claim that Section
> 1005 is unconstitutional and, if implemented, would deprive him of his right to
> equal protection under the law. The implementation of Section 1005 will be swift
> and irreversible, meaning the only way to avoid Plaintiff's irreparable harm is to
> enjoin the program. The Court can envision no other remedy that will prevent the

---

[19]  In her decision, Judge Howard noted some of the criticism of nationwide injunctions.

> [T]he Court proceeds with great caution in determining that an injunction that
> will have nationwide effect is warranted. Justices Gorsuch and Thomas have
> questioned a district courts' authority to enter nationwide injunctions, *see, e.g.,*
> *Dep't of Homeland Sec. v. N.Y.*, ⸺ U.S. ⸺, 140 S. Ct. 599, 599-601, 206
> L.Ed.2d 115 (2020) (concurring opinion); *see also Trump v. Hawaii*, ⸺ U.S. ⸺
> ⸺, 138 S. Ct. 2392, 2423, 201 L.Ed.2d 775 (2018) (noting the "disposition of the
> case makes it unnecessary to consider the propriety of the nationwide scope of the
> injunction," leaving the question unresolved), and courts and scholars have been
> critical of their use. *See Trump*, 138 S. Ct. at 2429 (collecting scholarly articles
> criticizing the issuance of nationwide preliminary injunctions).

*Wynn*, 2021 WL 2580678, at *17 (footnotes omitted).

likely violation of Plaintiff's constitutional right which absent an injunction cannot be remedied in this action.

*Wynn*, 2021 WL 2580678, at \*17 (footnotes omitted). *See also Faust* at \*5 (quoting *City of Chicago v. Barr*, 961 F.3d 882, 916–17 (7th Cir. 2020) ("While universal injunctions are rare, they 'can be necessary to provide complete relief to plaintiffs, to protect similarly-situated nonparties, and to avoid the chaos and confusion that comes from a patchwork of injunctions.'")) *Faust* also found that a nation-wide injunction was appropriate because "Defendants' proposal to set aside funds to pay off any of Plaintiffs' qualified loans is unworkable. If the USDA forgave Plaintiffs' loans, it would be required to forgive every farmer's loan, since the only criteria for loan forgiveness is the applicant's race."[20] *Id.* Therefore, the only way to preserve the status quo is for the Court to issue a nationwide injunction.

Accordingly, Plaintiff's motion for a preliminary injunction is **GRANTED**, and Defendants are hereby enjoined from implementing Section 1005. Defendants Thomas J. Vilsack, in his official capacity as U.S. Secretary of Agriculture and Zach Ducheneaux, in his official capacity as Administrator, Farm Service Agency, their agents, employees, and all others acting in concert with them, who receive actual notice of this Order by personal service or otherwise, are immediately enjoined from issuing any payments, loan assistance, or debt relief pursuant to Section 1005(a)(2) of the American Rescue Plan Act of 2021 until further orders of the Court.

The government has not opposed Plaintiff's request that the Court waive the bond requirement.  Therefore, Plaintiff will not be required to post a bond or other security.

---

[20]   The plaintiffs in *Miller* were granted class certification and did not seek a nationwide injunction.  *Miller*, No. 4:21-cv-0595-O at p. 22.

No later than fourteen (14) days from the entry of this order, the parties must confer and submit to the undersigned Judge's ECF inbox a proposed scheduling order in word processing format.  A scheduling conference will be set by separate order.

**IT IS SO ORDERED.**

s/ S. Thomas Anderson
**S. THOMAS ANDERSON**
UNITED STATES DISTRICT JUDGE

Date:  July 8, 2021