**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT HOLMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:21-cv-01085-STA-jay |
| | ) | |
| THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture, and | ) ) ) | |
| | ) | |
| ZACH DUCHENEAUX, in his official capacity as Administrator of the Farm Service Agency, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' PARTIAL MOTION TO DISMISS
CLAIMS TWO AND THREE [DOC. NO. 57]**

---

The government improperly moves to dismiss Plaintiff's claims concerning eligibility for future farm loans. (Defs.' Mot. Dismiss, Doc. No. 57.) The motion should be denied because Plaintiff's farm loans will not be forgiven under the American Rescue Plan Act (ARPA) because of his race. The government will only ignore the prohibition on future loans if a person is an ARPA recipient. This is an actualized injury; Plaintiff was not a recipient because of his race. The government admits that it already forgave some loans and approved recipients for further loans. Plaintiff also faces certain, imminent injury from the government's lawless act because the government would continue acting illegally, but only for those who are eligible under ARPA because of their race. These injuries are concrete and particularized. This Court is empowered to halt it.

## LEGAL STANDARD

"A motion to dismiss under Fed. R. Civ. Pro. 12(b)(6) requires the Court to construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief." *Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998). Likewise, "any ambiguities must be resolved in the plaintiff's favor." *Carter v. Cornwell*, 983 F.2d 52, 54 (6th Cir. 1993) (citing *Jackson v. Richards Med. Co.*, 961 F.2d 575, 577 (6th Cir. 1992)). "Hence, a judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations." *Columbia Nat. Res. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). "Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Id*. (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(6) "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

On a motion to dismiss, "[c]ourts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies." *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999). In fact, the Sixth Circuit takes "a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6)." *Alsbrook v. Concorde*

2

*Career Colls.*, 469 F. Supp. 3d 805, 822 (W.D. Tenn. 2020) (quoting *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001)).

A motion attacking a complaint based on subject matter jurisdiction relies on a similar standard as a Rule 12(b)(6) motion. *See, e.g.*, *Jetform Corp. v. Unisys Corp.*, 11 F. Supp. 2d 788, 789 (E.D. Va. 1998). A court must take the pleadings as true and construe them in the light most favorable to the party opposing the motion. *Scheurer v. Rhodes*, 416 U.S. 232, 237 (1974); *Great Lakes Educ. Consultants v. Fed. Emergency Mgmt. Agency*, 582 F. Supp. 194, 194 (W.D. Mich. 1984). To have standing, a plaintiff must show that he has suffered an injury that is fairly traceable to the defendants' allegedly unlawful conduct. *Allen v. Wright*, 468 U.S. 737, 750-51 (1984); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 280-84, 291 (6th Cir. 1997).

## ARGUMENT

Under the above legal standards, Plaintiff's allegations regarding future loan eligibility both state a claim for relief and demonstrate an injury traceable to the government's conduct, especially when the Complaint is viewed in the light most favorable to Plaintiff. As such, the government's Partial Motion to Dismiss should be denied.

### I. Plaintiff has stated a claim for relief as to Counts Two and Three.

#### A. Plaintiff has established that § 1005 provides debt forgiveness.

The government's Rule 12(b)(6) motion asserts that § 1005 loan forgiveness does not trigger the statutory bar to future loan eligibility because § 1005 is not "debt forgiveness," as defined by 7 U.S.C. § 1991(a)(12). (Defs.' Mot. Dismiss, Doc. No. 57 at 13.) This is erroneous.

When ARPA was originally proposed, § 1005 provided that a payment under paragraph § 1005(a)(2) to a socially disadvantaged farmer or rancher shall not affect the eligibility of such farmer or rancher to receive a farm loan after the date on which the payment is provided. (Compl.,

Doc. No. 1, at ¶ 78.) This proposed exception, however, did not become part of § 1005 of ARPA

as enacted. (Id. at ¶ 79.) Thus, the prohibition on eligibility for future loans pursuant to 7 U.S.C. §

2008h remains in effect for anyone who receives loan forgiveness. (Id.)

The government argues that § 1005 does not qualify as "debt forgiveness" because it does

not "result[] in a loss to the Secretary" as funds were appropriated by ARPA. "Debt forgiveness"

is defined under 7 U.S.C. § 1991(12)(A) to mean "reducing or terminating a farmer program loan

made or guaranteed under this title, in a manner that results in a loss to the Secretary" through:

> A.    writing down or writing off a loan under section 353 [7 U.S.C. § 2001];
> B.    compromising, adjusting, reducing, or charging-off a debt or claim under
> section 331 [7 U.S.C.§ 1981];
> C.    paying a loss on a guaranteed loan under section 357 [7 U.S.C.§ 2005]; or
> D.    discharging a debt as a result of bankruptcy.

In turn, 7 U.S.C. § 1981(b)(4) provides:

> The Secretary may … compromise, adjust, reduce, or charge-off debts or claims
> (including debts and claims arising from loan guarantees), and adjust, modify,
> subordinate, or release the terms of security instruments, leases, contracts, and
> agreements entered into or administered by the Consolidated Farm Service Agency,
> Rural Utilities Service, Rural Housing Service, Rural Business-Cooperative
> Service, or a successor agency, or the Rural Development Administration, except
> for activities under the Housing Act of 1949.

Section 1005 is plainly a compromise, adjustment, reduction, or charge off. *See* 7 U.S.C. §

1991(a)(12)(A)(ii). "Compromise" is defined by regulation as "the settlement or *forgiveness* of a

debt under 31 U.S.C. § 3711 [collection and compromise], in accordance with standards specified

in [Federal Claims Collection Standards] and applicable federal law." 7 C.F.R. § 3.3 (emphasis

added). The ordinary meaning of "reduce" is simply to "make smaller or less in size, amount or

degree." The New Oxford American Dictionary 1429 (2001). Similarly, "charge-off" means to

"treat (an account receivable) as a loss or expense because payment is unlikely; treat as bad debt."

Black's Law Dictionary 184 (abr. 7th ed.); *see also* Antonin Scalia & Bryan A. Garner, Reading

4

Law: The Interpretation of Legal Texts 69 (2012) ("Interpreters should not be required to divine

arcane nuances or to discover hidden meanings."). The ordinary meaning of "adjust" is to "arrive

at a new agreement with a creditor for the payment of a debt." Black's Law Dictionary 34 (abr.

7th ed.) [1] As the government intends with § 1005 loan forgiveness, these methods of debt

forgiveness may be accomplished without liquidating secured property or accelerating payments.

7 U.S.C. § 1981(b)(4). Thus, when a "socially disadvantaged farmer or rancher" receives § 1005

loan forgiveness and walks away from his loan(s) with a "zero" balance, his debt has been

"compromise[d], adjust[ed], reduce[ed], or charge[d]-off" pursuant to 7 U.S.C. § 1981. In this way,

§ 1005 is "debt forgiveness."

The government asks the Court to accept that the multi-billion dollar § 1005 loan

forgiveness program will not "result[] in a loss to the Secretary." The government has already

strained its budgetary credibility by arguing that ARPA funds are unlimited. (Defs.' Mot. Dismiss,

Doc. No. 57, at 18.) The Court expressed serious doubts about the government's suggestion,

concluding that "it not believable that Congress intended to appropriate open-ended funding."

(Order, Doc. No. 41, at 18-19.) Even assuming Congress allocated funds sufficient to repay "up to

120 percent of the outstanding indebtedness" of eligible loans, the § 1005 program may still result

in a loss to the Secretary. Plaintiff should be allowed to prove that it does.

What "results in a loss" should be subject to discovery. Plaintiff served his first set of

written discovery on the government on September 28, 2021. Many of Plaintiff's discovery

requests go straight to this question. Given that ARPA was originally drafted to address the future

---

[1] The government contends that an adjustment under 7 U.S.C. § 1981 may only occur if it is accompanied by an alternate payment plan. (*See* Defs.' Mot. Dismiss, Doc. No. 57 at 18.) This is not in the statute. Nor is an agency handbook authoritative with respect to a federal statute when a term has a plain meaning.

eligibility of a loan forgiveness recipient. under § 1995 (Compl., Doc. No. 1, at ¶ 78), there is

healthy cause to suspect that § 1005 results in a loss that would disqualify ARPA recipients.

There are many ways in which discovery may reveal that § 1005 results in a loss to the

Secretary. It almost certainly must. Farm loans accrue interest. *See, e.g.*, 7 U.S.C. § 1927. A loss

will result from § 1005 loan forgiveness because the Secretary will not recoup interest owed on

farm loans. The banks who hold guaranteed loans immediately recognized that this problem is

widely known:

> In a joint letter addressed to Secretary of Agriculture Tom Vilsack last month, the
> American Bankers Association, the Independent Community Bankers of America
> and the National Rural Lenders Association say that banks will suffer "lost income"
> if the farm loans are paid off early. The banks say they will lose the interest they
> would have earned over the life of these long-term loans. The groups want the
> USDA to compensate banks for any lost income, the letter states.

Vanessa Yurkevich and Kate Trafecante, *Banks say USDA's debt forgiveness for minority farmers*

*will cost them money and could affect future loans. Black farmers call that a threat*, CNN (May

19, 2021)[2]; *see* Fed. R. Evid. 902(6) (newspapers are self-authenticating); *Roane Cnty. v. Jacobs*

*Eng'g Grp.*, No. 3:19-cv-206, 2020 U.S. Dist. LEXIS 73491, at *12 (E.D. Tenn. Apr. 27. 2020)

(news reports can be judicially noticed). Additionally, when a loan is delinquent,[3] the government

"will charge … penalties, and administrative costs." 7 C.F.R. § 3.17. Here, the government has

admitted that it will shoulder significant administrative costs associated with § 1005 loan

forgiveness program. For example, the government has already identified tens of thousands of

eligible loans. (Cobb Decl., Doc. No. 31-1, at ¶¶ 22-27.) Those holding qualifying loans "need not

apply to receive § 1005 loan payments" because the government will notify eligible recipients,

---

[2] www.cnn.com/2021/05/19/politics/usda-debt-forgiveness-banks-minority-farmers/index.html.
[3] Significant percentages of eligible loans are delinquent. (*See* Cobb Decl., Doc. No. 31-1, at ¶ 37.)

which must impose losses on the Secretary. (Defs.' Mot. Dismiss, Doc. No. 57, at 4.) The government will follow up if it does not receive a response to the offer letter. (Cobb Decl., Doc. No. 31-1, at ¶ 18.) Eligible recipients may also schedule a meeting to the discuss the offer with FSA prior to accepting or rejecting it. (Id. at ¶ 16.) "FSA anticipates it will require an average of 1.5 hours per account for the designated employees to coordinate and complete the validation and verification of payment amounts, and to print, copy and mail offer letters." (Id. at ¶ 34.) "There are approximately 209 designated employees whose primary responsibility is to process offer letters and payments." (Id.) The costs of the application process alone will not be recouped. Thus, it is certainly plausible that fact-discovery will show that the program "results in a loss."

Still more, "agencies may liquidate security or collateral through a sale or a nonjudicial foreclosure and apply the proceeds to the applicable debt(s), if the debtor fails to pay the debt(s) within a reasonable time after demand and if such action is in the interest of the United States." 7 C.F.R. § 3.15. The government does not account for the value of security and collateral. *See Wells v. Brown*, 9 Vet. App. 293, 294 (U.S. 1996) (the Secretary sustains a loss even where the amount is only $5,539.67); *Dixon v. United States*, 68 F.3d 1253 (10th Cir. 1995) (the Secretary sustains a loss even where the agency is precluded by law from recovering a debt). Given how broad the language of the statute is, *see* 7 § 1991(a)(12), the pleadings alone tend to demonstrate that the § 1005 loan forgiveness program may result "in a loss to the Secretary." *Cf. Lau v. Nichols*, 414 U.S. 563, 568 (1974) (civil rights provision that barred adoption of policies that merely have the "effect" of discriminating was written so broadly as to sweep in forms of unintentional acts that led to incidental racial disparities).

**B. Plaintiff has shown the USDA is barred from giving future loans to individuals whose debts are forgiven under § 1005.**

Claims Two and Three are premised upon the USDA's disregard of the law regarding eligibility for future farm loans. (Compl., Doc. No. 1, at ¶¶ 75-85.)  As set out in Plaintiff's' Complaint, 7 U.S.C. § 2008h(b) prohibits the USDA from providing future loans to persons who receive forgiveness of a loan, except in narrowly specified circumstances.  (Id. at ¶ 76.)  In pertinent part, 7 U.S.C. § 2008h(b) provides:

> (1) Prohibitions. Except as provided in paragraph (2)—
> (A) the Secretary may not make a loan under this title to a borrower that has received debt forgiveness on a loan made or guaranteed under this title; and
> (B) the Secretary may not guarantee a loan under this title to a borrower that has received—
> (i) debt forgiveness after April 4, 1996, on a loan made or guaranteed under this title; or
> (ii) received debt forgiveness on more than 3 occasions on or before April 4, 1996.

Notwithstanding the clear statutory prohibition against future loan eligibility, the USDA has stated that persons who receive loan forgiveness under the ARPA will be eligible for future FSA loans. (Compl., Doc. No.1, at ¶ 80 (citing American Rescue Plan Debt Payments FAQ, at Question 27, www.farmers.gov/americanrescueplan/arp-faq).).)[4] "Because the Department has indicated that it will it disregard the statutory prohibition on future loans for anyone who receives forgiveness, but *only* for those who receive loan forgiveness under 1005—a program that is only available in the first place to persons of particular races that do not include Plaintiff's," he has been

---

[4] As shown above, the government admitted in a declaration that not only will recipients of §1005 payments remain eligible for future loans, but "[e]ligible recipients of payments under Section 1005 . . . *have been approved for* [] new FSA loans on the condition that the ARPA-eligible debt is paid in full prior to loan closing." (Cobb Decl., Doc. No. 31-1 ¶ 39 (emphasis added).) This is a binding admission that the government has already approved future loans for recipients of forgiveness. *See Ferguson v. Neighborhood Hous. Servs., Inc.*, 780 F.2d 549, 551 (6th Cir. 1986) (admissions in pleadings are binding). The government also judicially admits that socially disadvantaged farmers and ranchers who receive payments under paragraph §1005(a)(2) will remain eligible for future farm loans. (*See* Hr'g Tr., Doc. 40, at 65:11 – 66:9.)

injured. (Id. at ¶ 81.) In the same way, Plaintiff will be injured because he will be treated differently and "he will be at a competitive disadvantage relative to similarly situated farmers who can have their current loans paid off and still obtain future loans." (Id. at ¶ 84.)

Because the original version of ARPA that addressed future eligibility was stripped out due to budget reconciliation (Compl., Doc. No. 1, at ¶¶ 78-79; Pls. Mem., Doc. 7-1, at 9) the prohibition on eligibility for future loans pursuant to 7 U.S.C. § 2008h remains in effect for anyone who receives loan forgiveness. (Id.) That is why the government today is forced to attempt to resort to statutory hair-splitting to try and justify its stated intention to ignore a statutory prohibition. This Court should find those efforts unpersuasive.

The government argues that Congress intended recipients of loan forgiveness to remain eligible for future loans because it did not state otherwise in the text of the statute. (Defs.' Mot. Dismiss, Doc. No. 57, at 19.) But this gets things upside down, ignoring that Congress had to strip a relevant provision out of ARPA if it was to pass through Senate reconciliation procedures. (Pls. Mem., Doc. 7-1 at 9.); *see also* Scalia & Garner, Reading Law 21 (noting that purposivism is limited by the fact that a statute might not have been enacted if not for its exact text). That is certainly more "plausible" (Defs.' Mot. Dismiss, Doc. 57 at 20) than the idea that Congress was worried about superfluous language in a law that was hundreds of pages. (*See* Doc. 7-4.) And if the government's argument is taken seriously, it would mean that statutes are never meant to be read together. The cases cited by the government are entirely inapposite. *See Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 821 (2018) (issuing its holding after "starting with a brief review of the historical development of foreign sovereign immunity law and the statutory framework.").

The government's effort to make this a pure question of statutory interpretation, arguing that § 1005 does not cover "emergency debt relief" collapses on itself. (Defs.' Mot. Dismiss, Doc.

9

57, at 19.) After all, 7 U.S.C. § 2008(h)(2)(iii) contains a statutory exception for *other* forms of

emergency debt relief. The government is correct that if Congress wanted an exception for § 1005,

"it knew how to say so." (Defs.' Mot. Dismiss, Doc. 57, at 19.) This just means that Congress did

not intend to make an exception for "debt relief" under ARPA.

The government's final argument is that § 1005 would "destroy itself" if recipients of

§ 1005 loan forgiveness were ineligible to receive future farm loans. (Defs.' Mot. Dismiss, Doc.

No. 57, at 20.)[5] Section 1005 says what it says. As enacted, it makes no allowances for future loan

eligibility. Scalia & Garner, Reading Law 22 ("[I]t is precisely because people differ over what is

sensible and what is desirable that we elect those who will write our laws—and expect courts to

observe what has been written."). Indeed, when past secretaries have spoken on the purported need

to reform § 2008(h), they have emphasized its breadth and uncompromising language:

> The 1996 Farm Bill stripped **every producer who's ever had a USDA farm debt
> write-down** of the ability to get another government farm loan. That standard is
> stricter than even that which for-profit commercial banks use.

Introduction of the Agricultural Credit Restoration Act, Release No. 0124.98 (Statement of

Agriculture Secretary Dan Glickman on the Introduction of the Agricultural Credit Restoration

Act), March 19, 1998 (emphasis added). Secretary Glickman's statement is also inconsistent with

the government's argument now that 7 U.S.C. § 1991 contains only a subset of the ways that debt

can be absolved. If that were true, Secretary Glickman's statement would make no sense. The

---

[5] Plaintiff is not the only person to notice that the loan forgiveness program may harm those it
intended to help. Commercial lenders have sounded the alarm about unintended consequences:
"'If USDA does not compensate lenders for such disruptions or avoid sudden loan payoffs, the
likely result will be less access to credit for those seeking USDA guaranteed loans in the future,
including [socially disadvantaged] farmers/ranchers.'" *Banks say USDA's debt forgiveness for
minority farmers will cost them money and could affect future loans. Black farmers call that a
threat.*"        https://www.cnn.com/2021/05/19/politics/usda-debt-forgiveness-banks-minority-
farmers/index.html (alteration in original).

government's shift here is due solely to strategic concerns. No doubt, as written, § 1005 imposes certain burdens on those it benefits, which is precisely why Congress initially drafted it to specify that loan ineligibility would be waived in this instance. (Compl., Doc. No. 1, at ¶ 78.)

Of course, once Congress elected to act through budget reconciliation—with the Parliamentarian removing substantive provisions (Pl.' Mem., Doc. No. 7-1, at 9)—the present version of § 1005 is what we are left with. This Court can only consider what Congress enacted, not re-write the law to compensate for the fallout from Congress's political maneuvers. *See Stahl v. U.S. Dept. of Agriculture*, 327 F.3d 697, 701 (8th Cir. 2003) (statutory language superseded the written terms of an agreement entered pursuant to a debt write-down to avoid "losses to the Secretary," and triggered USDA's "recapture" interest, despite negative consequences for the farmer).

The government also premises its argument on the assertion that § 1005 is "one-time emergency debt relief" from Covid. (Id.) But the government's argument is undercut by its continued assertion that Congress passed § 1005 to remedy the lingering effects of decades of historic racial discrimination. It is likewise undercut by the simple fact that other forms of FSA loan forgiveness result in the borrower being ineligible to receive future FSA loans—regardless of the reason for the loan forgiveness (*e.g.*, bankruptcy) or whether the person was a recipient of past settlements for being victimized by discrimination.

### C. The government's failure to treat Plaintiff equally with similarly situated individuals violates the Equal Protection Clause.

"The constitutional guarantee of equal protection under the law protects against government intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Martinez v. Litteral*, No. 18-

5210, 2018 U.S. App. LEXIS 30486, at *4 (6th Cir. Oct. 26, 2018) (internal quotations omitted);

*accord Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011)

("[Courts] evaluate equal protection claims against the federal government under the Fifth

Amendment just as [they] would evaluate equal protection claims against state and local

governments under the Fourteenth Amendment."). "To state a valid equal protection claim, a

plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared

to similarly situated persons and that such disparate treatment either burdens a fundamental right,

targets a suspect class, or has no rational basis.'" *Id.* (quoting *Club Italia Soccer & Sports Org.,

Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 299 (6th Cir. 2006)).

Here, Plaintiff pleaded that the USDA intends not to enforce the statutory bar to future loan

eligibility against a "socially disadvantaged farmer or rancher" who obtains loan forgiveness under

§ 1005. On the other hand, Plaintiff, who does not qualify for loan forgiveness under § 1005 solely

because of his race, would not enjoy the same benefit—*i.e.*, pursuant to 7 U.S.C. § 2008h(b), he

would not be eligible for a future direct or guaranteed FSA loan if he were to obtain loan

forgiveness. This is a paradigmatic equal protection claim where Plaintiff is suffering disparate

treatment by the government based exclusively upon his race. *Vitolo*, 999 F.3d at 360. As explained

more fully below, this is a cognizable injury that is currently ripe.

## II. Plaintiff has established Article III standing and a statutory cause of action as to Claims Two and Three.

### A. Plaintiff has an Equal Protection injury that is ripe, in the form of a barrier to eligibility for future loans.

The government asserts that Plaintiff "does not allege that USDA has taken (or

immediately plans to take) any action that injures him in any concrete and particular way" and that

this injury is speculative and unripe. (Defs.' Mot. Dismiss, Doc. No. 57, at 14-18.) The government

is wrong on both the facts and the law. Even today—despite the entry of multiple preliminary injunctions—some socially disadvantaged farmers are eligible to receive future direct loans right now even after they have received Section 1005 forgiveness, but Plaintiff is not. This treats Plaintiff differently and puts him at a competitive disadvantage based solely on race—an injury that is both concrete and ripe.

"To establish standing under Article III, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Sullivan v. Benningfield*, 920 F.3d 401, 407-08 (6th Cir. 2019) (citations and quotations omitted). "In the context of claims for injunctive or declaratory relief, the threatened injury in fact must be concrete and particularized, as well as actual and imminent, not conjectural or hypothetical." *Id*. (citations and quotations omitted). Courts recognize that the injury-in-fact requirement is "not as stringent in Equal Protection cases." *Johnson v. United States OPM*, 783 F.3d 655, 665 (7th Cir. 2015) (quotation omitted).

As a matter of law, "the government's use of racial preferences causes [an equal protection] injury." *Vitolo*, 999 F.3d at 359. Thus, any classification that makes it "more difficult for members of one [racial] group to obtain a benefit" is an injury sufficient to confer standing. *Id.* (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)). In that event, "a member of the [racial] group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *Id*. Rather, to establish standing, a party "need only demonstrate that it is able and ready" to engage in activity "and that a discriminatory policy prevents it from doing so on an equal basis." *Id.*

The government's argument that Plaintiff must be denied a benefit based on his race before the harm is concrete has been repeatedly rejected in the equal protection context. *See id*.; *Parents*

13

*Involved*, 551 U.S. at 719 (finding that students who had not actually been rejected from schools based on their race had standing to bring an equal protection claim because "one form of injury under the Equal Protection Clause is being forced to compete in a race-based system that *may* prejudice the plaintiff") (emphasis added); *Turner v. Fouche*, 396 U.S. 346, 362 (1970) (plaintiffs had standing to challenge a property ownership requirement for public office although they never applied because they had "a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications"); *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 405 (6th Cir. 1999) ("Lac Vieux therefore need not allege that it would have been awarded a contract but for the preferential and thereby allegedly unconstitutional selection process, but only that it was capable of submitting a proposal."); *Brunet v. City of Columbus*, 1 F.3d 390, 396-97 (6th Cir. 1993) ("[T]he challenger need only show that, but for the program, he would have been considered for the job, to satisfy standing requirements."). In fact, this very argument was rejected by the Sixth Circuit in *Vitolo*, the most recent on-point case that the government consistently ignores. 999 F.3d 358-59.

The government does not contest the injury pleaded in Claim One of Plaintiff's Complaint: but for the government's use of racial classifications, Plaintiff would receive loan forgiveness up to 120% of the value of his outstanding debt. (Compl., Doc. No. 1, at ¶¶ 64-74.) Indeed, because farmers need not apply for debt forgiveness (Defs.' Mot. Dismiss, Doc. No. 57) that means that but for Plaintiff's race (and court-issued injunctions), the government would have already begun the process of forgiving his loans. Instead, the government contests Claims Two and Three. (Defs.' Mot. Dismiss, Doc. No. 57, at 14-18.) Plaintiff pleaded that he would be barred from obtaining a future direct or guaranteed FSA loan by 7 U.S.C. § 2008h(b) if he were to obtain debt relief, but a

"socially disadvantaged farmer or rancher" who obtains loan forgiveness under §1005 of the ARPA would not. (Compl., Doc. No. 1, at ¶¶ 75-85.)[6]

In other words, the government gives access to a benefit to some farmers but not others, based on race. The resulting injury is that the government treats Plaintiff differently and places him at a distinct competitive disadvantage, which Plaintiff pleaded clearly. (*See* id. at ¶ 63 ("Plaintiff is disadvantaged relative to similarly situated farmers in that they can receive full loan forgiveness, plus 20%, and still receive further loans to upgrade their farming operations.")) Much as in *Vitolo*, "[t]he injury here is 'the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.'" 999 F.3d at 358-59 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors*, 508 U.S. at 666). Accordingly, Plaintiff has pleaded an injury arising from "being forced to compete in a race-based system that may prejudice" him. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007).

Plaintiff's injury is particularized because it is distinct from the general public. As laid out in Claim One of his Complaint, he is a farmer with active loans that will not be automatically forgiven as part of a COVID-19 aid package, solely because of his skin color. (Compl., Doc. No. 1, at ¶¶ 69-74.) And if this Court accepted the government's invitation that it has made in this case to forgive Plaintiff's loans as well[7] (Defs. Mot. Dismiss, Doc. No. 31 at 40), then he suffers a second form of unequal treatment: he will be forever ineligible for future USDA loans. (Compl.,

---

[6] The government argues that Plaintiff's injury is not ripe because some statutes set forth "various exceptions and even grant the Secretary some measure of discretion." (*See* Defs.' Mot. Dismiss, Doc. No. 57 at 15.) It is not clear how these concepts are connected. But notably, the government's idea that each individual future loan must be considered separately demonstrates the fact-based nature of this inquiry. It does not, in any measure, cut *in favor* of granting a motion to dismiss.
[7] It certainly would cause a hardship to Plaintiff if the question of his future loan eligibility were not resolved now, given that the government is advocating for his loan to be paid off, should he prevail. (Defs.' Mem., Doc. 31, at 40.)

Doc. No. 1, at ¶¶ 78-85.) While the parties disagree, the government's position in this case has been that Plaintiff's remedy, if he prevails, is that his loans will be paid off. (Defs.' Mem., Doc. 31, at 40.) But those are precisely the facts that put him on a different playing field. In other words, if the Court were to dismiss Claims 2 and 3, but if Plaintiff prevailed on Claim 1—which the Court has concluded he is likely to do—then the government's proposed remedy would merely supercharge the unequal treatment in this case.

Moreover, Plaintiff's injury is not a "some-day" competitive injury. (Defs.' Mot. Dismiss, Doc. No. 57, at 11.) It has already happened because the government already admitted that it has approved recipients of forgiveness for new loans. Prior to the first injunction, the government managed to forgive some farm loans, and approve them for new loans.[8] The government admitted that "[e]ligible recipients of payments under Section 1005 may be approved for, *and have been approved for*, new FSA loans on the condition that the ARPA-eligible debt is paid in full prior to loan closing." (Cobb Decl., Doc. No. 12-1, at ¶ 28, emphasis added.) Plaintiff has already been treated differently. Unquestionably, the injury would also be ongoing had this Court not enjoined the program. But this is only proof of injury itself; the Court's intervention was necessary to keep Plaintiff from further harm. It is both actual and imminent.

And there is nothing speculative about recipients of loan forgiveness remaining eligible. The USDA's website indicates that recipients of loan forgiveness under the ARPA will be eligible for future FSA loans. (Compl., Doc. No. 1, at ¶ 50.)  The website states:

Question 27: Will ARPA payment recipients be eligible for future FSA loans?

---

[8] Section 1005 is a unique benefits program in that it does not require a beneficiary to apply, thus undercutting the government's suggestion that Plaintiff must apply and get rejected. (Defs.' Mot. Dismiss, Doc. No. 57, at 4; *see also* Compl., Doc. No. 1, at ¶¶ 51-53; Cobb Decl., Doc. No. 12-1, at ¶ 13)

16

> Yes. The FSA encourages ongoing use of its loan programs. Customers should contact their local FSA service center if they have questions about loan assistance.

*American Rescue Plan Debt Payments FAQ*, at Question 27.[9] The government has admitted that socially disadvantaged farmers and ranchers who receive loan forgiveness under § 1005 will remain eligible for future farm loans. (See Hr'g Tr., Doc. No. 40, at 65:11 – 66:9.) Plaintiff will not "face the same eligibility requirements" for future loans as other farmers. (Defs.' Mot. Dismiss, Doc. 57, at 13.) The government openly admits that it will continue loans for ARPA payment recipients, which excludes Plaintiff.

In sum, Plaintiff has shown an injury for Claims Two and Three in the form of his eligibility for further loans arising from the USDA's disregard of 7 U.S.C. § 2008h(b) in the case of farmers who receive §1005 loan forgiveness. (Compl., Doc. No. 1, at ¶¶. 15-16.) The government already injured Plaintiff given that it doled out some forgiveness to farmers and approved them for new loans. The government's disparate enforcement of 7 U.S.C. § 2008h(b) would be ongoing, as would Plaintiff's concomitant injury, but for the courts' injunctions.

**B. Plaintiff has a cause of action.**

The government is incorrect that Plaintiff lacks a right of action to challenge its stated intention to provide future loans to recipients of loan forgiveness on both constitutional (Claim Two) and statutory (Claim Three) grounds. The Court's ability to issue an injunction to stop the government from acting illegally is well established. *See Ex parte Young*, 209 U.S. 123, 167-68 (1908) (permitting suit in federal court against state officials for constitutional violations); *see also*

---

[9] www.farmers.gov/americanrescueplan/arp-faq.

*Philadelphia Co. v. Stimson*, 223 U.S. 605, 620 (1912) (extending *Ex parte Young* principle to federal government officials).

A private right of action need not be created by statute; it can also emerge from "some other source." *Thompson v. Thompson*, 484 U.S. 174, 179 (1988). The seminal case of *Ex parte Young* settled long ago that courts have the power in equity to issue declaratory and injunctive relief for violations of the Constitution. 209 U.S. at 152; *see also Philadelphia Co.*, 223 U.S. at 620*; Ball v. Union Carbide Corp.*, 385 F.3d 713, 729 (6th Cir. 2004) ("[F]ederal courts have jurisdiction to provide injunctive relief against unconstitutional actions by federal officials.") (citing *Bell v. Hood*, 327 U.S. 678, 684-85 (1946)). In suggesting that the court cannot consider Plaintiff's claim, the government insists on a remedy at law, failing to recognize that this Court is also a court in *equity*. *See* U.S. Const. art. III, § 2; *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *Carroll* v. *Safford*, 44 U.S. 441 (1845) ("[I]n a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer[.]").

The government does not appear to take issue with this Court's ability to enforce the Constitution (Claim Two). Rather, the government erroneously argues that a private right of action must exist to enforce the statutory prohibition that forms the basis of Claim Three. But since Plaintiff only requests prospective equitable relief to halt an illegal action, the government is wrong for the same reason it was wrong about Claim Two.

The Court's equitable powers allow it to issue a prospective injunction to stop the government from acting illegally, not just unconstitutionally. *See Armstrong*, 575 U.S. at 327 ("[T]hat has been true not only with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials."). When the government attempts an act in violation of its authority, the act is *ultra vires* and the courts have long recognized their

18

power to stop it prospectively. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 691 n.11

(1949); *see also Dalton v. Specter*, 511 U.S. 462, 472 (1994); *United States v. Lee*, 106 U.S. 196,

220 (1882) ("No officer of the law may set that law at defiance with impunity."); *Diaz v. Mich.*

*Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013); *Milligan v. United States*, No. 3:07-1053, 2008

U.S. Dist. LEXIS 36635, at *48-49 (M.D. Tenn. May 2, 2008). Plaintiff seeks relief "properly

characterized as prospective" in the form of an injunction halting the enforcement of § 1005. *See*

*Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011).

To be sure, if Congress had created a remedial scheme for the enforcement of its bar on

future loans, *see Va. Office for Prot. & Advocacy*, 563 U.S at 256 n. 3, or indicated an "intent to

foreclose" equitable relief, *see Armstrong*, 575 U.S. at 328, then this Court's options would be

limited. In that case, Plaintiff would be left with the legislatively specified remedies. Indeed, the

government's primary case, *Alexander v. Sandoval*, 532 U.S. 275, 288-91 (2001) held that § 602

of Title VI lacked a private right of action to enforce agency *regulations* specifically because

Congress had specified remedies for *agency* enforcement. The Court otherwise recognized that

individuals could sue under § 601 to obtain both injunctive relief and damages because they were

legislatively specified. *See id.* at 279. The case otherwise did not consider *Ex parte Young* or the

courts' ability to provide equitable relief in the absence of a remedial scheme when the government

breaks the law. Likewise, in *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 903 (6th Cir.

2014), Congress had specified a private right of action to remedy wage-and-hour also conferred

upon the Department of Labor the authority to retrain violators of wage provisions. Because it was

a suit for monetary damages against a state, the state of Michigan was immune under the Eleventh

Amendment unless damages were authorized by Congress under the Fair Labor Standards Act. *Id.*

at 899, 903. That is a far cry from here, where (1) the Department of Agriculture has announced

the intent to violate a law that applies to it, (2) Congress did not specify that only the Department could ask for an injunction against itself, and (3) Plaintiff does not seek damages against a state with Eleventh Amendment immunity.

The government fails to appreciate the significant difference between a claim for prospective relief and a demand for damages in the cases it cites. In *Ohlendorf v. United Food & Commercial Workers Int'l Union, Loc. 876*, 883 F.3d 636, 640 (6th Cir. 2018), the plaintiff had requested an injunction, but it had become moot, leaving plaintiffs with only a "backward-looking request for damages." The government did not consider *Ex parte Young*, and the Court's dismissal of the injunction claim on mootness grounds instead of the absence of a cause of action in fact bolsters Plaintiff's argument. Similarly, in *Touche Ross & Co. v. Reddington*, 442 U.S. 560, 571 (1979), the Supreme Court held that the language of a portion of the Securities Exchange Act provided no basis for "inferring that a civil cause of action for damages lay in favor of anyone."

### III. Alternatively Plaintiff Requests Leave to Amend.

Should the Court be inclined to grant the government's motion for partial dismissal, in whole or in part, Plaintiff would respectfully request leave to amend his Complaint. *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 519 (6th Cir. 2001) ("Leave to file an amended complaint 'shall be freely given when justice so requires,' Fed. R. Civ. P. 15(a), and should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility.")

### CONCLUSION

For these reasons, the Court should deny the government's Partial Motion to Dismiss. (Doc. No. 57). Alternatively, should the Court be inclined to grant the government's motion, Plaintiff respectfully requests leave to amend his Complaint.

Dated: <u>October 27, 2021</u>.          Respectfully submitted,

 s/ B. H. Boucek
BRADEN H. BOUCEK
TN BPR No. 021399
GA Bar. No. 396831
CELIA H. O'LEARY*
GA Bar No. 747472
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA  30075
Telephone: (770) 977-2131
bboucek@southeasternlegal.org
coleary@southeasternlegal.org

William E. Trachman*
CO. Bar No. 45684
Mountain States Legal Foundation
2596 S. Lewis Way
Lakewood, Colorado 80227
Telephone: (303) 292-2021
Facsimile: (303) 292-1980
wtrachman@mslegal.org
*Appearing Pro Hac Vice

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the date indicated below I filed the documents on the Court's electronic filing system. I future certify that I served the following persons in the manner indicated below.

| Counsel | Via |
|---|---|
| Emily Newton<br>U.S. Department of Justice<br>20 Massachusetts Ave. NW<br>Washington, DC 20530<br>202/305-8356<br>Fax: 202/616-8470<br>Email: emily.s.newton@usdoj.gov | ☐ United States mail, postage prepaid<br>☐ Hand delivery<br>☐ Fax<br>☐ Email<br>☐ FedEx<br>☒ Efile |
| Kyla Snow<br>DOJ-Civ<br>Federal Programs Branch<br>1100 L. St. NW<br>Washington, DC 20005<br>202/514-3259<br>Email: kyla.snow@usdoj.gov | |
| Audrey Calkins<br>United States Attorney – Western District of Tennessee<br>167 N. Main Street, Suite 800<br>Memphis, TN 38103<br>901/544-4231<br>Fax: 901/544-4230<br>Email: audrey.calkins@usdoj.gov | |

Dated: <u>October 27, 2021</u>.          Respectfully submitted,


 s/ Braden H. Boucek
BRADEN H. BOUCEK

22