# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |
|---|---|
| SID MILLER, *et al.*, on behalf of themselves and others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>TOM VILSACK, in his official capacity as SECRETARY OF AGRICULTURE,<br><br>        Defendant. | Civil Action No. 4:21-cv-595-O |

## DECLARATION OF WILLIAM D. COBB

1.      My name is William D. Cobb. I am over 21 years of age and fully competent and duly authorized to make this declaration. The facts and opinions in this declaration are based on my personal knowledge and information I have gathered for the purposes of producing this report.

### Qualifications

2.      I have been employed by the United States Department of Agriculture ("USDA") Farm Service Agency ("FSA"), or its predecessor agency, for over 37 years and am stationed in Washington, District of Columbia.

3.      I am presently Deputy Administrator for Farm Loan Programs ("FLP") in charge of the Farm Loan Programs policies and activities within FSA, a position I have held since April 2019. As Deputy Administrator for FLP, I oversee a $32 billion loan portfolio and provide leadership, management, and direction to FSA's direct and guaranteed lending programs, including annual appropriations in excess of $9.85 billion for new loans and guarantees. I also provide technical assistance to Congress on development of legislative initiatives and establish systems to monitor

1

compliance with Equal Opportunity laws and statutes authorizing program delivery. In addition, I lead

analysis to identify regional or national loan making and servicing problems, and develop corrective

actions to mitigate deficiencies.

4.      As part of my responsibilities as Deputy Administrator for FLP, I provided data the

to Congressional Budget Office and Congressional Research Service for their assessment of the impact

of the initiative that ultimately became Section 1005 of the American Rescue Plan Act of 2021 and

have led USDA's the implementation of that provision.

5.      I started my federal government career 37 years ago as a loan officer in Delaware and

have since held various positions in FLP at the FSA National Office in Washington, D.C. for the past

30 years. Prior to serving as the Deputy Administrator for FLP, over the last ten years, I have served

as the Acting Deputy Administrator of FLP, the Assistant Deputy Administrator for FLP, and the

Deputy Director of the Program Development and Economic Enhancement Division. I also have

served as an Agricultural Economist, advising on regulatory policy and activity, ensuring compliance

with regulatory requirements, and overseeing development of regulations to meet both statutory intent

and public needs.

6.      Throughout my career I have attended training courses on a range of topics, including

regulatory drafting and process, credit and financial analysis, and informational rule making. I have

also received honors recognizing my work in Farm Loan Programs, including the Secretary of

Agriculture's Honor Award for my work with the FLP Streamlining Task Force and the FSA

Administrator's Award for the development of a guide to FSA Farm Loans.

7.      I am a graduate of the Federal Executive Institute and I hold a Bachelor of Science in

Agricultural Business Management from the University of Delaware.

8.      Through the course of my professional duties, I am familiar with the statutory

authorities, regulations, policies, and procedures that govern FLP[1] operations and loans as well as

---

[1] Farm Loan Programs are administered primarily under the Consolidated Farm and Rural
Development Act of 1961 ("CONACT"), as amended (7 U.S.C. § 1922, et seq.). A potential borrower
must show inability to obtain sufficient credit elsewhere to qualify for a majority of these types of
loans.

2

Farm Storage Facility Loans.[2]  Over the course of my career, I have led initiatives to streamline the Federal regulations for FLP, have provided technical assistance to Congress on the development of legislation impacting FLP, developed training programs on loan making and loan servicing for farm loan officers, and developed and implemented programs, policies, and procedures used to process tens of thousands of direct and guaranteed loan and servicing applications per year that service more than 120,000 borrowers.

### Summary of Conclusions

9.      I have been asked to provide a report addressing:  (1) the general scope of USDA Farm Loan Programs, the Farm Storage Facility Loan Program, and certain other forms of recent loan and financial assistance programs; (2) USDA's history of discrimination against minority farmers and ranchers in Farm Loan Programs; (3) relevant agency efforts to remedy effects of historical discrimination and to increase minority participation in USDA Farm Loan Programs; (4) the lingering effects of USDA's historical discrimination against minority farmers and ranchers notwithstanding USDA's remedial efforts; and (5) why USDA's implementation of § 1005 of the American Rescue Plan Act is necessary to remedy the lingering effects of USDA's past discrimination.

10.      A summary of my conclusions and opinions is as follows:

a.      The USDA has a well-documented history of discrimination against minority farmers and ranchers in the administration of its various Farm Loan Programs. This historical discrimination continues to have observable effects on minority communities.

b.      USDA has attempted to address or remedy these lingering effects of historical discrimination in a variety of ways, including by creating special outreach programs, entering into cooperative agreements with local organizations, establishing administrative processes for discrimination claimants, and otherwise adjusting the implementation of its programs.

---

[2] Farm Storage Facility Loans are administered under the Commodity Credit Corporation ("CCC") Charter Act (15 U.S.C. § 714, et seq.) and the Food and Conservation, and Energy Act of 2008 (7 U.S.C. § 7971 and 8789). A potential borrower need not show inability to obtain credit elsewhere to qualify for these types of loans.

c.      Despite USDA's various efforts to remedy the lingering effects of historical discrimination, minority communities continue to be underrepresented in USDA programs. Minority farmers and ranchers are disproportionately less likely to participate in or benefit from certain types of financial or loan assistance that USDA offers.

d.      USDA's experience has demonstrated that direct financial assistance to socially disadvantaged farmers and ranchers, of the kind authorized under § 1005, is necessary to assist in remedying some of the persistent effects of past USDA discrimination which cannot be remedied by race-neutral programs alone. Among other things, such direct financial assistance is necessary to address the lack of generational wealth that are observable in higher rates of delinquency, loan denial, application withdrawal, and foreclosure for minority communities. Further, direct financial assistance is integral in rebuilding trust between USDA and minority communities in a way that will make other USDA and FSA programs more effective overall.

e.      USDA's implementation of § 1005 is specifically designed to achieve the goal of remedying the lingering effects of past discrimination in USDA programs while rebuilding trust between USDA and minority communities. An inability to successfully implement the program will adversely affect minority communities and their engagement with USDA.

**Background on FSA Programs**

11.      FSA provides programs and services that support the economic stability of farmers and ranchers. The Agency works closely with other USDA agencies to accomplish USDA's strategic goal of assisting rural communities. FSA's farm loan programs provide access to credit for farmers and ranchers who are temporarily unable to obtain financing from a commercial source at reasonable rates and terms. Price weaknesses in the livestock sector, adverse weather conditions, and heightened risk sensitivity in the commercial lending sector, generally result in greatly increased demand for FSA loans.

12.      Through direct and guaranteed farm ownership, operating, emergency and other loans, FSA assists tens of thousands of family farmers each year in starting and maintaining profitable farm businesses. FSA's loan programs are also an integral part of USDA's economic safety net. As a part

of this safety net, FSA participates with borrowers in a number of routine servicing activities to ensure a farm's success. These activities include routine chattel inspections, farm visits, and analysis of financial documents. Delinquent loan servicing, including account restructuring options, is also essential to assist borrowers in maintaining and continuing operations and ensuring future credit. FSA also conducts outreach to inform farmers and ranchers about the availability of USDA farm and farm loan programs. The goal of the outreach program is to make programs and services accessible to all and to ensure that all customers receive equal and timely access to all of FSA's programs and services. FSA places special emphasis on the outreach to underserved customers, recognizing that certain groups have not participated in, or have received limited benefits from, FSA's programs.

13.    FSA administers a variety of farm credit programs through FLP, including those authorized by the Consolidated Farm and Rural Development Act, as amended (the "CONACT"). *See* 7 U.S.C. §§ 1921, *et seq.*; 7 C.F.R. § 2.42(a)(28). Like its predecessor the Farmers Home Administration (FmHA), FSA makes farm credit available to farmers who may not otherwise obtain it from commercial institutions. The objective of these programs "is to provide supervised credit and management assistance to eligible farmers to become owners or operators, or both, of family farms, to continue such operations when credit is not available elsewhere, or to return to normal farming operations after sustaining substantial losses as a result of a designated or declared disaster." 7 C.F.R. § 761.1(c).

14.    FLP loans support farmers in a variety of ways. For example, farm ownership loans can be used to purchase or expand a farm or ranch. 7 U.S.C. § 1923. These loan funds can help pay closing costs, subsidize constructing or improving buildings on the farm, or help conserve and protect soil and water resources. Operating loans may be used to purchase livestock, farm equipment, feed, seed, fuel, farm chemicals, insurance, and other operating expenses. 7 U.S.C. § 1942. Operating loans may also be used to pay for minor improvement to buildings, costs associated with land and water development, family living expenses, and to refinance debt under certain conditions. *Id.* . Microloans are designed to meet the needs of small and beginning farmers, or for non-traditional and specialty operations by easing some of the requirements and requiring less paperwork. 7 U.S.C. § 1943(c). Down

payment loans can partially finance the purchase of a family size farm or ranch and are available only to eligible beginning farmers and ranchers and/or minority and women applicants. 7 U.S.C. § 1935. Youth loans can provide operating money for young people between the ages of 10 and 20 years old who need assistance with an educational agricultural project. 7 U.S.C. § 1941. Emergency loans help farmers and ranchers recover from substantial production and physical losses due to a required quarantine, drought, flooding, and other natural disasters and emergencies. 7 U.S.C. § 1961. Conservation loans support conservation practices on farms and ranches that help protect natural resources throughout the United States, such as reducing soil erosion and improving water quality. 7 U.S.C. § 1924.

15.    FSA accomplishes its credit mission through two distinct delivery mechanisms: direct and guaranteed loan programs. Direct farm loans are made and serviced by FSA staff, whereas guaranteed farm loans are originated and serviced by qualified commercial, cooperative, or nonprofit lenders. While there is some overlap in their respective functions, direct loan programs are broadly intended to assist those deemed underserved by credit markets because of cash flow feasibility, security, or creditworthiness concerns, or a lack of available agricultural credit in the applicant's area. Guaranteed programs are broadly intended to assist farmers who do not meet the lender's underwriting criteria or when lenders lack the liquidity necessary to fund otherwise creditworthy applicants. Without the direct and guaranteed loan programs some creditworthy farmers or underserved groups would be unable to obtain credit or would have to accept less favorable loan terms.

16.    Differences in general eligibility criteria, loan size limits, and loan purpose requirements between the direct and guaranteed programs are reflective of their somewhat different missions. The agency provides credit to agricultural producers who are unable to receive private, commercial credit at reasonable rates and terms. For example, most CONACT loans require that a borrower be "unable to obtain sufficient credit elsewhere to finance his actual needs at reasonable rates and terms, taking into consideration prevailing private and cooperative rates and terms in the community in or near which the applicant resides for loans for similar purposes and periods of time."

6

7 U.S.C. § 1983.[3] However, a qualified guaranteed loan applicant must have been unable to obtain credit from private lenders at competitive rates and terms without the presence of a guarantee. Meanwhile, for most loans a qualified direct loan applicant must have been unable to obtain credit from private lenders at competitive rates and terms even with the presence of a guarantee. Such differences in borrower eligibility make it more likely that direct lending programs serve more economically disadvantaged farmers.

17.      Most of FLP's farm loans also require that the borrower be, or become, the owner of not larger than a family farm. *See, e.g.*, 7 U.S.C. § 1922(a)(1)(C) (requiring that a farm ownership loan borrower must "be or will become owner-operators of not larger than family farms"). Typically, family members must provide most of the day-to-day labor and management for the farm. This family farm requirement results in FLP funding being targeted towards smaller farms.

18.      In addition, the direct program's smaller loan limits make it more likely that direct programs serve smaller farms which are more likely to be economically disadvantaged. For example, the maximum loan limit for a direct farm ownership loan is $600,000, whereas the limit for a guaranteed loan is set at $1,750,000 (increased yearly to account for inflation). 7 U.S.C. § 1925.[4]

19.      Direct and guaranteed loan funds are also targeted to groups USDA determines, based on statutory criteria, to be underserved, resulting in an allocated share of loan funds going to farmers meeting beginning and socially disadvantaged farmer qualifications. The CONACT requires USDA to set annual target participation rates and reserve sufficient loan funds, on a county wide basis, taking into account the portion of the population of the county made up of such groups, to ensure that members of socially disadvantaged groups (which includes women under the CONACT definition of

---

[3] Conservation loans are not subject to such a requirement. 7 U.S.C. § 1924(g). However, since USDA has not received an appropriation for direct conservation loans since FY 2011, and has only approved a handful of guaranteed conservation loans since that time, there are only a few FLP loan borrowers that do not meet this test for credit. FLP completes credit quality reviews on each loan officer yearly to ensure compliance with applicable program requirements.

[4] There are also maximum loan terms applicable to each type of loan. For example, farm ownership loans are capped at 40 years, *see* 7 C.F.R. § 764.154(b), with operating loans capped at 7 years. *Id.* 764.254.

this term) will receive farm ownership loans and will have the opportunity to purchase or lease inventory farmland. 7 U.S.C. § 2003(a); 7 U.S.C. § 2003(c) (target participation rates for operating loans). Non-reserved funds can also be used by members of those groups. There are similar requirements to reserve funds for qualified beginning farmers and ranchers, and for direct loans, for the down payment loan program and joint financing arrangements. *See* 7 U.S.C. § 1994(b)(2).

20.     Irrespective of the delivery mechanism, these federal loan programs are generally intended to serve as temporary and not permanent credit sources. "The programs are designed to allow those who participate to transition to private commercial credit or other sources of credit in the shortest period of time practicable through the use of supervised credit, including farm assessments, borrower training, market placement, and borrower graduation requirements." 7 C.F.R. § 761.1(c). Graduation to commercial credit, for the direct program, is encouraged through time limits on borrower eligibility and periodic reviews. Further, under the CONACT, FSA is required to conduct an annual review of borrowers who meet certain financial standards to determine whether "a borrower would be able to obtain a loan, guaranteed by the Secretary, from a commercial or cooperative lender at reasonable rates and terms for loans of similar purposes and period of time." 7 U.S.C. § 1983a(f)(2). If FSA determines that borrower could obtain such a guaranteed loan, FSA is to assist the borrower in applying for a guaranteed loan and the borrower must agree to apply for and accept such loan. *Id.*; 7 U.S.C. § 1983(3). Guaranteed credit is seen as a first step to graduation from federal credit (direct lending programs) to commercial sources of credit. FSA is required to "promote the goal of transitioning borrowers to private commercial credit and other sources of credit in the shortest period of time practicable" using a number of programs to assist in graduation. 7 U.S.C. § 1993(a); *see* 7 U.S.C. § 2006a (borrower training program); 7 U.S.C. § 2006b (loan assessment process); 7 U.S.C. § 2006c (supervised credit training of employees); 7 U.S.C. § 2006d (market placement program).

21.     A large share of direct and guaranteed loans are made to groups deemed to be marginally creditworthy by private sector lending standards. Direct loans are typically much smaller in size and reflect the smaller family farming clientele that they serve. Generally, FSA guaranteed loans go to groups who are more creditworthy than FSA direct borrowers, yet guaranteed borrowers are

still unlikely to meet commercial lending standards in order to obtain loans at reasonable rates and terms without a government guarantee.

22.     By design, direct loan programs serve higher-risk applicants than the guaranteed-loan program. Compared to guaranteed borrowers, direct borrowers generally carry greater amounts of debt relative to their assets, have lower net worth, are more likely to have cash flow difficulties, and operate smaller family farms. These borrowers are unable to meet commercial credit standards and would likely have had difficulty either continuing or beginning in farming without access to direct loan programs. In FSA's experience, the direct lending delivery system tends to more often serve groups considered socially or economically disadvantaged. Therefore, a much higher share of total direct lending goes to socially disadvantaged farmers and beginning farmers than in the guaranteed loan programs.

23.     Notably, the higher default probabilities and servicing costs associated with direct loans discourage commercial lenders from serving many within this higher-risk clientele without further incentives and/or subsidies. Even with a complete federal loan guarantee, commercial lenders may be reluctant to serve many high-risk direct borrowers because greater loan servicing costs would render the loans unprofitable.

24.     Sometimes a farmer becomes unable to make payments on his or her loan as scheduled. When faced with that situation, most lenders will consider whether they should foreclose on the loan or restructure the loan. Restructuring means somehow changing the payment schedule so that it is within the farmer's means. Restructuring can include changing the timing of payments, extending the loan term, reducing the interest rate on the loan, or even reducing the total amount that the farmer owes. Generally, restructuring allows a lender to collect more than the lender would collect in a foreclosure. "Primary loan servicing" is FSA's term for its restructuring programs. One of FSA's long-standing goals has been to keep family farmers on their farms. This goal is also set by statute in the CONACT, which allows for modification of delinquent farmer program loans within statutory requirements "to the maximum extent possible . . . to ensure that borrowers are able to continue

farming or ranching operations." 7 U.S.C. § 2001(a)(2). The FSA primary loan servicing programs
have helped FSA to achieve that goal.

## History of Discrimination in FSA Programs

25.     In 1965, the U.S. Commission on Civil Rights ("Commission") issued a report in
which it found discrimination at USDA in program delivery and employment. With respect to the
FmHA (the predecessor agency to FSA), it found "a different kind of service to the two races," Black
and white. Thus, white farmers, "[a]ided by Federal loans and technical advice, . . . increasingly
diversified their crops and applied modern farming practices," while Black farmers were increasingly
displaced. Moreover, even when FmHA programs did reach Black farmers, the level of assistance
provided to them was consistently inferior; for instance, Black farmers would receive smaller loans
and thus have fewer opportunities for capital investments. The Commission found that, in each
economic class, the average loan size for whites was larger than it was for Blacks. Moreover, the
average loan size for poorer white farmers increased as net worth decreased. On the other hand, Black
farmers were loaned lower amounts of funding as their level of net worth decreased.

26.     In 1982, the Commission issued a follow-up report that depicted the devastating but
inevitable results of such sustained historical discrimination. The report detailed numerous complaints
filed against the FmHA, alleging that Black farmers "[we]re subjected to disrespect, embarrassment,
and humiliation by FmHA officials" and a range of discriminatory actions, including: denying Black
farmers the opportunity to submit loan applications; awarding them loans in lower amounts than
requested; failing to give them the full loan amount actually awarded; accelerating loan repayment
schedules without explanation; applying loan payments to the wrong accounts, so as to pay off low-
interest rather than high-interest loans; and contacting creditors and other businesses to inform them
that no loans will be made to these farmers, thereby preventing them from obtaining other credit,
goods, and services needed to continue their farm operations; and foreclosing and selling off
properties of Black farmers at a higher rate than white farmers. The Commission emphasized that
these disparities were leading to a rapid loss of Black-owned farmland, expressing a sense of urgency
over the possibility of the "extinction of black farms in this country" absent "immediate measures" to

counter bias and historical discrimination. There was strong evidence supporting the Commission's concern over the loss of Black farms. The Commission found that between 1970 and 1980, Black-operated farms had declined "57 percent—a rate of loss 2 1/2 times that for white-operated farms"—and "almost 94 percent of the farms operated by blacks ha[d] been lost since 1920."

27.     In 1997, the USDA Office of the Inspector General conducted an audit of loan programs and published its findings in a report entitled, Minority Participation in Farm Service Agency's Farm Loan Programs – Phase II. The audit looked at, among other things, loan servicing decisions made in 11 states and 33 counties in the decade following the enactment of the Agricultural Credit Act of 1987. The audit found that FSA's loan-servicing decisions made from January 1, 1989, through March 3, 1997, disproportionately benefitted nonminority farmers, even though minority borrowers were experiencing higher rates of delinquency. OIG's audit specifically compared the rates at which minorities and non-minorities received two or more loan-servicing decisions during the applicable time period and concluded that non-minority farmers received 85 percent of the multiple servicing decisions while minorities, with 46 percent of their accounts in these categories, received only 15 percent of multiple Agency efforts to avoid serious delinquency and potential foreclosure. In 2005, OIG published a follow-up report that examined progress on its 1997 recommendations and observed that FSA Civil Rights had not conducted program compliance reviews for over five years, were not effective at monitoring the progress of program civil rights complaints, and that the FSA office of outreach did not evaluate or monitor State or County office outreach activities or provide any guidance on reaching minority farmers.

28.     In 2011, USDA contracted with an outside law firm, Jackson Lewis, to conduct a qualitative assessment of the delivery of technical and financial assistance. The Jackson Lewis report reiterated the findings that FSA outreach efforts are generally known only to employees holding a select few job positions in the field, were not linked to performance ratings or job duties generally, and were not systematically evaluated to determine whether certain outreach methods were more successful than others. The Jackson Lewis report also had a low opinion of FSA's outreach efforts, particularly among Farm Programs personnel at the State and County Office level, and FLP

personnel (primarily at the County Office level), that potentially negatively impacted the delivery of service to socially disadvantaged customers and potential customers. In fact, the report indicated "the term 'outreach' is widely misunderstood by field personnel" and is "regarded as a task that takes time away from their 'real duties.'"

29.    Recently, in its 2019 report on credit and outreach to socially disadvantaged borrowers, the Government Accountability Office (GAO) reported that "[o]n average, farms for which an SDFR was the primary producer (SDFR farms)," which in the GAO's definition included women, "were smaller and brought in less revenue than non-SDFR farms in 2017." Although SDFR farms represented 30% of all farms, they operated only 21% of all farmland and accounted for only 13% of the market value of agricultural products sold in 2017.

30.    The GAO further noted that "[a]bout 55 percent of SDFR farms had fewer than 50 acres, and 88 percent had less than $50,000 in total sales and government payments."

## Discrimination Settlements and Claims Processes

31.    Beginning in 1997, Black, Native American and Hispanic farmers initiated legal actions, some of which were certified as class actions, alleging that USDA had systematically discriminated against them on the basis of race and ethnicity in the administration of farm loans and other benefits. In general, the minority borrowers in each of these actions alleged that (1) USDA willfully discriminated against them on the basis of their race or ethnicity when they sought to apply for farm program loans, loan servicing, and farm program benefits; and (2) when they filed administrative discrimination complaints with USDA to seek redress for that discrimination, USDA failed to adequately respond, instead delaying review, conducting meaningless investigations, or failing to take any investigative action whatsoever to resolve the complaints.

32.    In 1997, two putative class-action lawsuits entitled *Pigford v. Glickman ("Pigford I")* and *Brewington v. Glickman ("Brewington")*, respectively, were filed on behalf of groups of Black farmers. Those lawsuits asserted that the USDA had systematically discriminated against Black farmers on the basis of race, in violation of the Fifth Amendment to the United States Constitution, the Equal Credit

Opportunity Act, Title VI of the Civil Rights Act, and the Administrative Procedure Act. The *Brewington* case was later consolidated with *Pigford I*, and the court certified the case as a class action. The class covered Black farmers who alleged certain types of discrimination by USDA between 1981 and 1996.

33.     The *Pigford I* case later settled in 1999. The terms of the settlement were outlined in a Consent Decree entered by the Court on April 14, 1999. The Consent Decree established a two-track dispute resolution process for those seeking relief. Track A provided a monetary settlement of $50,000 plus the potential for partial debt relief for those loans within the class period that were deemed by the neutral adjudicator to be impacted by discrimination. Track A had fewer documentation requirements for claimants. Alternatively, class members could seek a larger payment by presenting documentary evidence of their claims to a third-party arbitrator who made a binding decision. The Consent Decree also provided limited injunctive relief in the form of one-time priority consideration for one loan application or purchases of inventory property held by the Agency.

34.     Eligible claimants were required to file their claims with the case administrator by October 1999.  While approximately 22,700 claimants filed claims before the October 1999 claims deadline, approximately 61,000 additional individuals requested permission to file claims after the October 12, 1999, claims deadline but before the September 15, 2000 "late-filing" cut-off date. Fewer than 3,000 of the roughly 61,000 "late-filers" were found to have demonstrated the required "extraordinary circumstances" for receiving extra time to file their claims. As a result, more than 58,000 "late-filers" did not have their discrimination claims initially heard.

35.     In 2010, Congress passed legislation to reopen the *Pigford I* claims settlement process for certain late filers. Later, Congress passed legislation extending the statute of limitations to bring discrimination claims against USDA. This allowed certain Black farmers procedurally shut out of the *Pigford I* claims process to bring claims in federal court based on discrimination occurring between 1981 and 1996. This action was likewise certified as a class action and is known as "*Pigford II*."  That case settled, and the parties agreed to a similar claims process as was adopted in *Pigford I*.

36.      Meanwhile, in 1999, a group of Native American farmers brought similar claims in federal court alleging a pattern of discrimination by FSA in the administration of its farm loan programs and in FSA's resolution of administrative discrimination claims. That case was also certified as a class action covering all Native American farmers and ranchers who farmed or ranched between 1981 and 1999, applied to the USDA for participation in a farm program during that time period, and filed a discrimination complaint with the USDA (the *Keepseagle* case). After class certification, the parties agreed to settle the case and the court approved a settlement agreement that established a two-track settlement claims process that was similar in many respects to the claims processes in *Pigford I* and *Pigford II*. However, only approximately 3,600 claimants filed successful claims in the *Keepseagle* class action and $380 million was left over from what USDA had set aside as relief for successful claimants. Class counsel identified the age of the claims, the age of the farmers, and a profound distrust of USDA as the main reasons that the participation rate from the class was smaller than anticipated.

37.      In 2000, a group of Hispanic farmers also brought suit alleging a similar pattern of discrimination by FSA against Hispanic farmers. The cases were consolidated in one action, *Garcia v. Glickman*, but it was not certified as a class action. However, USDA agreed to establish a voluntary administrative claims process similar to the ones created in *Pigford I* and *Keepseagle* to allow for a more efficient resolution of the plaintiffs' discrimination claims outside of federal court. That claims process covered Hispanic farmers alleging discrimination between the years 1981 and 2000. Approximately 2,985 Hispanic claimants participated in that alternative claims process.

38.      Most of the claimants who prevailed in the *Pigford*, *Keepseagle*, and *Garcia* claims resolution processes were individuals who claimed to have applied to USDA and had their applications denied or claimed to have been denied an application in the first place. Most successful claimants in both processes thus had no existing outstanding farm loan debts with USDA. As a result, the total debt relief provided in these processes was generally concentrated in a very small portion of the classes. Additionally, because the settlements were designed to remedy debts from the specific loan program that was affected by discrimination, few claimants received complete debt forgiveness. As a result, while the claims processes provided valuable relief to many claimants, those claimants who had

14

outstanding debts generally still had debts with USDA after the claims programs concluded. Many socially disadvantaged farmers in FSA's loan portfolio were still not in a position to pay their debts and remained delinquent.

**USDA Efforts to Remedy Lingering Effects of Discrimination**

39.     Aside from the administrative claims processes described above, USDA has attempted to address or remedy the documented history of discrimination in its farm loans programs, and that history's lingering effects, in a variety of ways, including by creating special outreach programs, entering into cooperative agreements with local organizations, establishing administrative processes for discrimination complaints, and otherwise adjusting the implementation of its programs.

40.     For example, per the recommendations of the Civil Rights Action Team and the Commission on Small Farms, USDA farm loan programs permanently removed the county committees from loan making decisions. Congress subsequently enacted legislation authorizing the Secretary to appoint socially disadvantaged members to county committees associated with the administration of Farm Programs, whose members are otherwise selected through county elections.

41.     Between 1999 and 2020, USDA improved farm loan programs by streamlining its regulations, separating its farm lending regulations from the regulations of a separate USDA agency (Rural Development), and substantially updated its computer systems by transitioning to the Direct Loan System. USDA can now accurately track participation rates and timeliness of application processing as well as the timeliness of farm loan servicing actions.

42.     In 2008, USDA created the Office of Advocacy and Outreach (currently the Office of Partnerships and Public Engagement (OPPE)) as a Department-wide office. OPPE is USDA's chief office tasked with serving beginning, minority and other underserved farmers. Congress funded OPPE in part to address systemic deficiencies in the delivery of USDA programs and services to minority and socially disadvantaged farmers and ranchers. Its mission is both to strengthen the Department's advocacy on behalf of small farm and new farming opportunity policies/programs, as well as to enhance the Department's outreach to beginning and socially disadvantaged farmers. OPPE is also charged with working across USDA agencies to coordinate their outreach activities.

43.    OPPE at USDA also administers a grant program supporting outreach and assistance for socially disadvantaged farmers, also known as the 2501 Program. This program was created through the 1990 Farm Bill to help socially disadvantaged farmers, ranchers, and foresters, who have historically experienced limited access to USDA programs and services. The program was later expanded to include veterans. It is a grant program for higher education institutions and nonprofit and community-based organization to extend USDA's engagement efforts in these communities. The 2501 Program funds projects that include conferences, workshops, and demonstrations on various farming techniques, farm financial planning, as well as connecting underserved farmers and ranchers to USDA local officials to increase awareness of USDA's programs and services.

44.    In 2011, pursuant to statutory requirements, USDA instituted a Receipt for Service requirement that ensures that customers receive a receipt from farm loan programs personnel that describes each benefit or service sought by any inquirer, applicant, or customer, the date of inquiry, and the actions taken or recommended to be taken by FSA and other service center agencies. This measure was instituted in part to improve accountability in processing farm loan applications and primary loan servicing requests. It applies to Farm Programs and other USDA agencies to ensure customers and potential customers are being properly served in local offices.

45.    To support USDA-wide coordination on outreach and technical assistance, FSA appointed a National Director of Outreach in 2013.  As of 2016, outreach coordinators are now in all States and territories with FSA offices. The FSA Outreach office also performs a vital function in connecting the concerns of producers with farm loan program managers so that programs may be refined and improved to meet the needs of borrowers.

46.    In 2012, FSA created a microloan program for operating loans for up to $35,000 (subsequently increased to $50,000 in 2014). Microloan programs for farm ownership loans and farm storage facility loans were subsequently established in January and April of 2016. As noted above, microloans are designed to meet the needs of small and beginning farmers, or for non-traditional and specialty operations by easing some of the requirements and requiring less paperwork. Thus, the microloan application process is simpler, requiring less paperwork to complete, consistent with a

smaller loan amount. Requirements for managerial experience and loan security have been modified to accommodate veterans, smaller farm operations, and beginning farmers.

47.    In 2015, USDA established the Socially Disadvantaged Farmer and Rancher Policy Research Center at Alcorn State University, and the agency continues to provide funding for its operations. The Policy Research Center was established to collect, analyze, and evaluate data to develop policy recommendations for the protection and promotion of the interests of socially disadvantaged farmers and ranchers. The Center also serves as a public awareness organization that provides education to the public about the history and condition of socially disadvantaged farmers and ranchers.

48.    FSA has also made numerous efforts at targeted loan programs over the years to improve the participation rates and outcomes for socially disadvantaged farmers and ranchers. As previously discussed, since 1990, FSA has set target participation rates and reserves funds, to the extent practicable, for members of socially disadvantaged groups. For loans to socially disadvantaged and beginning farmers and ranchers, FSA also guarantees up to 95% of a commercial lender's losses in the event of default to incentive lenders to provide loans to those borrowers. 7 U.S.C. § 2008b. This is above the otherwise applicable maximum guarantee of 90%.

49.    In addition, the down payment program assists socially disadvantaged and beginning farmers in purchasing a farm, and only requires a cash down payment of at least 5 percent of the purchase price. *See* 7 C.F.R. § Part 764, Subpart E. FSA will finance 45% to a maximum loan amount of $300,150. The remaining balance may be obtained from a commercial lender or private party, but if obtained from a commercial lender, FSA can provide up to a 95% guarantee and participating lenders do not have to pay a guarantee fee.

50.    FSA has other programs that also encourage the entry or reentry of socially disadvantaged farmers and ranchers into farming or ranching. For example, in selling its inventory property, FSA is required to "maximize the opportunity for beginning farmers or socially disadvantaged farmers to purchase real property." *See* 7 C.F.R. § 767.151(a). The CONACT requires FSA to advertise any inventory property acquired with first priority given to eligible socially

disadvantaged and beginning farmers to purchase the properties at the appraised market value. 7 U.S.C. § 1985(c). Only if there are no offers from eligible beginning or socially disadvantaged farmers within a certain time frame will FSA then sell the inventory property by auction or sealed bid to the general public. *See* 7 U.S.C. § 1985(c)(1)(C).

51.    In addition, the Land Contract Guarantee Program was designed to assist beginning or socially disadvantaged farmers and ranchers to obtain farmland. *See* 7 U.S.C. § 1936; 7 C.F.R. § Part 763. FSA guarantees for up to 10 years are offered to the owner of a farm who wishes to sell real estate through a land contract to a beginning or socially disadvantaged farmer or rancher. To be eligible the beginning or socially disadvantaged famer must be engaged primarily in farming after the guarantee is issued. A land contract is an installment contract between a buyer and a seller for the sale of real property, in which complete ownership of the property is not transferred until all payments have been made. This program incentivizes the sale of family farm real estate to eligible beginning or socially disadvantaged farmers and ranchers because it reduces the financial risk to the seller of buyer default on the contract payments.

## Continuing Effects of Past Discrimination

52.    Despite USDA's various efforts to remedy the lingering effects of historical discrimination through these various initiatives, minority communities continue to be under-represented in certain USDA programs. Minority farmers are disproportionately less likely to participate in or benefit from certain types of financial assistance that USDA offers in part because minority farmers generally have smaller farms, and therefore receive a disproportionately small share of funds provided through USDA payment programs, many of which, like the recent Market Facilitation Program discussed in more detail below, are based on crop-acreage or are targeted to crops typically grown on large farms.

53.    In general, FSA data indicates that minority participants have:

a.    Higher loan application withdrawal and rejection rates due, in part, to difficulty meeting loan standards relative to non-minority applications;

b.      Smaller average loan amounts due to minority borrowers having smaller scale operations;

c.      Less operating capital overall and less equity in assets due to smaller operations, which makes it difficult to obtain new loans. This may be due to the fact that these borrowers have not had the same access to credit to increase the size of their operations. There is a general lack of generational wealth.

d.      Higher delinquency, application withdrawal, and foreclosure rates.

54.     While FSA has improved and amplified its data analytics to assess these and other disparities in an effort to continually review and improve its programs, the available information makes clear that differences persist under existing programs.

55.     Additionally, the widely publicized history of USDA discrimination has made it difficult for the agency and the communities it serves to overcome distrust:

a.      Many minority farming families have personal experiences with discrimination and pass those stories down generation to generation, which makes family members reluctant to interact and participate in FSA programs and creates a cycle of distrust.

b.      Current reports, articles, and publications reiterate that trust of USDA, and particularly FSA, continues to be a lingering problem and trust has not improved over time even since the class action settlements.[5]

c.      It is widely understood by FSA personnel, including by loan officers, that USDA has not been able to regain its image as a trusted partner for minority communities. Indeed, USDA has explicitly included requirements to "Build Trust" in its performance plans

---

[5] These include: *Black Farmers Fear Foreclosure as Debt Relief Remains Frozen*, N.Y. Times (Feb. 21, 2022), https://www.nytimes.com/2022/02/21/us/politics/black-farmers-debt-relief.html; *Many Black Farmers Nationwide Struggling to Keep Their Farms Afloat as they Face Disparities Across the Board*, CNN (Dec. 15, 2021), https://www.cnn.com/2021/12/15/politics/black-farmers-debt-relief-disparities/index.html; *Black-Owned Farms are Holding on by a Thread*, Eater (Feb. 23, 2021), https://www.eater.com/22291510/black-farmers-fighting-for-farmland-discrimination-in-agriculture

for senior level employees.[6]  As Secretary Vilsack noted in his March 25, 2021, testimony before the House Committee on Agriculture, the agency "must establish the support systems to enable socially disadvantaged producers to have the opportunity to succeed. Only with the establishment of such systems, will we be able to finally address the cumulative effect of discrimination and break the cycles that are holding these producers back.*"*

   d.  Indeed, USDA provides grants to organizations to improve communication because it recognizes that there is still a lack of trust on the part of minority communities.

  56.  In USDA's interaction with community groups, the agency regularly hears about lack of trust for the agency on the part of minority communities and is told that programs are not reaching these communities. FSA hears the same themes in its interactions with actual and potential customers. And this theme appears regularly in correspondence I receive about farm loan programs at USDA, including in Congressional inquiries on behalf of constituents, as well as in correspondence received from program applicants and participants.

  57.  This lack of trust impacts the effectiveness of USDA's work when minority farmers interact with FSA.

   a.  Based on my experience, people are more reluctant to engage with USDA and ask for farm loans in the first instance, and may increase reluctance to engage with USDA on other farm programs. This reluctance to engage is likely, in part, the cause of the higher rate of loan applications withdrawals resulting from incomplete application submissions even after two formal notifications of the documents needed.

   b.  Even when USDA makes a loan decision based on specified statutory criteria, the lack of trust erodes USDA's ability to effectively communicate with the applicant in a cooperative manner on ways in which the applicant could improve their chances of success

---

[6] For example, employee performance plans for Senior Executive Service positions includes a category titled "Build Trust" which requires that they "[p]rioritize upholding civil rights and building trust with underserved communities, including with Tribal Nations, through equitable and inclusive customer service and actions."

on future applications. One of the key functions of FSA loan officers is to advise, and lack of trust makes it harder to help minority farmers.

58.     As a result, enhancements to outreach programs, additional investments to improve communications and interactions with minority farmers and applicants, automated loan services, and incremental changes to forms and regulations cannot in isolation address the lack of access to capital and the issues related to the dispossession of land that has persisted over many years. And even recent payment programs directed to all farmers have shown substantial failures in reaching socially disadvantaged farmers.

59.     For example, the Market Facilitation Program (MFP) provided direct payments to farmers impacted by foreign retaliatory trade practices, resulting in the loss of traditional markets, in 2018 and 2019. However, the program tended to benefit larger farms, and for MFP payees and payments for 2018 and 2019, minorities accounted for an average of 8,733 payees per year (1.4%) and an average of $116.50 million in payments per year (1%). In addition, the Coronavirus Food Assistance Program (CFAP) provides assistance to agricultural producers impacted by the effects of the COVID-19 pandemic. When it was initially implemented, CFAP 1 had a minority participation rate of 4.4% (3.5% of payments). Prior to being reopened on April 5, 2021, CFAP 2 had a minority participation rate of 4.2% (3% of payments).[7]

60.     FSA has taken steps to attempt to remedy these types of deficiencies in its programs. In particular, USDA reopened CFAP 2 from April 5, 2021, to October 12, 2021, to reach a broader set of producers, including socially disadvantaged communities. USDA also committed at least $2.5

_____

[7] MFP paid out $23.1 billion over two years, and CFAP 1 and CFAP 2 combined paid out $31.1 billion. These were the largest payments made for USDA emergency assistance programs within the recent decade. The named Plaintiffs appear to have received a variety of agricultural subsidies from FSA, including CFAP payments for four of the borrowers and MFP payments for one, totaling thousands of dollars since 2010. According to FSA records, since 2010 Plaintiff Sidney Miller received $192,290.47 in farm program subsidies, including $139,235.47 in CFAP payments. Plaintiff Greg Macha received $2,364, including $2,259 in CFAP payments. Plaintiff James Meek received $32,404, including $26,898 in CFAP payments. Plaintiff Jeff Peters received $138,063.03, including $23,984.28 in MFP payments and $41,333.75 in CFAP payments. Plaintiff Lorinda O'Shaughnessy received $1,447 in farm program subsidies.

million to establish partnerships with third-party organizations with strong connections to socially disadvantaged communities to ensure robust technical assistance during the application process. As a result of FSA's efforts, the minority participation rate during that reopening period jumped to 16% and equated to a 15% payment rate; however, the overall participation rate for CFAP 2 only increased to 4.5% and the percentage of payments only increased to 3.2%, so the higher percentage of minority participation in the reopened program overstates the increase in participation in raw numbers. The reopening of CFAP 2 was a unique opportunity in which the agency had discretion to reopen a recent program in order to address perceived gaps in distribution. Unfortunately, it is not possible to similarly address past inequities in Farm Loan Programs that have had longstanding lingering effects through incentive programs and increased outreach alone. This is especially true where, unlike in the Section 1005 program, "reopening" loan programs would not change a borrower's cash flow and feasibility assessment to allow those borrowers to obtain new loans, resolve current delinquencies, or provide a release of liens to free up equity.

## USDA's Implementation of Section 1005

61.     Section 1005 of the American Rescue Plan Act ("ARPA"), enacted on March 11, 2021, authorizes USDA to pay up to 120% of the outstanding indebtedness, as of January 1, 2021, of certain FSA Direct and Guaranteed Farm Loans and Farm Storage Facility Loans held by socially disadvantaged farmers or ranchers.

62.     The Direct and Guaranteed Farm Loans covered by Section 1005 are those discussed above that are administered under the CONACT:  farm ownership loans, operating loans, emergency loans, and conservation loans.

63.     Section 1005 of the American Rescue Plan Act (ARPA) also defined the "farm loans" it covered as including "a Commodity Credit Corporation Farm Storage Facility Loan."  Farm Storage Facility Loans (FSFLs) provide low-interest financing for producers to build or upgrade facilities to store, handle, and/or transport certain eligible commodities that they produce. *See* 7 C.F.R. Part 1436. This program is authorized by and funded through the Commodity Credit Corporation (CCC) Charter

Act. 15 U.S.C. § 714c(b) and 714b(h); *see also* 7 U.S.C. § 8789; 7 U.S.C. § 7971. However, the CCC does not have its own employees, so the FSFL program is administered by FSA.

64.     An eligible borrower of an FSFL is a producer of an eligible commodity who is a "landowner, landlord, operator, producer, tenant, sharecropper, or processor of domestically produced sugarcane or sugar beets" with a "satisfactory credit history," "an ability to repay," and "demonstrates a need for increased storage capacity as determined by CCC," among other eligibility requirements. *See* 7 C.F.R. § 1436.5. An FSFL term may not exceed 12 years and is limited to $500,000 per loan. *See* 7 C.F.R. § 1436.7 and 1438.9. Unlike most FLP loans, there is no requirement that FSFL borrowers be unable to obtain sufficient credit elsewhere at reasonable rates and terms in order to be eligible for an FSFL. FSFLs must be approved by the local FSA state or county committee. *See* 7 C.F.R. § 1436.9. While FSFLs are generally available to any farmer, these loans account for less than 1% of the total value of loans potentially covered by Section 1005.

65.     Section 1005(a)(1) of ARPA provides "for such funds as may be necessary, to remain available until expended" to make the ARPA loan payments.

66.     Section 1005(a)(2) of ARPA permits the Secretary of Agriculture to provide payments to a lender directly, to an eligible applicant, or a combination of both.

67.     Section 1005(b)(3) of ARPA provides that the term "socially disadvantaged farmer or rancher" has the meaning given to the term in section 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. § 2279(a)).

68.     Section 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. § 2279(a)) defines a "socially disadvantaged farmer or rancher" as someone "who is a member of a socially disadvantaged group," which is further defined as "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities."

69.     The 120 percent payment authorized by Section 1005 includes 100 percent toward loan indebtedness as of January 1, 2021, and an additional 20 percent of that indebtedness to eligible recipients.

70.     FSA published a Notice of Funds Availability ("NOFA") in the *Federal Register* (86 FR 28329) on May 26, 2021 ("May 2021 NOFA"), announcing the availability of funds for eligible borrowers with eligible direct loans as authorized by Section 1005 of ARPA, with the exception of direct loans that no longer have collateral and have been previously referred to the Department of Treasury for debt collection for offset.

71.     The May 2021 NOFA announced that a subsequent NOFA was anticipated within 120 days, or by September 23, 2021, which would address guaranteed loans and direct loans that no longer have collateral and have been previously referred to the Department of Treasury for debt collection for offset. However, in light of the preliminary injunctions, FSA has delayed publication of this subsequent NOFA.

72.     Under the May 2021 NOFA, members of socially disadvantaged groups are: American Indians or Alaskan Natives, Asians, Blacks or African Americans, Native Hawaiians or other Pacific Islanders, and Hispanics or Latinos. The Secretary of Agriculture will determine on a case-by-case basis whether additional groups qualify under this definition in response to a written request with supporting explanation.

73.     Under the provisions of the May 2021 NOFA, eligible recipients do not need to take any action until receipt of a payment notification letter from FSA (form FSA-2601). FSA is identifying eligible recipients whose demographic designations in FSA systems qualifies them as socially disadvantaged based on race or ethnicity. Direct and guaranteed loan borrowers who have not previously provided demographic designations to FSA or believe their records are not accurate can contact their local FSA offices to verify and/or update their designations.

74.     FSA anticipated sending a payment notification letter to most eligible recipients under the May 2021 NOFA within 45 days of the publication of the NOFA, or by July 10, 2021. Eligible recipients had the option to decline or accept the payment; if the recipient accepted the payment, the amount to pay off the eligible direct loans would be applied directly to the eligible recipient's FSA loans and the additional 20 percent, which can be used by recipients to offset tax liabilities, would be paid directly to the eligible recipient.

75.     Payments for the following eligible recipients will be addressed in the subsequent NOFA when published by FSA:

a.     As of February 15, 2022, FSA identified at least 2,624 accounts for eligible guaranteed Farm Loan Programs loan recipients with 3,922 outstanding eligible loans. The total unpaid principal and interest on those loans as of January 1, 2021, was estimated at $1,625,293,687.

b.     As of February 11, 2022, FSA has identified 762 accounts for eligible direct Farm Loan Programs recipients with 1,502 loans with no collateral remaining that have been referred to the Department of Treasury for collection. The total unpaid principal and interest of these loans is estimated at $56,169,936.

76.     Consistent with court orders, USDA is not currently disbursing Section 1005 loan payments to eligible recipients. Also consistent with those orders, USDA is identifying eligible recipients of loan payments, sending payment notification letters, and carrying out all other administrative tasks to be ready to swiftly disburse payments whenever an injunction against doing so is lifted.

77.     As of January 31, 2022, the ratio of White borrowers who are delinquent on an eligible FSA loan was 11.9%, compared to 50.3% of African American/Black borrowers, 22.9% of Asian borrowers, 24% of American Indian/Alaskan Natives, and 68.9% of Hispanic borrowers.

78.     As explained in the Frequently Asked Questions posted on the USDA website at https://www.farmers.gov/americanrescueplan/arp-faq, at this time USDA is not taking any adverse actions on any eligible direct borrowers who do not make payments.  This forbearance is based on a January 27, 2021, announcement that the USDA has temporarily suspended past-due debt collections and foreclosures for distressed borrowers under the Farm Storage Facility Loan and the Direct Farm Loan programs due to the pandemic. *See* https://www.usda.gov/media/press-releases/2021/01/27/usda-temporarily-suspends-debt-collections-foreclosures-and-other. However, the Debt Collection Improvement Act (DCIA) prohibits loans to those delinquent on a Federal debt, and therefore a recipient's eligibility for student loans, loans from the Small Business Administration,

25

or loans from other Federal agencies could be adversely impacted by failure to make payments on eligible USDA loans before they are paid off under ARPA Section 1005. Consistent with the January 2021 announcement the Secretary has waived this provision of the DCIA for delinquent FLP borrowers to be able to obtain FSA's Marketing Assistance Loans and Farm Storage Facility Loans, but the CONACT prohibits delinquent FLP borrowers from obtaining direct operating loans. *See* 7 U.S.C. § 2008h(a).

### Necessity of Implementing § 1005 to Remedy Lingering Effects of Past Discrimination

79.    As of February 11, 2022, FSA identified 18,519 Farm Loan Program direct loan accounts with 35,344 outstanding direct loans eligible for Section 1005 payments. The total unpaid principal and interest on these loans outstanding as of January 1, 2021, was $2,924,512,191.  This amount is separate from the 3,922 outstanding eligible guaranteed loans, some of which may be held by some of the same individuals.

80.    As of February 9, 2022, FSA identified 385 eligible Farm Storage Facility Loan accounts with 517 outstanding direct eligible loans. The total unpaid principal and interest on these loans outstanding as of January 1, 2021, was $29,049,632.

81.    Based on currently available information, USDA estimates that the loans covered by the May 2021 NOFA comprise 84% of the total number of ARPA-eligible accounts and 63% of the total dollar amount of projected payments that will be made to eligible accounts once Section 1005 is fully implemented.

82.    Direct financial assistance to these recipients is necessary to assist in remedying some of the persistent effects of past USDA discrimination which cannot be remedied by race-neutral programs alone.

83.    Experience with MFP and CFAP indicates that race-neutral programs do not always reach minority farmers equitably. Reopening programs like CFAP is not always possible, and does nothing to improve position of those people who are ineligible for the program based on its criteria. Direct payment improves both repayment ability and equity in available security, making it easier for

recipients to receive loans. This will increase trust in USDA, and thereby enhance participation in future programs.

84.     Reports on reasons for rejections reflect that for Black applicants, the most common reason for loan rejection was unacceptable credit history in recent years, whereas for White and other applicants, the primary reason for denial was their operating plan did not cash flow. A direct impact of past discrimination may be long term impact on credit history which would not be remedied by reopening more loan programs, as it will take time to establish an acceptable credit history.

85.     Direct financial assistance through debt payment frees up funds for expansion of operations that many socially disadvantaged farmers could not achieve in prior years, helps increase equity position and operating capital, and provides a realistic opportunity to graduate to commercial credit sources in the near future.

86.     Separately, § 1005 signals that the agency intends to help minority farmers recover from the financial effects of past discrimination, showing a level of commitment from USDA to work with minority farmers and ranchers, establishing a base of trust that FSA can continue to build into beneficial relationships with these customers. This would allow FSA to better assist all its borrowers to get to the position where they can graduate to commercial credit.

87.     USDA's implementation of § 1005 takes these considerations into account and is specifically designed to achieve the goal of increasing participation by minority communities in other USDA programs by rebuilding trust between minority communities and the agency.

88.     For example, more minority farmers came forward to update their data with FSA, indicating that these borrowers felt more comfortable reporting their race and ethnicity to the FSA. FSA officers have reported that some borrowers admitted that they had not previously reported, or accurately reported, their race and ethnicity in the past due to concerns that they would not be treated fairly by FSA.

89.     Listening tour sessions USDA conducted after the passage of § 1005 also confirm that community organizations and minority farmers saw § 1005 payments as aid that would help rebuild trust between USDA and minority communities. Community members noted the difficulty for

farmers of color to acquire land, get access to funding and loans, and to get the necessary capital to get off the ground, which has historically been made harder by the USDA. Community members were encouraged by the passage of Section 1005 as a necessary first step representing an attempt by USDA and Congress to address the disproportionate impact of the debt burden that farmers of color face because of historic discrimination in agricultural credit. And community organizations looked forward to working with FSA to translate the programs envisioned in Section 1006 into reality. These groups expressed to FSA that the debt relief payments under Section 1005 were seen as a necessary reset financially for the farmers and also of their relationship with USDA, but minority farmers and ranchers had been made promises by USDA before and felt that USDA has not held up to their end of the bargain. A failure to implement this program will only further the eroded trust between the USDA and socially disadvantaged communities and be one more broken promise to these communities.

90.     Based on my extensive experience with farm loan programs, I anticipate that implementing § 1005 would prove uniquely effective in enabling USDA to extend the reach of its other financial programs. As noted above, making a payment would give individuals a sense that FSA is acknowledging past issues and demonstrate that FSA is committed to working with minority communities. This, in turn, would make minority farmers more likely to engage with FSA in the future.

91.     Conversely, further delay in ARPA payments would continue to create confusion and undermine trust in USDA. Delay in payments could also result in the foreclosure on the farms of the eligible recipients. African American, American Indian/Alaskan Native, Asian, Pacific Islander, and Hispanics accounted for 20-24% of foreclosures in Fiscal Year 17 through Fiscal Year 19 even though they only accounted for 9-10% of the direct borrowers in the loan portfolio. While FSA has suspended acceleration and foreclosure on direct loans due to COVID-19, FSA cannot prevent other lenders from pursuing foreclosure action. Third party foreclosure accounted for 40-65% of the foreclosure on FSA borrowers during Fiscal Years 2016 through 2020.

92.     Delays in Section 1005 payments will also suspend the closing of new FSA loans to ARPA-eligible borrowers when loan limits will be exceeded if Section 1005 payment are not made, and may limit the borrower's ability to make scheduled payments on ARPA-eligible loans.

93.    The cost of extending the Section 1005 program to include all non-Hispanic white farmers is estimated to cost approximately $36 billion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: _____March 11, 2022_____

WILLIAM COBB    Digitally signed by WILLIAM COBB
Date: 2022.03.11 08:57:46 -05'00'

_____

William D. Cobb

29